53,83505

## IN THE TEXAS COURT OF CRIMINAL APPEALS
### AT AUSTIN, TEXAS

EX PARTE §
§
§ WR-53,835-05
§
§
CARL MATTHEW BELLOTTI, III §

This document contains some
pages that are of poor quality
at the time of imaging.

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 1 1 2015

Abel Acosta, Clerk

# N O T I C E
## in re the Official *Reporter's* Record

Philip W. "Phil" Moore, Petitioner *Pro $e*
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

## IN THE TEXAS COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

EX PARTE § 
§ 
§                                                  WR-53,835-05
§ 
CARL MATTHEW BELLOTTI, III    §


# N O T I C E
## in re the Official *Reporter's* Record


Philip W. "Phil" Moore, Petitioner *Pro Se*
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

# FOREWORD

TO BE CLEAR,

**A *FRAUD* has been perpetrated upon this Honorable Court**

in the case at bar by Jefferson County officialdom's not-so-veiled insistence upon depriving our Texas Court of Criminal Appeals of the Official Court Reporter's **(trial)** Record despite the **Strickland** Court's mandate(s) that

> ". . .a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance *must* identify the acts or omissions of counsel **[shown in the Official *Reporter's* (trial) Record]** that are alleged not to have been the result of reasonable professional judgment. The court *must* then determine whether, in light of all the circumstances, the *identified* **[in the Official *Reporter's* (trial) Record]** acts or omissions were outside the wide range of professionally competent assistance. . . ."

466 U.S. @ 690 (1984). *Indeed,* at least according to the State's Attorney who filed the State's *Original* Answer pleading(s) in the case at bar — "Rubber Stamped" by the habeas court below that very next morning — anyway,

> ". . .the Official *Reporter's* **(trial)** Record is *Off Limits on Habeas Corpus!!?"*

See, *inter alia,* pp. 2-3, infra.

-i-

*Indeed,*

> "...in a case such as this, where the alleged derelictions primarily are errors of *omission* de hors the record rather than *commission* revealed **in the trial record**, collateral attack may be just the vehicle by which a thorough and detailed examination of alleged ineffectiveness [and/or Prosecutorial Misconduct] may be spread upon a record [IN OPEN COURT for all to see]." *[emphasis in original/***emphasis ADDed***]*

**Ex parte Duffy**, No. 64863, 607 S.W.2d 507, 513 (Tex. Crim. App. – *En Banc* – 10/01/1980) (the Most Honorable Samuel Houston "Sam" Clinton, Judge, writing for the Court), *Rehearing Denied* (11/26/1980) **and cases cited therein.**

...and that "...thorough and detailed examination of alleged ineffectiveness [and/ or Prosecutorial Misconduct] ...spread upon a record [IN OPEN COURT for all to see]" is *exactly* what the State and its licentious lackies don't want to see happen here and are so very determined to prevent that they have even had the unmitigated gall to perpetrate (or at least attempt to perpetuate) a fraud upon our Texas Court of Criminal Appeals in their not-so-veiled "C.Y.A." attempt(s) to protect the reputation(s) of their so-called "Brothers (and Sisters) of the Bar" — each of whom so proudly style themselves "Officers of the Court(s)" but all-too-often act as though they are **above** the Law.

...and you wonder why so many of our incarcerated citizens — each of whom is nonetheless a human being deserving of that pseudo-aspirational thing known as Due Process (and/or Due Course) of Law — often lament that

**"This isn't justice — it's Just U$!!?"**

...and, as stated at page ten (10), infra, *right now* is the time for this Honorable Court to set its jaw(s) squarely against the kind(s) of guile and chicanery foisted upon Carl Matthew Bellotti, III *ab initio* and, in the process, prevent The Great Writ of Habeas Corpus from being "suspended" in contravention of Federal and State constitutional law.

# ERRORES SCRIBENTIS NOCERE NON DEBENT

-ii-

## IN THE TEXAS COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

EX PARTE                        §
                                §
                                §                    WR-53,835-05
                                §
CARL MATTHEW BELLOTTI, III      §


# N O T I C E
## in re the Official *Reporter's* Record


TO THE HONORABLE JUDGES of said court:

COMES NOW CARL MATTHEW BELLOTTI, III, APPLICANT *Pro $e*[1] in the above-styled and numbered cause, by and through Philip W. "Phil" Moore, who presents this his **NOTICE in re the Official *Reporter's* Record** pleading(s) in the above-styled and numbered cause in accordance with, *inter alia,* Article 11.12 **(Who May Present Petition)**[2] of our Texas Code of Criminal Procedure and its "Hornbook Law" progenies and who, in support thereof, would respectfully show this Honorable Court the following:

## I
## PROCEDURAL BACKGROUND

---

[1]    ALL *"emphasi$"* belongs to this writer unless otherwise indicated.

[2]    Either the party for whom the relief is intended, **or any *person* "for" him**, may present a petition to the proper authority for the purpose of obtaining relief.

Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.

- 1 -

In the interest(s) of brevity, Applicant has raised two (2) Grounds for Relief in the habeas pleading(s) filed on his behalf on Monday, February 9th, 2015 — ineffective "assistance" of trial counsel (a/k/a IAC) based primarily on "trial" counsel's failure(s) to so much as attempt to impugn the testimony of the State's "Star" Witnesses identified infra and Prosecutorial Misconduct based primarily upon the State's *knowing and intentional* subornation of perjured testimony (viz, Inconsistent Statements as defined by V.T.C.A., Texas *Penal* Code §37.06) on the part of its two (2) "Star" Witnesses, Groves Police Department Sergeant Kevin Russell White and a Lay Witness by the name of Aelisa Faye Sanders.

...and despite *prima facie* evidence in support of Applicant's allegations and lengthy *verbatim* quotations from the **Strickland** Court's two-pronged test now required for analysis of such IAC allegations,[3] the habeas court below has entered its so-called Findings of Fact and Conclusions of Law asserting that

> "...[A]pplicant has failed to meet his twin-burden of production and persuasion for establishing his IAC claim, as required under **Strickland v. Washington**, 466 U.S. 668, 687-688 (1984), by a preponderance of the evidence . . .."

"...FINDINGS, CONCLUSIONS . . ." @ p. 5. Worse yet, the habeas court below has ordered the Jefferson County District Clerk's Office to immediately forward to this Honorable Court

> "...[t]he *[C]lerk's* [R]ecord in ...[Cause] No. 09-072[83] . . .,"

ID. @ p. 6 (4), rather obviously intent upon compelling this Honorable Court to reach the merits vel non of the case at bar *without benefit of the Official **Reporter's (trial) Record!?***

. . .and then **most alarmingly**, when this writer placed a telephone call to

---

[3]    See MEMORANDUM @ pp. 17-19.

- 2 -

Deborah Ann (Ann) Manes — the Assistant Jefferson County District Attorney who filed the State's *Original* Answer pleading(s) in the case at bar — to question her about the habeas court's exclusion of the Official *Reporter's* (trial) Record from its so-called "Transmittal" Order, Ann Manes actually had the unmitigated gall to respond that

> "...the Official *Reporter's* (trial) Record is *Off Limits on Habeas Corpus!!?"*

# *REDUCTIO AD ABSURDUM*

Even a cursory review of the **Strickland** Court's holding(s) reveals that

> "...a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance *must* identify the acts or omissions of counsel **[shown in the Official *Reporter's* (trial) Record]** that are alleged not to have been the result of reasonable professional judgment. The court **must** then determine whether, in light of all the circumstances, the *identified* **[in the Official *Reporter's* (trial) Record]** acts or omissions were outside the wide range of professionally competent assistance. ..."

**Strickland v. Washington,**[4] No. 82-1554, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 (Argued 01/10/1984 – Decided 03/14/1984) (JUSTICE Sandra Day O'CONNOR delivering the opinion of the Court).

QUERY: *HOW* ___ ___ ___ is this Honorable Court supposed to comply with the **Strickland** Court's "...*must* judge the reasonableness of counsel's challenged conduct [and/or, for that matter, the Prosecutorial Misconduct issue(s) intertwined

---

[4]     ...a true and correct copy of which — downloaded from the Internet @ Google Scholar — is attached hereto as Applicant's Exhibit **"A"** and included herein for the readers' perusal.

- 3 -

therewith] on the facts of [this] particular case, *viewed at the time of counsel's [and/or the State's Attorneys'] conduct"* mandate(s) **without the Official Court Reporter's (trial) Record for crying out Loud!!!!?**

CLEAR*ly,*[5] if Jefferson County officialdom is allowed to place the Official *Reporter's* **(trial)** Record "Off Limits" in the case at bar, it will have been allowed to do so vis-a-vis the *Supreme* Law of the Land.

Just for starters,

> **"The Privilege of the Writ of Habeas shall** *not* **be suspended,**
> unless when in Cases of Rebellion or Invasion the public Safety
> may require it. "

Article I, Section 9 of our "United" States Constitution.[6]

> "The judicial Power of the United States shall be vested in
> one *[S]upreme* Court . . .,"

Article III, Section 1 of our "United" States Constitution, and *all* courts in these "United" States of America — including our Texas Court of Criminal Appeals — are "bound" by the decisions of our United States "Supreme" Court. Put another way,

> **". . .No State shall make or enforce** *any* **law which**
> **shall abridge the privileges or immunities of citizens of**

---

[5] For some definitions of the word *clearly,* see WEST'S LAW DICTIONARY, Ninth Edition (1990), West Publishing Co., St. Paul, Minnesota @ p. 267.

[6] . . .and **even in Texas**

> **"The writ of habeas corpus is a writ of right, and shall** *never*
> **be suspended.** The Legislature shall enact laws to render the remedy
> speedy and effectual. "

Article I [Bill of Rights], Section 12 (Habeas Corpus), effective (with the approval of Texas Proposition 13) on November 6th, 2007.

the United States; nor shall any State deprive *any* person of life, liberty, or property, without due process of law; nor deny to *any* person within its jurisdiction the equal protection of the laws."

Fourteenth (14th) Amendment to our "United" States Constitution — a/k/a the "Supremacy" Clause — adopted July 9th, 1868.[7]

. . .and, as stated at page three (3), ante, our United States "Supreme" Court has *already* decided that

> ". . .a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance *must* identify the acts or omissions of counsel **[shown in the Official *Reporter's* (trial) Record]** that are alleged not to have been the result of reasonable professional judgment. The court *must* then determine whether, in light of all the circumstances, the *identified* **[in the Official *Reporter's* (trial) Record]** acts or omissions were outside the wide range of professionally competent assistance. . . ."

**Strickland v. Washington,** *supra.* Accordingly, Deborah Ann (Ann) Manes' noxious *"Off Limits"* dirge should be sent packing to Davey Jones' Foot Locker to take its rightful place among the other *faulty and defective* merchandise which drummers representing the State have brought to the courts of Jefferson County, Texas (and elsewhere) to sell*!!?*

What is *really* "Off Limits" here is the kind(s) of guile and chicanery foisted upon the hard-working/ tax-paying/voting citizens of Jefferson County, Texas (and

---

[7] ". . .any *person* . . ." folks, including Carl Matthew Bellotti, III — his Judgment & Sentence in the case at bar notwithstanding*!!?*

- 5 -

elsewhere) by licentious lackies who have forgotten that it is their

> ". . .primary duty . . .not to convict, but to see that justice is done. They shall not suppress facts **[including facts contained in the Official Court Reporter's (trial) Record]** nor secret witnesses capable of establishing the innocence of the accused **[or providing** *prima facie* **evidence of the Prosecutorial Misconduct and/or Ineffective Assistance of Counsel (IAC) issues hotly presented by Applicant,** *viewed as of the time of counsel's (and/or Prosecutors') conduct,* **as an aid to this Honorable Court in assessing the merits vel non of Applicant's** *habeas* **claim(s)]."**

V.A.C.C.P. Article 2.01 — Duties of District Attorneys. They rather obviously have *also* forgotten that all lawyers — each of whom so proudly style themselves "Officers of the Court(s)" but too often act as though they are **above** the Law — are responsible for the pleading(s) they submit to a tribunal in a(ny) given case and are forbidden to

> ". . .bring or defend a proceeding, **or assert or controvert an issue therein,** unless the lawyer *reasonably* believes that there is a basis for doing so that is not frivolous."[8]

Rule 3.01 (Meritorious Claims and Contentions) — TEXAS *DISCIPLINARY* RULES OF PROFESSIONAL CONDUCT — a/k/a *the* State Bar (of Texas) *Rules.* They have lost their Moral Compass and visited substantial (and substantive) violence upon not only Carl Matthew Bellotti, III but upon the entire Criminal "Justice" System of Jefferson County, Texas (and elsewhere) as well.

## II
## CONCLUSION

---

[8]     . . .and there is certainly nothing "reasonable" about Ann Manes' *"Off Limits"* noxious dirge — WHAT WAS SHE *THINKING?*

Sadly, the State has been given its chances to "come clean" but has chosen instead to perpetuate its Dog & Pony Show routine in a series of "C.Y.A." attempts to keep the hard-working/tax-paying/voting citizens of Jefferson County, Texas (and elsewhere) from finding out just how things *really* "work" in that Jefferson County Courthouse — all while attempting to shield their "Brothers (and Sisters) of the Bar" from the Eyes of Texas so-to-speak.

*Indeed,* on Thursday, January 27th, 2015, Petitioner [accompanied by Applicant's dearly-beloved eighty-four (84+)-year old ailing/Heart Patient/Pensioner father] met with the newly-elected District Attorney of Jefferson County, Texas (Bob Wortham) himself (Kimberly Ann "Kim" Hobbs, Assistant District Attorney, was also present)[9] in an attempt to provide Jefferson County officialdom with an opportunity to "take care of its *own* business" with a view towards avoiding the contentious litigation within which we now all find ourselves ensnared and presented Bob Wortham with a *complete* BOUND copy of the *entire* Official Court Reporter's (trial) Record in the above-styled and numbered cause — **BOTH TRIALS/all five (5) Volumes** — prepared by Summer Tanner (the Official Court Reporter in the case at bar) and paid for by Applicant's father, Carl S. Bellotti, Jr. long before these habeas proceedings commenced.

BUT all Bob Wortham seemed to want to talk about was having Petitioner file a "Bill of Review" pleading in the 252nd Judicial District Court of Jefferson County, Texas (Hon. Raquel West, Judge Presiding) seeking relief in the premises —

---

[9]    ...a meeting "arranged" by a telephone call to Mr. Wortham from the Honorable John Burch "Johnny" Stevens, Judge of the Criminal District Court (right next door to Judge West's courtroom) of Jefferson County, Texas — one of the most impressive (if not *the* most impressive) members of the Bench that this writer has ever encountered — urging him (Wortham) to meet with Petitioner in an attempt to avoid this Armageddon.

Mr. Wortham allocated two (2) hours for that meeting — it lasted for slightly more than one-and-a-half (1½) hours and resulted in little (if any) more than Mr. Wortham's *"Bill of Review"* ersatz.

*ostensibly,* relief would come "faster" that way*!?*

. . .*but* "that dog just won't hunt" so-to-speak — at least according to Randy Schaffer anyway,

> ". .**[a] Bill of Review is *only* applicable to CIVIL cases —** the Texas Code of Criminal Procedure *specifically* states that **the Texas Court of Criminal Appeals is the *only* Court that can grant or deny relief to an applicant in cases involving a final *felony* conviction. . . ."** *[emphasis in original]*

Petitioner's *January 28th, 2015* letter to Bob Wortham[10] @ p. 1, ¶ 3.

It is against this backdrop that the State's Attorney (Ann Manes) vicariously tarred Petitioner with having utilized mere "snippets" from the Official Court Reporter's **(trial)** Record in advancing Applicant's claims and then further stultified herself by asserting that

> ". . .[t]he snippets presented in Petitioner's memorandum (page 8 et seq.) are *not* presented in context, and without context the differences between the statements [made by Groves Police Department Kevin Russell White and a Lay Witness by the name of Aelisa Faye Sanders] cannot be ascertained to rise to the level of perjury. . . ."

State's *Original* Answer @ p. 2.

OKay, so we'll just let those duly-elected members of our Texas Court of Criminal Appeals peruse the *entire* Official Court Reporter's **(trial)** Record germane

---

[10]    . . .a true and correct copy of which is **attached** hereto as Applicant's Exhibit "A" and included herein for all purposes.

- 8 -

to the case at bar — **BOTH TRIALS/**all five (5) Volumes[11] — prepared by Summer Tanner (the Official Court Reporter) and paid for by Applicant's father, Carl S. Bellotti, Jr. long before these habeas proceedings commenced and let *those* "impartial triers of fact" decide who the "snippet" Shill is.

In any event, *right now* is the time for this Honorable Court to set its jaws(s) squarely against the kind(s) of guile and chicanery bitterly complained of by Applicant so that those licentious lackies will *all* discover that

## it ain't no fun when 'da Rabbit gots 'da gun!!?

### III
### PRAYER

WHEREFORE, PREMISES CONSIDERED, Applicant respectfully prays that this Honorable Court will O R D E R the habeas court below to ORDER the Official Court Reporter of the 252nd Judicial District Court of Jefferson County, Texas to provide this Honorable Court with a certified copy of said *trial* Record to enable this Honorable Court to comply with our United States "Supreme" Court's mandate(s) that

> ". . .a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance *must* identify the acts or omissions of counsel **[shown in the Official *Reporter's* (trial) Record]** that are alleged not

---

[11] . . .a true and correct copy of which will be hand-delivered to the Clerk of this Honorable Court (Abel Acosta) commensurate with the filing of this NOTICE pleading — *indeed,* true and correct copies of said Official Court Reporter's (trial) Record can (and will) be delivered electronically to each member of this Honorable Court upon request, but the rather voluminous nature of that Record (and this writer's limited financial resources) make electronic transmission of that Record the best (if not only) way to "make everybody happy" so-to-speak.

to have been the result of reasonable professional judgment. The court **must** then determine whether, in light of all the circumstances, the *identified* **[in the Official *Reporter's* (trial) Record]** acts or omissions that were outside the wide range of professionally competent assistance. . . . "

**Strickland v. Washington,** *supra.* In the alternative, this Honorable Court could (and probably should) rely upon the true and correct copy of the *entire* Official Court Reporter's **(trial)** Record — **BOTH TRIALS/**all five (5) Volumes[12] — being provided to this Honorable Court by Petitioner *at Petitioner's expense* to enable it to reach the merits vel non of Applicant's claims in the case at bar.

*CLEARly,*[13] because Applicant has alleged facts which, if true, would *surely* entitle him to the relief sought, the proper course of action is to

". . .remand this matter to the trial court for resolution of the factual issues presented in accordance with Article 11.07, § 3(d) of the [Texas] Code of Criminal Procedure."

**Ex parte Patterson,** No. 72,866, 993 S.W.2d 114, 115 (Tex. Crim. App. – 05/26/1999) (Holland, J., delivering the *unanimous* opinion of the Court).

". . .In these circumstances, *additional* facts are needed. As [this Honorable Court] held in **Ex parte Rodriguez,** 334 S.W.2d 294, 294 (Tex. Crim. App. 1960), the trial court is the appropriate forum for findings of fact. . . . "

**Ex parte Hinojosa,** WR-82,619-01 & WR-82,619-02 [ORDER @ p. 3] (Tex. Crim.

---

[12] . . .a true and correct copy of which will be hand-delivered to the Clerk of this Honorable Court (Abel Acosta) commensurate with the filing of this **NOTICE** pleading — *indeed,* true and correct copies of said Official Court Reporter's **(trial)** Record can (and will) be delivered electronically to each member of this Honorable Court upon request, but the rather voluminous nature of that Record (and this writer's limited financial resources) make electronic transmission of that Record the best (if not only) way to "make everybody happy" so-to-speak.

[13] *See* footnote five (5) @ p. 4, *ante.*

App. – *Per Curiam* – 02/25/2015)[14] (not designated for publication) *and* **cases cited therein**. At the very least, this Honorable Court should O R D E R the habeas court below to

> ". . .conduct a live [E]videntiary [H]earing [in this case], at
> which [Groves Police Department Sergeant Kevin Russell White,
> Aelisa Faye Sanders and *both* Prosecutors — Ernest Perry Thomas
> and Patrick W. (Pat) Knauth] shall be called to testify. . . ."

**Ex parte Contreras,**[15] WR-80,635-02 [ORDER @ p. 3] (Tex. Crim. App. – *Per Curiam* – February 4th, 2015) (not designated for publication) *and* **cases cited therein**.

## The Challenge is issued — the *Clarion* Call is made.

Respectfully submitted,

*[signature]*

Philip W. "Phil" Moore, Petitioner *Pro $e*

**IV**
**CERTIFICATE OF SERVICE**

I, Philip W. "Phil" Moore, Petitioner in the above-styled and numbered cause and the Amicus Curiae "person" alluded to throughout pleadings filed in the case at bar, hereby certify that the original and ten (10) true and correct copies of these **NOTICE in re the Official Reporter's Record** pleading(s) have been served upon the members of this Honorable Court by hand-delivering them as follows:

---

[14] Can't get much more "current" than *that!?*

[15] Relief was *finally* GRANTED on February 25th, 2015 because "the truth, the whole truth and nothing but the truth" was *finally* allowed to prevail*!!!?*

- 11 -

Hon. Abel Acosta, Clerk
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, Room 106
P.O. Box 12308
Austin, Texas 78711-2308
Phone: (512) 463-1551
FAX: 512/463-7061
e-mail: a.acosta@courts.state.tx.us

Date: _03/11/2015_ ATTEST:_____
      month/day/year            Philip W. "Phil" Moore, Petitioner *Pro $e*

I further certify that — as soon as I can get to the Post Office from the Supreme Court Building where the Court of Criminal Appeals is located — three (3) true and correct **date-stamped** *"FILED . . ."* copies of these **NOTICE in re the Official Reporter's Record** pleadings will be served upon the below named individual(s)[16] by placing the same in the United States Mail, First Class postage pre-paid, as follows:

Debbie Folse, Deputy District Clerk[17]
Felony Criminal Section
Jefferson County District Clerk's Office
Jefferson County Courthouse
1085 Pearl Street, Room 203
Beaumont, Texas 77701-3545
Phone: (409) 835-8580
FAX: 409/835-8527
e-mail: dfolse@co.jefferson.tx.us
------------------------------------------------
CERTIFIED MAIL
Article No. 7014 1200 0001 0065 9563
RETURN RECEIPT REQUESTED

---

[16] . . .with one (1) copy each being intended for the records and files of the Jefferson County District Clerk's Office, Hon. Raquel West, Judge Presiding of the 252nd Judicial District Court of Jefferson County, Texas and the State's Attorney, Deborah Ann (Ann) Manes.

[17] . . .and Petitioner hereby *once again* seizes upon the opportunity to laud Debbie Folse and the girls in that office (including Hope) for their style, aplomb and professionalism in their dealing(s) with this writer in the premises by calling this Honorable Court's attention to a *much-welcomed, needed and appreciated* asset of the Criminal "Justice" System there in Jefferson County, Texas. LUKE 12: 2-3.

- 12 -

Date: 03/11/2015     ATTEST: _Philip W. Moore_
month/day/year          Philip W. "Phil" Moore, Petitioner *Pro $e*

# ADDENDUM

## THE
## po$tage & return
## RECEIPTS



EXHIBITS



**Philip W. "Phil" Moore**                    Phone: (512) 667-1508

P.O. Box 19471 ♦ Austin, Texas 78760-9471          e-mail: pwm11.07@gmail.com


Wednesday, January 28th, 2015


Hon. Bob Wortham, District Attorney
Jefferson County District Attorney's Office
1085 Pearl Street, Suite 300
Beaumont, Texas 77701-3545


in re Ex parte Carl Matthew Bellotti, III, No. 09-07283-A:
AN UNCOMMON PLEA from an all-too-common *victim!*


Dear Mr. Wortham,

First, mere words cannot possibly express my gratitude to you and a certain Kimberly Ann "Kim" Hobbs for graciously allowing me and Carl's 84-year-old father (Carl S. Bellotti, Jr.) so much of y'alls valuable time yesterday morning in your office to share our thoughts about the above-styled and numbered cause.

All of that said, **and all of that *is* said**, it has come to my attention that your "Bill of Review" thoughts are misplaced.

According to Randy Schaffer, one of the best (if not *the* Best) Criminal "Defense" Lawyers in these United States of America,[1]

> "...[a] Bill of Review is *only* applicable to CIVIL cases — the Texas Code of Criminal Procedure *specifically* states that **the Texas Court of Criminal Appeals is the *only* Court that can grant or deny relief to an applicant in cases involving a final *felony* conviction. ...**"

I was a little bit embarrassed actually — I know Randy has one of the best Criminal Law minds *ever* and I didn't want to stultify myself before him by asking dumb questions; however, with so much at risk, I "made that call" anyway.

---

[1]    See the **attached** printout of Randy's web site downloaded this date from the Internet.

. . .and, mirabile dictu, Randy returned my call @ 5:11PM and provided me with the above-quoted input.

. . .and then I reviewed the relevant statute:

> ". . .Upon reviewing the record the [C]ourt [of Criminal Appeals] shall enter its judgment remanding the applicant to custody or ordering his release, *as the law and the facts may justify*. . . ." [emphasis added]

V.A.C.C.P. Article 11.07, Section 5 — PROCEDURE AFTER CONVICTION WITHOUT DEATH PENALTY.

SO in cases involving a final *felony* conviction, it is apparent that *only* the **Texas Court of Criminal Appeals** — and *not* the "convicting" Court — **may grant or deny the relief sought**.

We will *not* be seeking relief from Raquel West via a "Bill of Review" pleading; instead, we will be seeking relief from the Texas Court of Criminal Appeals via The Great Writ of Habeas Corpus in accordance with Article 11.07 of our Texas Code of Criminal Procedure and its "Hornbook Law" progeny which, under the circumstances present here,

> ". . .where the alleged derelictions primarily are errors of *omission* de hors the record rather than *commission* revealed in the 'trial' record, **collateral attack may be just the vehicle by which a *thorough and detailed* examination of alleged ineffectiveness [*and Prosecutorial Misconduct et al*] may be developed and spread upon a record**." *[emphasis in original/emphasis added]*

**Ex parte Duffy**, No. 64863, 607 S.W.2d 507, 513 (Tex. Crim. App. – *En Banc* – 10/01/1980) (the Most Honorable Sam Houston Clinton, Judge, writing for the Court), *Rehearing Denied* (11/26/1980) *and* **cases cited therein.**

◆      ◆      ◆

. . .and I *still* expect a certain Ernest Perry Thomas to be held accountable for his **patently ignominious** Subornation of Perjury in the premises!!?

. . .and you can tell him *I* said 'dat.

Respectfully submitted,

Philip W. "Phil" Moore

PWM/pwm

Enclosure

cc.   Kimberly Ann "Kim" Hobbs, Asst. D.A.
Jefferson County District Attorney's Office
1085 Pearl Street, Suite 300
Beaumont, Texas 77701-3545
Phone: (409) 835-8550
e-mail: khobbs@co.jefferson.tx.us

file(s)

# the
# COVER
# letter(s)

## Philip W. "Phil" Moore

15623 Fagerquist Road ♦ Del Valle, Texas 78617-5800          e-mail: pwm11.07@gmail.com

Wednesday, March 11th, 2015

Hon. Sharon Faye Keller, Presiding Judge
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, Room 106
P.O. Box 12308
Austin, Texas 78711-2308

### in re Ex parte Carl Matthew Bellotti, III, No. WR-53,835-05: AN UNCOMMON PLEA — from an all-too-common *victim!*

Your Honor,

Just for starters, **this is *not* a prohibited Ex Parte communication** because this letter is being shared with not only all of the parties to the above-styled and numbered cause but each of your fellow Jurists on the Texas Court of Criminal Appeals as well.

TO BE CLEAR, the unusual step of filing pleadings directly in the Texas Court of Criminal Appeals — and communicating directly with each sitting Member of the Court — is being taken because

### A FRAUD has been perpetrated upon this Honorable Court

in the above-styled and numbered cause by Jefferson County officialdom's not-so-veiled insistence upon depriving our Texas Court of Criminal Appeals of the Official Court Reporter's **(trial)** Record despite the **Strickland** Court's mandate(s) that

> ". . .a court [including our Texas Court of Criminal Appeals] deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct. . . ."* [emphasis **in original**]

- 1 -

"NOTICE . . ." pleading(s) @ p. i — FOREWORD. *Indeed,* at least according to the State's Attorney who filed the State's *Original* Answer pleading(s) in the case at bar ("Rubber Stamped" by the habeas court below that very next morning) anyway,

> ". . .the Official *Reporter's* (trial) Record is *Off Limits* on *Habeas Corpus*‼?"

I*D.*

While it is true that literally everything I know about the criminal law(s) of this Great State of Texas could easily be written upon a cigarette butt with a crayola, what I *do* know is that Jefferson County officialdom has adopted a **"Record"** position in this Bellotti case which — if allowed to go unchecked — would do **substantial** *(and substantive)* violence to our Court of Criminal Appeals' ability to follow the above-quoted mandate(s) of the **Strickland** Court in assessing the merits vel non of litigants' Ineffective Assistance of Counsel (IAC) claims, all while allowing the State and its licentious lackies to escape scrutiny for committing and/or suborning *Aggravated* **Perjury** (a/k/a *Inconsistent* Statements) from the "Witness" Stand in violation of a cornucopia of "Hornbook Law" jurisprudence, including the fact that time has not eroded the force of Justice Sutherland's thoughtful remarks when he wrote for the Court that

> ". . .[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by *[effective]* counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of the law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel **at *every* step in the proceedings against him**. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by [or appointed to represent him] and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing and, therefore, [D]ue [P]rocess [of Law] in the constitutional sense." *[emphasis added]*

-2-

**Powell v. Alabama**, Nos. 98, 99 & 100, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (Argued 10/10/1932 – Decided 11/07/1932) (MR. JUSTICE Thomas SUTHERLAND delivering the opinion of *the Court*); cf., **United States v. Cronic**, No. 82-660, 466 U.S. 648, 654 @ fn. 8, 104 S.Ct. 2039, 80 L.Ed.2d 657 (Argued 01/10/1984 – Decided 05/ 14/1984) (MR. JUSTICE John Paul STEVENS delivering the opinion of *the Court*) *and* **cases cited therein**.

In this **Bellotti** case, as eloquently stated by Mr. Justice Stevens,

> "...[Applicant] can ...make out a claim of ineffective assistance [of counsel and/or Prosecutorial Misconduct] **only by pointing to specific errors made by 'trial' counsel [and/or specific instances of Prosecutorial Misconduct,"** *[emphasis* added]

**Cronic**, *supra*, 466 U.S. @ 666, and Jefferson County officialdom *knows* that **the only place where those counsel errors and/or those instances of Prosecutorial Misconduct can be identified**, *viewed at the time of those errors/that Prosecutorial Misconduct,* **is in the Official Court Reporter's** *trial* **Record**.

*THEY KNOW* those two (2) "Star" Witnesses committed *"Aggravated* Perjury" as defined by Texas *Penal* Code §37.06 — **Inconsistent** Statements.

*THEY KNOW* a certain Ernest Perry Thomas[1] *knowingly and intentionally* **suborned** *Aggravated* **Perjury** on the part of the State's two (2) "Star" Witnesses — Groves Police Department Sergeant Kevin Russell White and a Lay Witness by the name of Aelisa Faye Sanders.

...and *THEY KNOW* that

> "...[t]he State is not allowed to obtain a 'conviction' through the use of perjured testimony [or other false evidence]. **Napue v. Illinois**, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. Furthermore, **reversal** *must* **follow** if the prosecutor presents a false picture of the facts by failing to correct its own testimony *when it first becomes apparent that it was false.* **Napue v. Illinois,** *supra*; **Means v. State**, 429 S.W.2d 490, Tex. Crim. App. [1968]. ..." *[emphasis in original]*

MEMORANDUM pleading(s) @ p. 12.

---

[1]     ...with a certain Patrick W. "Pat" Knauth witting right there beside him ...

. . .and that is *exactly* why those licentious lackies there in good 'ol Jefferson County, Texas don't want Applicant to be able to utilize the Official Court Reporter's (trial) Record to provide our Texas Court of Criminal Appeals with *prima facie* evidence in support of his habeas claims

> ". . .and are so very determined to prevent [Applicant from doing *precisely* that] that they have even had the unmitigated gall to perpetrate (or at least attempt to perpetuate) a fraud upon our Texas Court of Criminal Appeals in their not-so-veiled "C.Y.A." attempt(s) to protect the reputation(s) of their so-called "Brothers (and Sisters) of the Bar" — each of whom so proudly style themselves "Officers of the Court(s)" but all-too-often act as though they are **above** the Law." [emphasis in original]

"NOTICE . . ." pleading(s) @ p. ii.,
> . . .and it's got to stop *NOW!!!*

. . .and failure(s) of you and your fellow Jurists to do *exactly* that in this case would at least tend to undermine Public confidence in our judiciary — this one isn't gonna go away, Your Honor: *BELIEVE* THAT*!!*

◆     ◆     ◆

I would be easy enough for me to just go about my *own* Rat Killing and leave Carl Matthew Bellotti, III and/or his dearly-beloved eighty-four (84+)-year-old ailing/Heart Patient/Pensioner father to their own devices,

> *But* I have promises to keep,
> And miles to go before I sleep,
> And miles to go before I sleep.

Robert Frost, *Stopping By Woods on a Snowy Evening* (1923).

To say that I "anxiously" await the Court's response to these onerous habeas efforts would be a *classic* understatement indeed.

Respectfully submitted,

Philip W. "Phil" Moore, Petitioner *Pro Se*

- 4 -

PWM/*pwm*

cc.   Hon. Lawrence E. Meyers, Judge

       Hon. Robert C. "Bert" Richardson, Judge

       Hon. Kevin Patrick Yeary, Judge

       Hon. Cheryl Johnson, Judge

       Hon. Michael E. "Mike" Keasler, Judge

       Hon. Barbara Parker Hervey, Judge
       Hon. Elsa R. Alcala, Judge

       Hon. David Christopher Newell, Judge

       Debbie Folse, Deputy District Clerk
           Felony Criminal Section
       Jefferson County District Clerk's Office

       Hon. Raquel West, Judge Presiding
       252nd Judicial District Court
        of Jefferson County, Texas

       Deborah Ann (Ann) Manes, Asst. Dist. Attn.
       Jefferson County District Attorney's Office

       s e v e r a l  others

       file(s)   *Abel Acosta, Clerk*

# Philip W. "Phil" Moore

**Phone: (512) 667-1508**

15623 Fagerquist Road ♦ Del Valle, Texas 78617-5800          e-mail: pwm11.07@gmail.com

Wednesday, March 11th, 2015

Debbie Folse, Deputy Clerk
Jefferson County District Clerk's Office
Jefferson County Courthouse, Room 203
1085 Pearl Street
Beaumont, Texas 77701-3545

> **in re Ex parte Carl Matthew Bellotti, III, No. WR-53,835-05:**
> **AN UNCOMMON PLEA — from an all-too-common victim!**

Dear Debbie,

Please find enclosed three (3) true and correct **date-stamped** *"FILED . . ."* (in the Court of Criminal Appeals) copies[1] of my **NOTICE** in re the Official *Reporter's Record*[2] pleading(s) in the above-styled and numbered cause.

---

[1]      . . .one copy being intended for the records and files of the Jefferson County District Clerk's Office with one (1) copy **each** provided for Judge West and for the State's Postconviction Attorney, Deborah Ann (Ann) Manes.

[2]      . . .the **five *(5)* volume** Record which Deborah Ann (Ann) Manes stated to me was *"Off Limits"* in *habeas cases* despite the **Strickland** Court's mandate(s) that

> ". . .a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.* A convicted defendant making a claim of ineffective assistance *must* identify the acts or omissions of counsel **[shown in the Official *Reporter's* (trial) Record]** that are alleged not to have been the result of reasonable professional judgment. The court *must* then determine whether, in light of all the circumstances, the *identified* **[in the Official *Reporter's* (trial) Record]** acts or omissions were outside the wide range of professionally competent assistance. . . ."

*Id.*, 466 U.S. 668, 690 (1984).

- 1 -

. . .and allow me to *once again* thank you **(and all of the girls there in your office – including Hope)** for y'alls style, aplomb and professionalism in your dealing(s) with me in the premises!

". . .and miles to go before I sleep, and miles to go before I sleep."

Respectfully submitted,

*Philip W. Moore*

Philip W. "Phil" Moore

PWM/*pwm*

Enclosures

cc.  Carl Matthew Bellotti, III, 1755639
East Texas Treatment Facility
P.O. Box 8000
Henderson, Texas 75653-8000

Carl S. Bellotti, Jr.
2122 Merriman Street
Port Neches, Texas 77651-3728
Phone: (409) 626-4542

Hon. Abel Acosta, Clerk
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, Room 106
P.O. Box 12308
Austin, Texas 78711-2308
Phone: (512) 936-1620
FAX: 512/463-7061
e-mail: a.acosta@courts.state.tx.us

s e v e r a l   others

file(s)

**Philip W. "Phil" Moore**                    Phone: (512) 667-1508
15623 Fagerquist Road ♦ Del Valle, Texas 78617-5800      e-mail: pwm11.07@gmail.com

Wednesday, March 11th, 2015

Hon. Sharon Faye Keller, Presiding Judge
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, Room 106
P.O. Box 12308
Austin, Texas 78711-2308

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 11 2015

Abel Acosta, Clerk

### in re Ex parte Carl Matthew Bellotti, III, No. WR-53,835-05: AN UNCOMMON PLEA — from an all-too-common *victim!*

Your Honor,

Just for starters, **this is *not* a prohibited Ex Parte communication** because this letter is being shared with not only all of the parties to the above-styled and numbered cause but each of your fellow Jurists on the Texas Court of Criminal Appeals as well.

TO BE CLEAR, the unusual step of filing pleadings directly in the Texas Court of Criminal Appeals — and communicating directly with each sitting Member of the Court — is being taken because

### A FRAUD has been perpetrated upon this Honorable Court

in the above-styled and numbered cause by Jefferson County officialdom's not-so-veiled insistence upon depriving our Texas Court of Criminal Appeals of the Official Court Reporter's (trial) Record despite the **Strickland** Court's mandate(s) that

> ". . .a court [including our Texas Court of Criminal Appeals] deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct. . . ."* [*emphasis* in *original*]

- 1 -

"NOTICE . . ." pleading(s) @ p. i — FOREWORD. *Indeed,* at least according to the State's Attorney who filed the State's *Original* Answer pleading(s) in the case at bar ("Rubber Stamped" by the habeas court below that very next morning) anyway,

> ". . .the Official *Reporter's* (trial) Record is *Off Limits on Habeas Corpus!!?"*

ID.

While it is true that literally everything I know about the criminal law(s) of this Great State of Texas could easily be written upon a cigarette butt with a crayola, what I *do* know is that Jefferson County officialdom has adopted a **"Record"** position in this Bellotti case which — if allowed to go unchecked — would do **substantial** *(and substantive)* violence to our Court of Criminal Appeals' ability to follow the above-quoted mandate(s) of the **Strickland** Court in assessing the merits vel non of litigants' Ineffective Assistance of Counsel (IAC) claims, all while allowing the State and its licentious lackies to escape scrutiny for committing and/or suborning *Aggravated* **Perjury** (a/k/a *Inconsistent* Statements) from the "Witness" Stand in violation of a cornucopia of "Hornbook Law" jurisprudence, including the fact that time has not eroded the force of Justice Sutherland's thoughtful remarks when he wrote for the Court that

> ". . .[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by *[effective]* counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of the law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel **at *every* step in the proceedings against him.** Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by [or appointed to represent him] and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing and, therefore, [D]ue [P]rocess [of Law] in the constitutional sense." *[emphasis added]*

- 2 -

**Powell v. Alabama**, Nos. 98, 99 & 100, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (Argued 10/10/1932 – Decided 11/07/1932) (MR. JUSTICE Thomas SUTHERLAND delivering the opinion of *the Court*); cf., **United States v. Cronic**, No. 82-660, 466 U.S. 648, 654 @ fn. 8, 104 S.Ct. 2039, 80 L.Ed.2d 657 (Argued 01/10/1984 – Decided 05/ 14/1984) (MR. JUSTICE John Paul STEVENS delivering the opinion of *the Court*) *and* **cases cited therein**.

In this **Bellotti** case, as eloquently stated by Mr. Justice Stevens,

> "...[Applicant] can...make out a claim of ineffective assistance [of counsel and/or Prosecutorial Misconduct] **only by pointing to specific errors made by 'trial' counsel [and/or specific instances of Prosecutorial Misconduct,"** *[emphasis added]*

**Cronic**, *supra*, 466 U.S. @ 666, and Jefferson County officialdom *knows* that **the only place where those counsel errors and/or those instances of Prosecutorial Misconduct can be identified,** *viewed at the time of those errors/that Prosecutorial Misconduct,* **is in the Official Court Reporter's** *trial* **Record**.

*THEY KNOW* those two (2) "Star" Witnesses committed *"Aggravated* Perjury*"* as defined by Texas *Penal* Code §37.06 — *Inconsistent* Statements.

*THEY KNOW* a certain Ernest Perry Thomas[1] *knowingly and intentionally* suborned *Aggravated* **Perjury** on the part of the State's two (2) "Star" Witnesses — Groves Police Department Sergeant Kevin Russell White and a Lay Witness by the name of Aelisa Faye Sanders.

...and *THEY KNOW* that

> "...[t]he State is not allowed to obtain a 'conviction' through the use of perjured testimony [or other false evidence]. **Napue v. Illinois**, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. Further-more, **reversal** *must* **follow** if the prosecutor presents a false picture of the facts by failing to correct its own testimony *when it first becomes apparent that it was false.* **Napue v. Illinois**, *supra*; **Means v. State**, 429 S.W.2d 490, Tex. Crim. App. [1968]. ..." *[emphasis in original]*

MEMORANDUM pleading(s) @ p. 12.

---

[1]       ...with a certain Patrick W. "Pat" Knauth witting right there beside him . . .

. . .and that is *exactly* why those licentious lackies there in good 'ol Jefferson County, Texas don't want Applicant to be able to utilize the Official Court Reporter's **(trial)** Record to provide our Texas Court of Criminal Appeals with *prima facie* evidence in support of his habeas claims

> ". . .and are so very determined to prevent [Applicant from doing *precisely* that] that they have even had the unmitigated gall to perpetrate (or at least attempt to perpetuate) a fraud upon our Texas Court of Criminal Appeals in their not-so-veiled "C.Y.A." attempt(s) to protect the reputation(s) of their so-called "Brothers (and Sisters) of the Bar" — each of whom so proudly style themselves "Officers of the Court(s)" but all-too-often act as though they are **above** the Law." **[emphasis in original]**

"NOTICE . . ." pleading(s) @ p. ii.,
> . . .and it's got to stop *NOW!!!*

. . .and failure(s) of you and your fellow Jurists to do *exactly* that in this case would at least tend to undermine Public confidence in our judiciary — this one isn't gonna go away, Your Honor: *BELIEVE* THAT*!!*

◆　　　◆　　　◆

I would be easy enough for me to just go about my *own* Rat Killing and leave Carl Matthew Bellotti, III and/or his dearly-beloved eighty-four (84+)-year-old ailing/Heart Patient/Pensioner father to their own devices,

> *But* I have promises to keep,
> And miles to go before I sleep,
> And miles to go before I sleep.

Robert Frost, *Stopping By Woods on a Snowy Evening* (1923).

To say that I "anxiously" await the Court's response to these onerous habeas efforts would be a *classic* understatement indeed.

Respectfully submitted,

*Philip W. Moore*

Philip W. "Phil" Moore, Petitioner *Pro Se*

- 4 -

PWM/pwm

cc.  Hon. Lawrence E. Meyers, Judge

Hon. Robert C. "Bert" Richardson, Judge

Hon. Kevin Patrick Yeary, Judge

Hon. Cheryl Johnson, Judge

Hon. Michael E. "Mike" Keasler, Judge

Hon. Barbara Parker Hervey, Judge
Hon. Elsa R. Alcala, Judge

Hon. David Christopher Newell, Judge

Debbie Folse, Deputy District Clerk
        Felony Criminal Section
Jefferson County District Clerk's Office

Hon. Raquel West, Judge Presiding
252nd Judicial District Court
 of Jefferson County, Texas

Deborah Ann (Ann) Manes, Asst. Dist. Attn.
Jefferson County District Attorney's Office

s e v e r a l   others

file(s)

THE STATE OF TEXAS      §     IN THE DISTRICT COURT OF

                                  §

VS.                            §     JEFFERSON COUNTY, TEXAS

                                    §

CARL MATTHEW BELLOTTI, III    §     [252ND JUDICIAL DISTRICT]

## REPORTER'S RECORD
## Volume 1 of 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## BOND HEARING
### August 26th, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 1 1 2015

Abel Acosta, Clerk

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

THE STATE OF TEXAS § IN THE DISTRICT COURT OF

§

§

VS. § JEFFERSON COUNTY, TEXAS

§

§

CARL MATTHEW BELLOTTI, III § [252ND JUDICIAL DISTRICT]


# REPORTER'S RECORD
## Volume 1 of 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# BOND HEARING
## August 26th, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

REPORTER'S RECORD

VOLUME 1 OF 1

TRIAL COURT CAUSE NO. 08-04604

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE 252ND DISTRICT |
| | * | |
| | * | |
| VS. | * | COURT OF |
| | * | |
| | * | |
| CARL MATTHEW BELLOTTI, | * | |
| III, AKA CARL MATHEW | * | |
| BELLOTTI, III AKA CARL | * | |
| MATHEW BELOTTI, III, AKA | * | |
| CARL MATTHEW BELLOTTI | * | JEFFERSON COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
BOND HEARING
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 26TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Layne Walker, Judge Presiding, held in Beaumont, Jefferson County, Texas:

Proceedings reported by Machine Shorthand.

COPY

APPEARANCES

FOR THE STATE:

Mr. Perry Thomas
SBOT NO. 19849120
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701

FOR THE DEFENDANT:

Mr. Bryan Laine
SBOT NO. 24011488
Attorney at Law
1045 Redwood
Kountze, Texas 77625

VOLUME 1

BOND HEARING

|  | PAGE |
|---|---|
| Case Called | 4 |
| Motion to Amend Indictment | 4 |
| Motion Granted | 6 |
| Court Orders Drug Test | 8 |
| Case Reset | 9 |
| Drug Test Results | 9 |
| Court Raises Bond | 11 |
| Reporter's Certificate | 13 |

THE COURT: Carl Bellotti?

MR. LAINE: He is present.

MR. THOMAS: Judge, we have a motion in that case, a Motion to Amend the Indictment. I would like to file it at this time.

THE COURT: Okay. Y'all can come on up. Let me see the file on Carl Bellotti. This is Cause No. 4604. How many prior DWI's does he have?

MR. THOMAS: Quite a few. And the amendment then adds some to that enhancement count, too, Judge.

THE COURT: Five, six -- am I right on that?

MR. THOMAS: Two misdemeanors, and then, I think, four felony DWI's, Judge.

THE COURT: 1999, 1999, 1998 -- what is the amendment?

MR. THOMAS: The amendment -- there's a number of amendments, Your Honor. The first begins with -- it's going to be in the second paragraph of the indictment, the first enhancement counts. If the Court goes down, it says, "January 19th, 1988." That should be "January 5th, 1989."

THE COURT: Okay.

MR. THOMAS: Then if the Court goes down

one, two -- the third line below that, and it says, "and on driving while intoxicated -- second degree felony" --

THE COURT: Yeah.

MR. THOMAS: -- that -- begin that, "and on driving," line should be eliminated.

THE COURT: Eliminate "and on driving while intoxicated"?

MR. THOMAS: Yes, sir. And that would continue to the fourth line down where it -- go past -- wheres it says "in Cause No. 83727, the Defendant committed the felony of driving while intoxicated," eliminate all that to that semicolon.

THE COURT: Okay.

MR. THOMAS: It then picks up and continues correctly on there the two enhancement counts coming out of the Criminal District Court. There's two enhancement counts that are okay there.

THE COURT: Okay.

MR. THOMAS: Then after that, it would then add the language found in the motion here which would state, "and on February 10th, 1999." That language is going to have to be added at the end of that paragraph right here, Judge (pointing). This first enhancement will begin with...

THE COURT: That's numbers -- (reading), in the Criminal District Court, in Cause No. 690- -- the Defendant was convicted of the felony offense of driving while intoxicated" --

MR. THOMAS: Yes, sir.

THE COURT: -- "and on February" --

MR. THOMAS: Yes, sir. That language -- "and on February 10, 1999," that language to the end of that paragraph.

Just for the record, that adds a conviction of Guadalupe County and another conviction out of the Criminal District Court of Jefferson County, Texas.

THE COURT: Okay. I've made those amendments. Is there any objection to those amendments?

MR. LAINE: No objection, Your Honor.

THE COURT: Okay.

MR. THOMAS: Judge, this is for Court's file. That's been file marked (tendering).

THE COURT: I will go ahead and sign the Motion to Amend (signing). All right. That's done. Okay. And what is the offer in this case -- Mr. Bellotti, come on up.

(DEFENDANT APPROACHES BENCH)

MR. THOMAS: It's 6 T.D.C., Your Honor.

THE COURT: How many prior DWI convictions do you have, sir?

THE DEFENDANT: Dating back from, uh -- I guess 1987 is the first one up until the present.

THE COURT: How many?

THE DEFENDANT: I think there's 12 or 13.

THE COURT: 12 or 13?

THE DEFENDANT: Yes, sir. A lot of them. I figure I pleaded guilty just to get out of them.

THE COURT: Just to get rid of them, huh?

THE DEFENDANT: Yes, sir.

THE COURT: You didn't do them. I understand.

THE DEFENDANT: Yes, sir.

THE COURT: Are you driving a vehicle?

THE DEFENDANT: Not right now, sir.

THE COURT: When's the last time you had something to drink?

THE DEFENDANT: Sir?

THE COURT: When's the last time you had something to drink?

THE DEFENDANT: I haven't had anything to drink in quite awhile.

THE COURT: What is "quite awhile"?

THE DEFENDANT: Probably that September 21st of 2008.

THE COURT: Any kind of drugs?

THE DEFENDANT: No, sir.

THE COURT: So, if I tested you, you would be clean on every bit of it?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. We are going to do that anyway. Let's see. I want to set this -- the offer's 6 years, and it's rejected?

THE DEFENDANT: Yes.

THE COURT: "Yes"? "Yes"?

THE DEFENDANT: (Nodding head up and down)

MR. LAINE: You have to speak up.

THE COURT: The offer's rejected?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I'm going to set this case for a trial next Wednesday. Y'all will be the No. 1 case.

MR. LAINE: Yes, sir.

THE COORDINATOR: Judge, we don't have a docket on that Wednesday.

THE COURT: All right. The Wednesday after that. What's the date?

THE COORDINATOR: We're going to have to

do it the following Wednesday.

THE COURT: That's what I said. What's that date?

THE COORDINATOR: September 16th.

THE COURT: All right. You will not under any circumstances operate a motor vehicle. Do not operate a motor vehicle --

THE DEFENDANT: No, sir. I haven't been.

THE COURT: -- under any circumstances. I also want to get you hooked up to an alcohol bracelet between now and the time you go to trial. We are going to get that done today.

Let's get somebody over from probation to test him to make sure that he hasn't had any alcohol or drugs. And we will get y'all back down here on September 16th. If you will, have a seat over there in the jury box. We will get to you here in just a minute.

MR. LAINE: Thank you, Your Honor. May I be excused?

THE COURT: You bet.

(PAUSE IN PROCEEDINGS)

THE COURT: Mr. Bellotti, it looks like you studied hard, and you tested positive for marijuana and cocaine.

THE DEFENDANT: Yeah. And, Your Honor, I --

THE COURT: So, you failed.

THE DEFENDANT: -- I'm telling you, I haven't been doing that.

THE COURT: It's those Flintstones vitamins?

THE DEFENDANT: I am taking care of my father; he's 80. And I'm taking care of my mother; she's 79.

THE COURT: I understand.

THE DEFENDANT: She has Alzheimer's full -- full degree.

THE COURT: I understand.

THE DEFENDANT: That's all I do is take care of their home.

THE COURT: I understand, but -- so, you got it in some vitamins?

THE DEFENDANT: I do take Centrum Silver all the time.

THE COURT: Laced with cocaine?

THE DEFENDANT: No.

THE COURT: Okay.

THE DEFENDANT: Not that I know.

THE COURT: Anyway, long story short is,

you are going to jail. You're a danger to our community. I'm going to set your bond at a million dollars. You can go with the bailiff. Have a good day.

THE DEFENDANT: Set my bond at a million dollars?

THE COURT: Yes, sir. I sure did. I sure did. 1 million. You don't get to do cocaine and --

THE DEFENDANT: I don't do --

THE COURT: -- and marijuana.

THE DEFENDANT: -- cocaine. I don't have an attorney either --

THE COURT: I understand that.

THE DEFENDANT: -- okay?

THE COURT: I understand that.

THE DEFENDANT: I don't have an attorney.

THE COURT: I understand. You have a good day. But you do have cocaine in your system.

Sir, do you understand everything that's going on?

MR. BELLOTTI, SR: Yes, sir.

THE COURT: I am not trying to give him a hard time, but with 13 prior convictions of DWI, I gave him an opportunity to come clean, and to stand there and lie to me -- cocaine doesn't creep into your system

and neither does marijuana. Long story short, he is going to jail; that's where he will stay until this case is resolved one way or the other. He will not get out and have the opportunity to hurt somebody. I apologize about all that, but long story short, he doesn't run this show. We do.

MR. BELLOTTI, SR: I understand.

THE COURT: All right. You have a great day. Thank y'all very much.

13

REPORTER'S CERTIFICATE

THE STATE OF TEXAS)
COUNTY OF JEFFERSON)

I, Summer Tanner, Official Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ _38.79_ and was paid by _Bryan Laine_.

WITNESS MY OFFICIAL HAND this is the _5th_ day of _October_, 2009.

_Summer Tanner_

Summer Tanner, RPR
Texas CSR #8208
Expiration Date: 12/31/10
Official Court Reporter
Jefferson County, Texas
Beaumont, Texas 77701

SUMMER TANNER, CSR, RPR
252nd District Court

THE STATE OF TEXAS          §        IN THE DISTRICT COURT OF
                            §
VS.                  ,      §        JEFFERSON COUNTY, TEXAS
                            §
CARL MATTHEW BELLOTTI, III   §        [252ND JUDICIAL DISTRICT]


# REPORTER'S RECORD
## Volume 1 of 4

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
### MASTER INDEX
October 13th, 2009
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 1 1 2015

Abel Acosta, Clerk

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| CARL MATTHEW BELLOTTI, III | § | [252ND JUDICIAL DISTRICT] |

# REPORTER'S RECORD
## Volume 1 of 4

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
MASTER INDEX
October 13th, 2009
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

REPORTER'S RECORD

VOLUME 1 OF 4

TRIAL COURT CAUSE NO. 09-07283

THE STATE OF TEXAS          *    IN THE 252ND DISTRICT
                            *
                            *
VS.                         *    COURT OF
                            *
                            *
CARL MATTHEW BELLOTTI,       *
III, A/K/A CARL MATHEW       *
BELLOTTI, III, A/K/A         *
CARL MATHEW BELLOTTI,        *
A/K/A CARL MATTHEW           *
BELOTTI, III, A/K/A          *
CARL MATHEW BELOTTI, III     *    JEFFERSON COUNTY, TEXAS


* * * * * * * * * * * * * * * * * * * * * *
MASTER INDEX
* * * * * * * * * * * * * * * * * * * * * *


On the 13TH day of OCTOBER, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Layne Walker, Judge Presiding, held in Beaumont, Jefferson County, Texas:


Proceedings reported by Machine Shorthand.

SUMMER TANNER, CSR, RPR
*252nd District Court*

A P P E A R A N C E S


FOR THE STATE:

Mr. Perry Thomas
SBOT NO. 19849120
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701

Mr. Pat Knauth
SBOT NO. 11585500
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701


FOR THE DEFENDANT:

Mr. Bryan Laine
SBOT NO. 24011488
Attorney at Law
1045 Redwood
Kountze, Texas 77625

## VOLUME 2

### GUILT/INNOCENCE

|                                          |        |       | PAGE |
| ---------------------------------------- | ------ | ----- | ---- |
| Stipulations                             |        |       | 5    |
| Rule Invoked                             |        |       | 8    |
| Jury Sworn                               |        |       | 9    |
| State Reads Indictment                   |        |       | 9    |
| Defendant Pleads Not Guilty              |        |       | 11   |
| Defendant Pleads True to Enhancements    |        |       | 12   |
| State Testimony Begins                   |        |       | 13   |

| STATE'S WITNESSES         | DIRECT | CROSS |      |
| ------------------------- | ------ | ----- | ---- |
| Aleisa Sanders            | 13     | 21    |      |
| Sergeant Kevin White      | 27     | 46    |      |
| Deputy Robert Phillips    | 53     | 60    |      |

|                                          |        |       | PAGE |
| ---------------------------------------- | ------ | ----- | ---- |
| State Rests                              |        |       | 65   |
| Motion for Instructed Verdict by Defense |        |       | 67   |
| Court Denies Motion                      |        |       | 69   |
| Defense Rests                            |        |       | 69   |
| Reading of the Court's Charge            |        |       | 74   |
| Closing Arguments by the Defense         |        |       | 81   |
| Closing Arguments by the State           |        |       | 86   |
| Jury Deliberations                       |        |       | 91   |
| In Chambers Hearing                      |        |       | 91   |
| Reporter's Certificate                   |        |       | 93   |

VOLUME 3

GUILT/INNOCENCE

|                                          | PAGE |
|------------------------------------------|------|
| Case Called                              | 5    |
| Jury Question                            | 5    |
| Defendant's Motion for Mistrial          | 6    |
| Court Grants Motion for Mistrial         | 7    |
| Foreman Announces Jury Deadlocked        | 8    |
| Jury Dismissed                           | 9    |
| Reporter's Certificate                   | 10   |

VOLUME 4

EXHIBITS

JURY'S EXHIBITS

NO.              DESCRIPTION

1        Jury Question No. 1

2        Jury Question No. 2

3        Jury Question No. 3

4        Jury Question No. 4

5        Jury Question No. 5

SUMMER TANNER, CSR, RPR
252nd District Court

THE STATE OF TEXAS § IN THE DISTRICT COURT OF

§

VS. § JEFFERSON COUNTY, TEXAS

§

CARL MATTHEW BELLOTTI, III § [252ND JUDICIAL DISTRICT]

# REPORTER'S RECORD
## Volume 2 of 4

*****************************
GUILT / INNOCENCE
October 13th, 2009
*****************************

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 1 1 2015

Abel Acosta, Clerk

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

THE STATE OF TEXAS     §     IN THE DISTRICT COURT OF

                           §

VS.                           §     JEFFERSON COUNTY, TEXAS

                           §

CARL MATTHEW BELLOTTI, III     §     [252ND JUDICIAL DISTRICT]


# REPORTER'S RECORD
## Volume 2 of 4

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GUILT / INNOCENCE

October 13th, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

REPORTER'S RECORD

VOLUME 2 OF 4

TRIAL COURT CAUSE NO. 09-07283

THE STATE OF TEXAS        *    IN THE 252ND DISTRICT

                            *

                            *

VS.                         *    COURT OF

                            *

                            *

CARL MATTHEW BELLOTTI,      *

III, A/K/A CARL MATHEW      *

BELLOTTI, III, A/K/A        *

CARL MATHEW BELLOTTI,       *

A/K/A CARL MATTHEW        *

BELOTTI, III, A/K/A         *

CARL MATHEW BELOTTI, III    *    JEFFERSON COUNTY, TEXAS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

GUILT/INNOCENCE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 13TH day of OCTOBER, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Layne Walker, Judge Presiding, held in Beaumont, Jefferson County, Texas:

Proceedings reported by Machine Shorthand.

APPEARANCES


FOR THE STATE:

Mr. Perry Thomas
SBOT NO. 19849120
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701

Mr. Pat Knauth
SBOT NO. 11585500
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701


FOR THE DEFENDANT:

Mr. Bryan Laine
SBOT NO. 24011488
Attorney at Law
1045 Redwood
Kountze, Texas 77625

VOLUME 2

GUILT/INNOCENCE

|                                              |        |       | PAGE |
| -------------------------------------------- | ------ | ----- | ---- |
| Stipulations                                 |        |       | 5    |
| Rule Invoked                                 |        |       | 8    |
| Jury Sworn                                    |        |       | 9    |
| State Reads Indictment                       |        |       | 9    |
| Defendant Pleads Not Guilty                  |        |       | 11   |
| Defendant Pleads True to Enhancements        |        |       | 12   |
| State Testimony Begins                       |        |       | 13   |
| STATE'S WITNESSES                            | DIRECT | CROSS |      |
| Aleisa Sanders                               | 13     | 21    |      |
| Sergeant Kevin White                         | 27     | 46    |      |
| Deputy Robert Phillips                       | 53     | 60    |      |
| State Rests                                  |        |       | 65   |
| Motion for Instructed Verdict by Defense     |        |       | 67   |
| Court Denies Motion                          |        |       | 69   |
| Defense Rests                                |        |       | 69   |
| Reading of the Court's Charge                |        |       | 74   |
| Closing Arguments by the Defense             |        |       | 81   |
| Closing Arguments by the State               |        |       | 86   |
| Jury Deliberations                           |        |       | 91   |
| In Chambers Hearing                          |        |       | 91   |
| Reporter's Certificate                       |        |       | 93   |

VOLUME 4

EXHIBITS

JURY'S EXHIBITS

NO.           DESCRIPTION

1             Jury Question No. 1

2             Jury Question No. 2

3             Jury Question No. 3

4             Jury Question No. 4

5             Jury Question No. 5

(OPEN COURT, JURY NOT PRESENT, DEFENDANT PRESENT)

THE BAILIFF: All rise. 252nd District Court's now in session. The Honorable Judge Layne Walker presiding.

THE COURT: Thank you. Please be seated. All right. Before we get the jury in -- I dealt with the Motion to Compel. We need to clear up on the stipulation before we read the indictment.

And, Mr. Bellotti, I'm going to ask you, sir: Have you had an opportunity to review this agreement in this stipulation?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And do you stipulate on the record that these prior convictions are true and correct?

THE DEFENDANT: Yes, sir. Now, I've got --

THE COURT: I don't -- I don't need an explanation. I just want to know if you agree and you stipulate that your prior convictions, as they are alleged in the indictment, are true and correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And, Mr. Thomas, do you agree and stipulate that they're true and correct?

MR. THOMAS: They are, but there is one

technical change that needs to be made to the document. It reads (Reading): Agreement to stipulate to two prior felony -- DWI convictions.

THE COURT: Okay.

MR. THOMAS: It should be -- down where it says small letter "b," it reads, "On January 19th, 1988."

It should read, "January 5th, 1989."

THE COURT: Okay.

MR. THOMAS: With that change, I would agree it matches the indictment.

THE COURT: It would be the same as little "a"?

MR. THOMAS: Yes. The dates would be the same, yes, sir.

THE COURT: Mr. Laine, what do you say about that?

MR. LAINE: I agree, Your Honor. I think I took the date of the arrest of the first prior conviction and not the date of the actual conviction.

THE COURT: Okay. So, is there an agreement to change your agreement to stipulate to two prior DWI convictions where little "b" -- I'm going to change that to "January 5th, 1989" --

MR. LAINE: Right.

THE COURT: Is that the agreement of the parties?

MR. LAINE: Yes. No objections.

MR. THOMAS: Correct.

THE COURT: Mr. Bellotti, to the agreement as it's been changed, do you stipulate that these two prior convictions are true and correct?

THE DEFENDANT: Yes, sir; but --

THE COURT: Okay. Here's the deal -- and I want to make sure the record's clear -- there is no "buts." You either agree to this or you disagree with it, one of the two. If you disagree with it, he's going to prove them up; and he's going to read this to the jury. So, whatever it is you want to do, that's fine; but I don't want the record to have any confusion as to "buts" or "maybes" or "ifs." So, you either agree to this as it's submitted or you disagree with it.

THE DEFENDANT: I agree with it.

THE COURT: Okay. I'm going to make this a part of the record. Anything further before we get started?

MR. THOMAS: No, sir, Your Honor.

THE COURT: All right.

MR. THOMAS: Other than the State is going

to invoke the Rule for trial.

THE COURT: Okay. If there's anybody that plans on testifying here --

MR. LAINE: Possibly Mr. Bellotti.

THE COURT: Okay. Then I need him to step out.

Sir, don't discuss your testimony or anything about this case with anybody; okay?

MR. LAINE: Your Honor, if I may have one second with Mr. Bellotti to give him some instructions outside?

THE COURT: Okay.

(PAUSE IN PROCEEDINGS)

MR. LAINE: Your Honor, if we could admonish Mr. James Shipley. I believe he will step out to be a possible -- possible punishment witness.

THE COURT: I have already admonished any witness not to talk to anybody or have any contact with any other witnesses until they testify or thereafter.

Anything further before we get started?

MR. THOMAS: No, sir, Your Honor.

THE COURT: Ready whenever y'all are, Wayne.

(JURY ENTERS COURTROOM)

THE COURT: Good morning to you.

THE JURY: (Response)

THE COURT: Let the record reflect all members of the jury are present.

Ladies and gentlemen, will you raise your right hand for me, please.

(JURY SWORN)

THE COURT: Okay. Is the State ready to proceed?

MR. THOMAS: State is ready, Your Honor.

THE COURT: Is the Defense ready to proceed?

MR. LAINE: Yes, Your Honor.

THE COURT: Would the defendant stand for the reading of the indictment.

THE DEFENDANT: (Standing)

MR. THOMAS: (Reading): In the name and by the authority of the State of Texas, the grand jurors for the County of Jefferson, State aforesaid, duly organized as such at the July Term A.D., 2009, of the Criminal District Court of Jefferson County, in Said State, upon oath in said Court present that Carl Matthew Bellotti, III, A/K/A Carl Mathew Bellotti, III, A/K/A Carl Mathew Bellotti, A/K/A Carl Matthew Belotti, III, A/K/A Carl Mathew Belotti, III, hereafter

styled the Defendant, committed an offense hereafter styled the primary offense, on or about the 21st day of September of 2008, and anterior to the presentment of this indictment, in the County of Jefferson and State of Texas, did then and there unlawfully operate a motor vehicle in a public place while the Defendant was intoxicated.

And the grand jurors aforesaid, upon their oaths aforesaid, do further present in and to said Court, at said term, and anterior to the presentment of this indictment, and before the commission of the primary offense by the Defendant, on January 5th, 1989, in the County Court at Law No. 2 of Jefferson County, in Cause No. 132178, the Defendant was convicted of the misdemeanor offense of driving and operating a motor vehicle in a public place while intoxicated; and on January 5th, 1989, in the County Court at Law No. 2 of Jefferson County, Texas, in Cause No. 138038, the Defendant was convicted of the misdemeanor offense of driving and operating a motor vehicle in a public place while intoxicated; against the peace and dignity of the State, signed by the foreperson of the Grand Jury.

THE COURT: Mr. Bellotti, to this indictment, sir, do you enter into a plea of guilty or

not guilty?

THE DEFENDANT: Not guilty.

THE COURT: And to the enhancement provision, sir, do you enter into a plea of true or not true?

THE DEFENDANT: Not true.

THE COURT: Okay. Y'all approach the bench, please.

(PRIVATE BENCH CONFERENCE)

MR. LAINE: I think he misunderstood.

THE COURT: Do you want to explain it to him?

MR. LAINE: Yes, sir.

(OPEN COURT, JURY PRESENT, DEFENDANT PRESENT)

MR. LAINE: Carl, was the --

THE COURT: You don't need to -- privately.

MR. LAINE: Your Honor, if you will read the indictment one more time.

THE COURT: I'll ask him. Again, to the indictment, do you enter into a plea of guilty or not guilty?

THE DEFENDANT: Not guilty.

THE COURT: To the enhancement provision, do you enter into a plea of true or not true?

THE DEFENDANT: True.

THE COURT: Have you pled true because they are, in fact, true?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. You may be seated.

Is the State ready to proceed?

MR. THOMAS: Yes, sir, Your Honor.

THE COURT: Okay. You may.

MR. THOMAS: Your Honor, the State would call Aleisa Sanders.

(WITNESS ENTERS COURTROOM)

THE COURT: Good morning. Raise your right hand, please.

(WITNESS SWORN)

THE COURT: Come on up and have a seat, please, and watch your step.

COURT REPORTER: Spell your first name, please.

THE WITNESS: A-L-E-I-S-A.

THE COURT: You may proceed.

MR. THOMAS: Your Honor, I'm tendering a copy of her statement to Counsel (tendering).

THE COURT: Okay. The record will so reflect.

**ALEISA SANDERS,**

having first been duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. THOMAS:**

Q.   Mrs. Sanders, would you state your full name for the ladies and gentlemen.

A.   Aleisa Sanders.

Q.   And where do you live, Mrs. Sanders?

A.   North Vidor.

Q.   Mrs. Sanders, do you have family living here in Jefferson County?

A.   Yes, I do.

Q.   Who is that?

A.   My mother.

Q.   Where does she live at?

A.   On 32nd Street in Groves.

Q.   The City of Groves?

A.   Yes.

Q.   That's here in Jefferson County, Texas?

A.   I -- if you think so.  I don't know.  I don't know the counties.  I'm sorry.

Q.   That's okay.  But she lives here in Groves?

A.   Correct.

Q.   Okay.  And on -- back on September 21st, 2008 --

A. Uh-huh.

Q. -- did you go to your mother's house in Groves?

A. Yes, I did.

Q. Why?

A. To clean her yard from the storm.

Q. That was from Hurricane Ike?

A. Correct.

Q. Okay. And was she home during that time?

A. No.

Q. Where did she go?

A. She and my stepdad were in Houston at my sister's.

Q. Okay. So, you went on -- after the storm you had gone to your mother's house to clean up. And did you go there with anybody?

A. Yes, I did.

Q. Who was that?

A. My husband and my two grandkids.

Q. While you were working in the yard in the afternoon of September 21st, 2008 -- you were working in the yard -- anything unusual happen to you?

A. Yes.

Q. What happened?

A. My two grandchildren and I were in the front

yard picking up limbs and things; and all of a sudden, I heard a screech -- tires -- turned actually to my right and saw a little maroon truck hit a stop sign, go in the ditch.

Q. So, a maroon truck hit a stop sign and then went into the ditch?

A. Correct.

Q. Okay. Went into the ditch -- did it stop when it got down in the ditch?

A. Yes, sir. It had to. It was nose-dived into the ditch.

Q. And when that happened, what did you do?

A. I hollered at my husband. He come around with the kids; and I got on my cell phone, called 9-1-1, and ran to the vehicle to see if anybody was hurt.

Q. Okay. You got to the vehicle. Was there somebody inside of it?

A. Yes, sir, there was.

Q. And was it a man or a woman?

A. A male.

Q. What happened when you got to that truck with the man inside of it?

A. Well, I looked around, and I -- he was sitting straight up. So, I was -- I was afraid the way it hit that he might have gone forward and gotten hurt. He

was sitting straight up and I knocked on the window and he kind of slowly turned and I was hollering, Are you okay? Are you okay?

And he was real slow to answer --

MR. LAINE: Your Honor, I'm going to object to narrative --

THE COURT: It's overruled.

MR. LAINE: -- and ask to stick to question and answer.

THE COURT: It's overruled.

BY MR. THOMAS:

Q. You were talking about what -- you knocked on the door, he was slow to answer.

What happened then?

A. Yeah. And I was asking him, Are you okay? Are you okay? And the window came down. And he didn't really understand me but basically was saying -- I said, Did you hit your head -- I was asking these questions you normally ask -- and was saying, though -- wasn't making a whole lot of sense but talking, went to get out of his truck --

MR. LAINE: Again, Your Honor, I'm going to ask for a running objection to the narrative.

THE COURT: You can have the running objection. It's overruled at this point.

MR. LAINE: Thank you.

BY MR. THOMAS:

Q. What happened when he got out of the truck?

A. He had to lean on his truck to get out of the truck.

Q. Why?

A. I -- and --

MR. LAINE: Objection. That would call for speculation.

THE COURT: It's overruled.

BY MR. THOMAS:

Q. Why did he have to lean on the truck?

A. I felt he was --

MR. LAINE: Your Honor, again, I'm going to object. It calls for speculation.

THE COURT: And it's overruled.

A. He couldn't stand up. And when I got close enough, I was still asking him if he was okay; looking to go see if there was any blood or anything like that.

BY MR. THOMAS:

Q. Did you see any blood?

A. No. No.

Q. When you asked him if he hit his head, what did he answer you?

A. He kind of didn't quite understand me. He

kind of shook his head but didn't quite understand.

Q. In looking at him, did you see that he was hurt in any way?

A. No.

Q. So, you got up closer to him while he was leaning on the truck?

A. Uh-huh.

Q. What happened then?

A. Well, like I say, continued to ask him questions. Are you hurt? Is there anyone I can call?

I called 9-1-1. They were on their way.

And he started saying, Don't call the police. Don't call the police.

I said, Well, we needed to call, you know. We've called them. You need help. Is there anyone else I can call?

But he would just say, No, and just don't call the police.

But he didn't speak the way we're speaking. It was slurry and -- I don't know the correct word to use, but kind of disoriented, you know. Like, I knew something was wrong. When I smelled the alcohol, I figured that he was in- -- intoxicated.

Q. Okay. So, at some point in time talking to him, you could smell alcohol on him?

A. Yes.

Q. You start putting two and two together and realize this guy's been drinking --

MR. LAINE: Your Honor, I object. That's leading.

THE COURT: That's sustained. Rephrase it.

**BY MR. THOMAS:**

Q. Did you put two and two together and come to some conclusion about why he was in the state he was in?

A. Well, my observations that I made of his actions, the way he was speaking, yes, I -- I think he was intoxicated.

Q. Okay. He didn't want you to call the police?

A. No.

Q. While you were waiting for the police to get there, what did he do?

A. Staggered -- trying to stagger out in the street trying to stop people, Pull me out. Pull me out. Pull me out.

He couldn't really stand, but...

Q. Did anybody stop to help him?

A. No. No.

Q. Did the police eventually get there?

A. Oh, yes.

Q. The person -- the person that's sitting right there (pointing) on the far side of that table, is that the man that was behind the wheel of that car?

A. Yes, sir, it is.

MR. THOMAS: Your Honor, I'd ask the record reflect she's identified the defendant in this case.

THE COURT: The record will so reflect.

**BY MR. THOMAS:**

Q. And is that the man -- the man you have identified here today, is that the man the police came and took charge of when they got to the scene?

A. Yes, sir.

Q. What was his reaction when the police pulled up to the scene?

A. He kind of put his head down and shook and said, There they are.

Q. He --

A. He wasn't happy.

Q. Okay. All right. I guess what I'm looking for -- he was sad to see them there?

A. Correct.

Q. Thank you, Mrs. Sanders.

MR. THOMAS: I pass the witness.

THE COURT: Mr. Laine?

## CROSS-EXAMINATION

**BY MR. LAINE:**

Q. Mrs. Sanders, when the officer arrived, did he arrive on his own; or was there another vehicle with him or --

A. There were two.

Q. There were two officers?

A. Correct.

Q. Two Groves police officers?

A. The --

Q. Cars?

A. Yes.

Q. Okay. Anyone else?

A. No.

Q. Okay. So, there was another officer involved. Did both of those officers get out at the same time to assist the accident?

A. I don't know if they both got out at the exact same time.

Q. Well, I guess they -- did they arrive at the same time?

A. I really -- I don't know. I really don't. It wasn't far between each other, no.

Q. Oh, okay. Okay. And you stated that your

husband was with you.

Is he here today?

A. No.

Q. How long did you stay out, I guess, viewing what was going on? Did you stay until the officers drove off?

A. Yes. And they pulled his truck out. Yes, we watched.

Q. Okay. And you stated earlier that he hit a stop sign and then went into the ditch; is that correct?

A. Well, actually he had to go in the ditch first. The stop sign is, like, in the ditch. So, the roads are small, so you'd have to go in the ditch to hit the stop sign.

Q. Okay. So, he didn't hit the stop sign first. He went into the ditch and then -- and then ran over a stop sign; correct?

A. You do it at the same time.

Q. Okay.

A. I mean, it's right there on the corner; and you have to hit one when you hit the other.

Q. Okay.

A. So, you don't travel any distance. It's there.

Q. Okay. About how long after he went into the ditch did you approach his vehicle?

A. Immediately. As soon as I --

Q. Immediately?

A. Sure. Yeah.

Q. Was it you that called 9-1-1 or your husband?

A. Myself.

Q. It was yourself?

A. Uh-huh.

Q. And you stated when you approached, you saw no injuries?

A. Not that I saw that was visible, no.

Q. You didn't notice that the windshield was cracked or anything like that?

A. No, it was not. That's what I was worried about, that he might have hit his head; but the windshield was not cracked.

Q. You stated that it was your assumption after speaking with him, because his speech was slurred, that he was intoxicated; is that correct?

A. Not just because of the slurred speech, no.

Q. Okay.

A. But it was my observation that -- I thought -- my opinion, he was intoxicated --

Q. Okay.

A. -- by his actions, his speech.

Q. Did you assist him out of the car?

A. No.

Q. Did you help him get out of the car in any way?

A. No.

Q. Eventually he did get out of the car?

A. Yes, hanging onto the door and the side of the truck and things like that. But, no, I did not touch him. No.

Q. So, was the ditch deep enough for you to not back out of it? It had to have a wrecker?

A. Correct.

Q. When you -- when the officers got there, did you talk with the officers?

A. Yes.

Q. Do you remember who you talked with?

A. Gentlemen, uh-huh.

Q. Who was that?

A. Uh, I don't know their names. One of them is White, I believe.

Q. Okay. Sergeant White?

A. I think so.

Q. Okay. And at that time, did you give a statement to Sergeant White?

A.   Yes.

MR. LAINE:   May I approach, Your Honor?

THE COURT:   Yes, sir.

**BY MR. LAINE:**

Q.   If you would, please review this to yourself quitely (tendering).

A.   (Reading).

Uh-huh (tendering).

Q.   Thank you, Mrs. Sanders.

Is that the statement that you gave that day?

A.   Correct.   Uh-huh.

Q.   Okay.   And within your statement, did you say anything about him staggering in the road or anything like that?

A.   I did, yes.

Q.   Let me ask you again --

A.   Verbally.

Q.   You didn't write that in your statement; correct?

A.   No, I didn't.

Q.   Did you say anything in your statement about him smelling of alcohol --

A.   No.

Q.   -- that you just read?

A.    No, I did not.

Q.    Did you say anything in your statement about him hitting a stop sign that you just read?

A.    No.

Q.    About him staggering and trying to stop cars in that statement?

A.    No.

Q.    Thank you, Mrs. Sanders.

MR. LAINE:  I pass the witness.

THE COURT:  Mr. Thomas?

MR. THOMAS:  I have no further questions of this witness, Your Honor.

THE COURT:  Ma'am, you may step down.

MR. THOMAS:  Your Honor, can she be excused?

THE COURT:  Any objection?

MR. LAINE:  (Pausing)

THE COURT:  No, she cannot.  Call your next witness.

You can step down.

MR. LAINE:  Thank you.

THE COURT:  Call your next witness.

MR. THOMAS:  Call Sergeant Kevin White.

THE COURT:  Kevin White?

MR. THOMAS:  Yes, sir.

(WITNESS ENTERS COURTROOM)

THE COURT: Good morning, sir. Will you raise your right hand for me.

(WITNESS SWORN)

THE COURT: Come on up and have a seat, please, sir.

You may proceed.

MR. THOMAS: Thank you, Your Honor. I am tendering a copy of his offense report (tendering).

THE COURT: The record will so reflect.

**KEVIN R. WHITE,** having first been duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. THOMAS:**

Q. Will you state your full name for the ladies and gentlemen of the jury, please?

A. Yes. It's Kevin R. White.

Q. What do you do for a living, sir?

A. I'm a Sergeant with the Groves Police Department.

Q. How long have you been employed with the Groves Police Department?

A. Five years. Since 2003.

Q. Prior to working for Groves, did you have any prior law enforcement experience?

A.   Yes.

Q.   Who with?

A.   Beaumont Police for several years, Houston Police.   I was with the State Police in Vermont, a couple other agencies.   Altogether, about 30 years.

Q.   Okay.   Back on September 21st, 2008, last year, what had just occurred in Southeast Texas back on September 21st?

A.   Hurricane Ike.

Q.   And September 21st, was that -- was that the day that the Evacuation Order was lifted for Jefferson County?

A.   Yes, it was.

Q.   Did you receive a call of a -- of a wreck that had occurred in the City of Groves?

A.   Yes.

Q.   Where was that wreck located at?

A.   The 5200 block of 32nd Street.

Q.   City of Groves, is that here in Jefferson County, Texas?

A.   Yes, it is.

Q.   When you got to that location, what did you observe?

A.   There was a maroon Ford Ranger pickup truck in the ditch on the westbound side.   In other words, on

the north side of 32nd Street, facing westbound right at the intersection with a street called Kleepsies. And standing outside the truck was a gentleman.

Q. That person you said standing outside the truck, do you see him in the courtroom today?

A. Yes, I do.

Q. Point to him and describe for us what he's wearing.

A. This gentleman to the right with the -- kind of the tannish-colored suit jacket (pointing).

MR. THOMAS: I ask that the record reflect he's identified the defendant.

THE COURT: The record will so indicate.

BY MR. THOMAS:

Q. When you got there and saw that man, what did you do first?

A. I approached him.

Q. And what happened?

A. Well, I asked him if he was the driver of the truck. I was just asking general questions like what had happened and so forth.

Q. What did he respond to you?

A. He really didn't respond.

Q. How was he acting?

A. He seemed confused. I could almost --

immediately as I got close to him, I detected an odor of alcohol. When he did try to talk, his speech was very garbled. And about the only question that he really answered was when I asked him if he knew where he was. He said he was in Port Neches.

Q. In fact, you were in Groves?

A. Yes.

Q. Other than saying he was in Port Neches, could you get any other information really out of him?

A. No.

Q. The condition of his speech, how was it?

A. It was garbled or slurred.

Q. Did he appear to be hurt in any way from the wreck?

A. Not that I saw.

Q. What did you do with him at that time?

A. Well, based on what I was observing, I began to suspect that he was intoxicated. I started to move out into a -- into a flatter area on the street to do what we would normally do, field sobriety tests; but I noticed that he was having extreme difficulty walking or even standing up without falling down. And almost immediately I was holding on to him.

Q. You had to hold him up?

A. Yes, sir.

Q. Did you try to --

THE COURT: Excuse me just a minute. Mr. Laine, approach the bench, please.

(PRIVATE BENCH CONFERENCE)

THE COURT: You need to tell Mr. Bellotti that if I hear "bullshit" come out of his mouth one more time, he's going to hear the remainder of this trial from the holding cell. That's the second time I have heard him speak loud enough for me to hear and, potentially, the jury. I want you to admonish him -- that will be the only time he will be admonished. If he wants to voluntarily absence himself from the proceeding, tell him to open his mouth again.

MR. LAINE: Okay.

(OPEN COURT, JURY PRESENT, DEFENDANT PRESENT)

THE COURT: Just one moment. Wayne, do me a favor, take the jury in the jury room real briefly.

I will get you right back out.

THE BAILIFF: Ladies and gentlemen.

(JURY EXITS COURTROOM)

THE COURT: Let the record reflect the jury is not present. Mr. Bellotti is present, along with his attorney. I want the record to reflect I am taking a break.

I will admonish you one time. During

the brief time that we have been here -- less than 30 minutes -- I've heard you speak now twice. The last comment you made was the term "bullshit." I will tell you one time and one time only: If you want to sit in here during your trial, you are more than welcome to. I encourage you to do so. It's in your best interest to remain in the courtroom. If I hear you speak one more time, you will be removed from the courtroom. Your outbursts, if I can hear them, the jury can hear them. So, if you can sit there and keep your mouth shut, then you're more than welcome to stay in this courtroom. If you speak again where I can hear it, then I'm going to put you in the holding cell; and that's where you will spend the rest of the trial. Do you have any questions about that?

THE DEFENDANT: No, I don't.

THE COURT: Okay. Ready for the jury -- the jury is still not present. I want both sides to know there -- you mentioned a name of James Shipley, Mr. Laine?

MR. LAINE: Yes, sir.

THE COURT: There was a James Shipley that tried to come back and talk to me this morning about this case, and I want the record to reflect that he says he is a friend of my father's, my brother's,



Mark Stiles, and I don't know who else, and wanted to come back and talk to me about the case.

But I want the record to be clear: I did not communicate with Mr. Shipley. I do not know Mr. Shipley, and there was no communication between the Court and your potential witness. I did not know at the time that he was calling back that he was a potential witness. But he was not allowed to come back simply because I was coming in the courtroom. But there was no contact between me and their witness; okay? I just want to make sure everybody knows that.

Ready when you are.

THE BAILIFF: We had another one take a break.

THE COURT: It may have been a good time for a break. Do you want to ask them if they need a few minutes to where they can all -- if they need it, great. If not, we will go forward. But if there's more, I will let everybody take a break.

(PAUSE IN PROCEEDINGS)

THE BAILIFF: As soon as that one's finished, they are coming back in.

(JURY ENTERS COURTROOM)

THE COURT: Let the record reflect all members of the jury are present. The defendant is



present, along with his attorney.

MR. Thomas, you may proceed.

MR. THOMAS: Thank you, Your Honor.

**BY MR. THOMAS:**

Q. Sergeant White, I think we left at -- off at you were going to try to perform some field sobriety tests.

And, again, what was the defendant's condition when you thought about trying to give him a field sobriety test?

A. It was pretty apparent to me that he was intoxicated -- highly intoxicated, and I just felt like he was a danger to himself or others. I -- I've made several of these arrests. I've seen people fall down during these field sobriety tests --

MR. LAINE: Your Honor, I'm going to object to the narrative --

THE COURT: Overruled.

MR. LAINE: -- and nonresponsiveness.

THE COURT: Overruled.

A. Just based on everything I was seeing, I felt like the best course of action then was to get him in custody.

**BY MR. THOMAS:**

Q. So, you didn't -- didn't perform any field

sobriety tests on him?

A.   That's correct.

Q.   And your belief was had you tried to perform those tests, that he actually would have fallen down instead of being able to --

MR. LAINE:   Objection.   That's leading, Your Honor.

THE COURT:   It's overruled.

A.   Yes.   Again, I've performed these tests several times.   It was apparent he wasn't going to be able to perform them; and to do so would have been further endangering him.   It would have endangered me. I'm not going to sit out there and tell some- -- somebody -- at that time, I was by myself.

**BY MR. THOMAS:**

Q.   Okay.   Eventually, another officer did come to assist you?

A.   Yes, after I placed him in handcuffs.

Q.   Now, at some point -- about the time you were going to place him in handcuffs, did his nature or his behavior begin to change a little bit to cause you concern?

A.   Initially he was fairly indifferent to everything that was going on; but as my contact went further with him, I was starting to pick up on some

signs that he was possibly going to get aggressive, which is another reason why I felt I needed to get him in handcuffs. He was a rather large man, and it would have been a pretty good fight.

Q. Is that another sign of intoxication, this happy one minute, ready to fight the next?

MR. LAINE: Your Honor, again, that calls for speculation.

THE COURT: It's overruled.

A. Yes. It's very common. People will go from being happy-go-lucky, indifferent, to wanting to fight and back and forth the whole time you are with them.

BY MR. THOMAS:

Q. You started to begin to fear that he was about to maybe start becoming aggressive?

A. Yes.

Q. You put him into custody -- or put handcuffs on him?

A. Yes, I did.

Q. And what did you do with him then?

A. Well, I began to walk him back towards my unit; but then the other officer arrived on scene. And I knew that I was going to have some other work to do out there, so I put him in the other officer's unit and told him to take him back to the police station.

Q. Did that officer take him back to the station?

A. Yes, he did.

Q. Did he take him to the Groves police station?

A. Yes, he did.

Q. Now, in the days after Hurricane Ike, what was the condition of the police station and law enforcement generally in the days after the hurricane?

A. We were dealing with an emergency situation; and like everyplace else, we had damage. We had damage at the police station, had damage at the jail here in Jefferson County. So, we weren't necessarily operating under our normal ways of doing things. We were having to basically "fly by night."

Q. Okay. More of a routine when you have a person that you've taken into custody for driving while intoxicated, would you take them to the Mid-County jail?

A. Yes.

Q. At the Mid-County jail, there's -- they have the video cameras, they have an Intoxilyzer to -- for a DWI suspect to blow into to measure their blood alcohol -- or breath alcohol.

At that time what was the condition of the County Jail?

A. The County Jail had been evacuated due to

damage and Hurricane Ike. All the prisoners were being brought to the old jail here in Beaumont.

Q. So, you couldn't take him to where you normally take driving-while-intoxicated suspects?

A. That's correct.

Q. So, you took him to the Groves Police Department?

A. That's correct.

Q. And there, with the condition of the Groves Police Department, were you able to -- was there any video camera or -- operating, anything at that time?

A. No. We were still running off generators.

Q. There's no Breathalyzer machine at the County Jail -- I mean at the Groves Police Department; is there?

A. No, there isn't.

Q. Okay. When you get him back to the Groves Police Department, what was his condition when you got -- when you get back there and he's there, what's his condition?

A. Well, we have what we call a patrol room, which has a bench where we usually sit our prisoners. When I walked in, he was sitting on the bench.

Q. And what condition was he in then?

A.    When I first got in there, he appeared --

MR. LAINE:    Your Honor --

A.    -- to be sleeping.

MR. LAINE:    Your Honor, if I can, I object to the relevance of these particular questions.

THE COURT:    It's overruled.

**BY MR. THOMAS:**

Q.    When you first walked in, he was what?

A.    He appeared to be sleeping.

Q.    About what time of the afternoon was the first -- when you got the call initially?

A.    It was right around 5:22 p.m.

Q.    When you get to the Groves Police Department, he appeared to be sleeping on the bench; is that correct?

A.    That's correct.

Q.    What happened then?

A.    Well, I began the paperwork that's involved in a DWI arrest; and it includes a series of questions that we ask, read him his Miranda warnings and requesting to submit a specimen, which, in this particular case, I was asking for blood because I knew the hospital was open.

Q.    Okay.  You couldn't get a Breathalyzer test; but you thought, Maybe I could ask him for blood?

A.   That's correct.

Q.   What's the purpose of taking a blood test?

A.   To -- we get a sample of blood, and it's submitted to the crime lab for examination and determine if there's alcohol content and/or any drugs.

Q.   Did you think, based on your experience, that drugs might also be a factor?

MR. LAINE:   Your Honor, I'm going to object to the speculation of this question.

THE COURT:   It's overruled.

A.   Yes, I did.

**BY MR. THOMAS:**

Q.   So, you asked him for a blood sample.

What did he tell you about giving a blood sample?

A.   He refused to give a specimen.

Q.   And like you said, the blood sample would have -- could have been analyzed to determine alcohol and/or drug contents; is that right?

A.   That's correct.

Q.   But he didn't want to give you that?

A.   That's correct.

Q.   Did you try to perform any of the field sobriety tests back at the Groves Police Department?

A.   No.

Q. Did you think it was actually more -- endangering him more to try to do those tests --

MR. LAINE: Your Honor -- Your Honor, again, I'm going to object to the speculation and leading the witness with his question.

THE COURT: Overruled.

A. The patrol room's not set up for that. It's a very small room. It's got desks. It's got computers. Again, I've seen people fall in our patrol room; and I just -- you don't want to take a chance they're going to fall down, strike their head on something. It's -- and to be quite honest with you, I --

MR. LAINE: Your Honor, I'm going to object to the narrative of his testimony.

THE COURT: It's overruled.

A. I generally was -- if I've got somebody in custody and handcuffs are on them, the handcuffs don't come off until they go to jail.

BY MR. THOMAS:

Q. And while you're still at the Groves Police Department, is the odor of alcohol still present on his person?

A. Yes.

Q. Go back out to the scene where the wreck occurred. You did an inventory of the truck that he

was driving; is that right?

A. That's correct.

Q. And inside the truck you found no evidence of -- there was no bottles or anything like that, was there?

A. No, there wasn't anything.

Q. Now back to the Groves Police Department station. Was there -- back to the confusion of the days after the hurricane, did you -- some question in your mind, What are we going to do with him now that we've got him? What do we do with him? Where do we take him?

A. Right.

Q. Did you finally determine where they were taking prisoners?

A. At that time, we were still bringing them here to Beaumont.

Q. And that's not normally where the County Jail houses their prisoners; is that right?

A. That's correct.

Q. That was where they had to make do after the storm?

A. Right.

Q. This street that you described in Groves where he wrecked from, is that a public street?

43

A.    Yes, it is.

Q.    Public place?

A.    Yes, it is.

Q.    And was there some work being done on the street?

A.    Yes, there was.

Q.    What was going on on the street?

MR. LAINE:    Your Honor, again, I object to the relevance of the question.

THE COURT:    It's overruled.

A.    There were utility crews out there doing storm debris cleanup.  The 5200 block of 32nd Street is almost Twin City Highway where the H-E-B store is, and they were probably in the 5100 block.  So, they were just west of where he had gone off in the ditch.

Q.    Was he driving in a direction toward where those workers were?

A.    Yes.  He was driving westbound towards Twin City Highway.

Q.    Did it appear, based on your experience as a police officer --

MR. LAINE:    Your Honor, I'm going to object to any speculative questions that he's asking the witness.

THE COURT:    It's overruled.

**BY MR. THOMAS:**

Q. Based on your experience, did it appear he -- the defendant was driving along, looks up and realizes, oh, there's these workers in the road, and drives off into --

MR. LAINE: Your Honor, if I may have a running objection to these questions. They're highly speculative.

THE COURT: It's overruled.

A. That's the conclusion I reached. The work crew had the entire west lane blocked. They had traffic cones and trucks with lights going. They even had a flagman out there. So, they were basically doing what we call a "default" back in the military, where you're using one lane for both directions.

**BY MR. THOMAS:**

Q. And in the days after Ike, that -- that was going on all over Southeast Texas, wasn't it?

A. Very much so.

Q. For most of us, that would have not been a surprise to drive along a power line crew or tree-trimming road crew, would it?

A. No, it wouldn't --

MR. LAINE: Your Honor, I object to relevance.

THE COURT: He's already answered it.

BY MR. THOMAS:

Q. Sergeant White, based on your training and experience and your years in law enforcement, on September 21st, 2008, was that man (pointing) -- in your opinion, was he intoxicated?

MR. LAINE: Again, I object to that, Your Honor. There's no scientific -- he's not qualified to answer that, and calls for speculation.

THE COURT: It's overruled.

BY MR. THOMAS:

Q. Was he intoxicated?

A. Yes, he was.

Q. Did he have any business being behind a wheel of a vehicle?

A. No, he didn't.

Q. Your investigation of this man, did it reveal him to be Carl Matthew Bellotti, III?

A. Yes, it did.

Q. The Ford Ranger truck, is that a motor vehicle?

A. Yes, it is.

MR. THOMAS: I pass the witness, Your Honor.

THE COURT: Mr. Laine?

MR. LAINE: Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. LAINE:**

Q. Sergeant White, was there any -- ever any time that you called an E.M.S. or anything of that nature out?

A. No, I didn't.

Q. You stated earlier that you were possibly going to get blood because you wanted to take him to the hospital; is that correct?

A. That's correct.

Q. How many officers arrived on the scene? Do you remember?

A. Just myself and Deputy Phillips.

Q. You stated earlier that you attempted to do field sobriety tests with Mr. Bellotti; is that correct?

A. I considered doing them. I began to walk him out to an area where it would have been level ground to do them.

Q. Okay.

MR. LAINE: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

His Report

**BY MR. LAINE:**

Q. If you could, read that silently to yourself to refresh your memory (tendering).

A. Which part?

Q. Just refresh your memory.

A. I will read the whole thing.

Q. Okay.

A. (Reading)

Okay (tendering).

Q. Thank you, sir.

Sergeant, you testified earlier that it wasn't long after you got there that Mr. Bellotti was hanging on you, or you were having to hold him up.

Is that what you testified to?

A. I didn't say he was hanging onto me. I had hold of him with my left hand walking him out onto the level portion of the roadway.

Q. Is that what you put in your statement? Did you put that in your statement?

A. It may not be all in there worded that way.

Q. That would be a "yes" or "no." Did you put that in your statement?

A. No.

Q. At what point did you turn on your video or the detective -- or Officer Phillips turn on their

video?

A.    My vehicle didn't have a video system.

Q.    Did his have a video system?

A.    I honestly don't know.

Q.    Is -- have you done DWI's where you've used a video?

A.    Yes.

Q.    While at the Groves Police Department?

A.    Yes.

Q.    But it's your testimony that you had no video this day; is that correct?

A.    That's correct.

Q.    Or that Officer Phillips had any video?

A.    I -- I don't know the unit he was driving, if his video system was working or not. Our video systems at that time were getting outdated and were breaking down. Some cars they were still working; some units they weren't.

Q.    Okay. You also testified that you -- that you took him back to the station, and you gave him no Breathalyzer; correct?

A.    That's correct.

Q.    Breathalyzers aren't portable?

A.    No.

Q.    No?

A.    The only place in Jefferson County that's got a Breathalyzer is at the County Jail -- Mid-County Jail.

Q.    You don't have portable Breathalyzers that you use on the side of the road?

A.    No.

Q.    You stated when you got back to the jail, he was asleep?

A.    No.    I said when he got back -- when I got back to the Groves Police Department, he was seated on the bench and appeared to be sleeping.

Q.    Okay.

A.    He was slumped over.

Q.    Okay.    And that's when you decided to do a blood test; correct?

A.    That's when -- as part of the normal processing -- I requested a specimen of his blood.

Q.    Why would you consider a blood test after all you've testified to the jury that you saw out there on the street?

A.    Because it's standard to ask for a breath and/or a blood test.    Generally I'm going to ask for a blood test if I believe there's also drugs involved, because it's not going to show up on a breath test.

Q.    You inventoried the car; correct?

A.    That's correct.

Q.    You stated that there was no evidence of -- you found no inventory in the car of alcohol; correct?

A.    That's correct.

Q.    What about drugs?

A.    Nothing.

Q.    And that you then later took him from the -- Port Neches to -- I guess it's GEO -- over here, the downtown jail?

A.    He was taken from the Groves Police Department and booked into the downtown jail.

Q.    Okay.  Was he asked for a Breathalyzer there?

A.    No.  But he wouldn't have been able to. There's no Breathalyzers at this jail anymore.

Q.    Did you ask for any type of video or anything of that -- of him at that time?

A.    There's no -- I'm not aware that there would be any video.  There's no DWI process at this --

Q.    Did you --

A.    -- jail.

Q.    I'm sorry, Sergeant.

      Did you drop him off?  Did you transport him?

A.    No.  I had one of the officers do it.

Q.    Okay.  So, you wouldn't know what they did at

the jail; correct?

A. Not specifically, but the paperwork was done. All they were doing was transporting.

Q. But wasn't the entire County Jail basically transported to the downtown jail; correct? Wasn't that your testimony?

A. The prisoners were transported down here. When we would get down here, we were having to do paperwork that we would normally do by computer by hand because they didn't have it set up here for that.

Q. I understand.

But you didn't -- you didn't transport him down; correct?

A. No. I really don't transport. I'm a supervisor.

Q. And you didn't transport him from the street to the Groves Police Department, did you?

A. No. Deputy Phillips did.

Q. How long after Deputy -- how long was it from the time Deputy Phillips left the street till the time Deputy Phillips got to the station -- I mean, until you got to the station? I'm sorry.

A. 20 at the most, 30 minutes. I had to wait for the wrecker.

Q. Mr. Thomas went into a lot about what you saw

or what you did at the station.

Did you write any of that in your report, that he was sleeping or appeared to be sleeping?

A. No, I didn't put that in the report.

Q. Did you take any pictures or photos or anything of that nature?

A. No, I did not.

Q. You talked about aggression and him going from angry to happy; or based on your experience, that often happens.

Did you put that in your report?

A. No, I did not.

MR. LAINE: No further questions.

THE COURT: Mr. Thomas?

MR. THOMAS: No further questions, Your Honor.

THE COURT: Sir, you may step down.

Call your next witness.

MR. THOMAS: Call Deputy Robert Phillips, Your Honor.

(WITNESS ENTERS COURTROOM)

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Will you raise your right hand for me, please.

(WITNESS SWORN)

THE COURT: Come on up and have a seat, please.

You may proceed.

MR. THOMAS: Thank you, Your Honor. Your Honor, I have tendered a copy of his report to Counsel.

**ROBERT ANTHONY PHILLIPS,**

having first been duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR THOMAS:**

Q. Could you state your name for the ladies and gentlemen of the jury.

A. My name is Robert Anthony Phillips.

Q. What do you do for a living?

A. I'm employed by the City of Groves as a police officer.

Q. How long have you been employed with the City of Groves?

A. Since February of '08.

Q. What are your job duties with the City of Groves?

A. I do patrol, I field calls for service, investigate motor vehicle accidents, do citations, work traffic, just basic stuff.

Q. Back on September 21st, 2008, were you working that day?

A. Yes, sir.

Q. Did you get a call to go out and assist Sergeant White?

A. Yes, sir. He called for me over the radio to come assist him.

Q. Why did he need your assistance?

A. To transport his prisoner.

Q. Okay. Where was he at?

A. He was at the 5200 block of 32nd. It intersects with Kleespies.

Q. And that was in the City of Groves?

A. Yes, sir.

Q. Here in Jefferson County, Texas?

A. Yes, sir.

Q. When you got there, did Sergeant White tell you about where his prisoner was at?

A. Yes, sir.

Q. Where was he at?

A. He was over next to his car already in custody.

Q. So, what did you do?

A. I then went over to his car. I talked to him to see -- because I wasn't sure what he had, because

the very beginning of our shift, I was just coming on. And he was early, so that's why he got there first. I was just asking him what was going on. He then requested for me to take the prisoner --

MR. LAINE: Your Honor, I'm going to object to the hearsay with Officer White -- Sergeant White.

THE COURT: Rephrase it.

**BY MR. THOMAS:**

Q. Did Sergeant White tell you what he -- what he was working?

A. Yes --

MR. LAINE: Your Honor, that would be requesting for hearsay.

THE COURT: He's already answered it.

**BY MR. THOMAS:**

Q. And did you see a vehicle in the ditch?

A. Yes, sir.

Q. Did you see a person in custody?

A. Yes, sir.

Q. The man seated right here (pointing), is that the man that was in custody?

A. Yes, sir.

MR. THOMAS: Your Honor, I ask that the record reflect he's identified the defendant.

THE COURT: The record will so indicate.

BY MR. THOMAS:

Q. Did you approach that man at the request of Sergeant White?

A. Yes, sir.

Q. When you got up to him, describe for us what you observed about him.

A. He was leaning against Sergeant White's patrol unit. I then helped him back to my patrol unit to put him into my car. I had to physically support him --

MR. LAINE: Your Honor, I'm going to object. The question -- the answer is nonresponsive.

THE COURT: It's overruled.

BY MR. THOMAS:

Q. You said you had to support him?

A. Yes, sir.

Q. Describe for us what you mean by that.

A. I attempted to let him walk on his own, but I felt it would be dangerous for him because we were close to a ditch and I didn't want him to fall and injure himself while he's in custody. So, I helped to support him because he was wobbling. I didn't want him to get hurt or me be responsible if he fell down while he was in custody.

Q. He was wobbling while he was walking?

A.    Yes, sir.  He was unsteady on his feet.

Q.    How did you have to -- how did you have to hold him up?  Describe for the jury how you were having to support him.

A.    I used my arm, and when he -- cuffed like this (indicating).  I put my arm under his arm like this (indicating), and put (indicating) -- on the back of his shoulder so -- to support his whole body to where he couldn't grab my gun, to where I could maneuver him to which way I needed him to go and me not being able to fall and me having to support him.

Q.    Did you notice anything about his breath?

A.    I could smell a strong odor of an alcoholic beverage coming from his breath and person because, like I said, I'm right next to him.  We were very close when I was walking him to my vehicle.

Q.    You've arrested people that are intoxicated before, haven't you?

A.    Yes, sir.

Q.    Was he intoxicated?

A.    Yes, sir --

MR. LAINE:  Objection, Your Honor.  That calls for speculation --

THE COURT:  It's overruled.

MR. LAINE:  -- he's not qualified to

answer that.

THE COURT: It's overruled.

**BY MR. THOMAS:**

Q. Was he intoxicated?

A. Yes, sir.

Q. So, you support him back to the -- your patrol car?

A. Yes, sir.

Q. How was it getting him into the car?

A. Due to his size and his level of intoxication, it was a little difficult getting him into the car because, for one, the car is not made for somebody of his stature; and it was difficult getting in the car because somebody that is intoxicated --

MR. LAINE: Your Honor, I'm going to object to the narrative.

THE COURT: It's overruled.

A. -- unsteady on his feet, it's kind of hard to manipulate to get somebody in there. I had to assist him by helping him sit down and then get his legs in the car.

**BY MR. THOMAS:**

Q. You had to put his legs in the car?

A. Yes, sir.

Q. And did he say or do anything on the way to

the Groves Police Department?

A.    He was slurring his words.  I wasn't really sure what he was saying.

Q.    He was trying to talk, but you couldn't understand what he was saying?

A.    Yes, sir.

Q.    When you get him back to the Groves police station, how was it getting him out of the car?

A.    Same way it was putting him in.  I had to assist him to get out of the vehicle.  Again, I had to support him and walk him up to the back of the station to open the door and assist him until we got inside --

MR. LAINE:  Your Honor, again, that's a narrative.  Just --

THE COURT:  It's overruled.

MR. LAINE:  -- question and answer.

THE COURT:  It's overruled.

A.    -- assist him inside until he was sitting where we set our prisoners on the bench in our office.

BY MR. THOMAS:

Q.    The whole way you had to assist him in walking?

A.    Yes, sir, because I felt it would be a danger if I did not.  I didn't want him to fall and hurt himself.

Q. Pretty bad shape?

A. In my opinion, yes, sir.

MR. THOMAS: I pass the witness, Your Honor.

THE COURT: Mr. Laine?

## CROSS-EXAMINATION

**BY MR. LAINE:**

Q. Officer Phillips, did you have a video in your car?

A. No, sir.

Q. Yours wasn't working, or you just didn't have one?

A. My particular unit wasn't equipped and the rest of our patrol units -- the equipment was run down because it was out-of-date and a lot of it was broken.

Q. So, every -- every car within the Groves Police Department didn't have an active video; is that what you're saying?

A. Not a working video, yes, sir.

Q. Because they were old and run down?

A. (Nodding head up and down)

MR. LAINE: Your Honor, may I approach?

THE COURT: Yes, sir.

**BY MR. LAINE:**

Q. I'll just have you read -- refresh quietly

your statement (tendering).

A.    (Tendering)

Q.    Thank you.

Officer, what -- what time did you -- or what point did you write this statement?

A.    When did I write that statement?

Q.    Yes, sir.

A.    I do not recall when -- when I wrote that particular report.  Is that what you are asking?

Q.    Yes, sir.

A.    I don't recall.

Q.    Do you recall giving it to the D.A.'s Office?

A.    Me, personally, I did not give it to the D.A.'s Office.  I'm sure someone from my office did.

Q.    So, you don't recall write -- when you wrote this statement; correct?

A.    No, sir.

Q.    Was there a date on this statement that you saw just now?

A.    Excuse me?  The date on the top of the statement?

Q.    No.  The date on -- when you wrote the statement.

A.    I'm sorry.  Could you -- I don't understand the question.

Q. Do you remember seeing a date or time that you wrote this statement?

A. Yeah. There's a date at the top, yes, sir.

Q. That's the date of the arrest; right?

A. Yes, sir.

Q. Did you write this shortly afterwards or --

A. I don't recall if I wrote it -- it depends on the call load -- if I wrote it that day; or I could have wrote it if I worked midnights, which I do. I could have wrote it the day after that in the a.m.; but like I said, I don't recall when I wrote it -- or typed it, I would say.

Q. Okay. Do you recall when it was sent to the District Attorney's Office?

A. No, sir.

MR. LAINE: Your Honor, may I approach?

THE COURT: Yes, sir.

BY MR. LAINE:

Q. You see that date (pointing)?

A. Uh-huh.

Q. Okay. Would it be fair to say it was faxed August 27th --

MR. THOMAS: Your Honor --

BY MR. LAINE:

Q. -- of 2009 --

MR. THOMAS: -- I'm going to object --

THE COURT: Hang on. Hang on.

MR. THOMAS: I'm going to object to something that's testified to that's not in evidence.

THE COURT: That's sustained.

**BY MR. LAINE:**

Q. After refreshing your memory, do you remember what time it was when it was faxed or what date?

MR. THOMAS: Your Honor, again, I'm going to object to statements not in evidence --

THE COURT: Sustained.

MR. THOMAS: -- calls --

MR. LAINE: Your Honor, was that sustained?

THE COURT: It was.

**BY MR. LAINE:**

Q. Was it sent in August?

MR. THOMAS: Your Honor, again, I'm going to object. He's still trying to get around the same question.

THE COURT: He can testify as to his personal knowledge.

A. Sir, I did not fax the report to the D.A.'s Office or have knowledge --

**BY MR. LAINE:**

Q. My question was: Was it in August of 2009?

A. I did not fax it. I have no idea when it was faxed.

Q. Did you write in your statement about how you helped him into the car and put his legs in the car and all that? Did you put that in your statement?

A. No, sir, that was not in my statement.

Q. You stated earlier that you have done several DWI stops or arrests; is that correct?

A. No, sir, I did not state that.

Q. Have you done several?

A. Yes, sir.

Q. And what is your policy? Do you give a Breathalyzer?

A. I'm not certified to give Breathalyzers personally.

Q. Okay. Do other officers give Breathalyzers?

A. For my DWI's?

Q. For their DWI's.

A. It just depends on if I believe it's drug related or alcohol related if I ask for either a Breathalyzer or a blood sample.

Q. Okay. And if you believe they're intoxicated, do you -- do you have an officer give a Breathalyzer or

you --

A. If the --

Q. -- take them -- I'm sorry. Go ahead.

A. If I request for breath, do I give it is what you're asking me?

Q. Or you request it be given since you are not certified?

A. Well, yes, sir.

MR. LAINE: No further questions.

THE COURT: Mr. Thomas?

MR. THOMAS: I have no further questions of this witness, Your Honor.

THE COURT: Sir, you may step down.

Call your next witness.

MR. THOMAS: Your Honor, at this time the State of Texas would rest.

THE COURT: Okay. Ladies and gentlemen, let's take our morning break. We will take a 20-minute break. We will start back -- let's just make it 10:30 even. We will start back at 10:30. On the break, please remember the instructions I gave you. Don't talk amongst yourselves or with anybody else about this case. If you need anything on the break, just let us know; and we will help you out, if we can. We will start back at 10:30, and we will see you at

that time. You are free to go.

(JURY EXITS COURTROOM)

THE COURT: Okay. The jury's not present. I don't know how much you have, but do y'all have your proposed charges? Do you have it with you?

MR. LAINE: No, sir.

THE COURT: Okay. On the break, call your staff and have them send it over to me so I can get -- I want to get the charge done. As soon as y'all finish, we can go into argument.

MR. LAINE: Your Honor, I just need a quick motion.

THE COURT: I will deal with it as soon as I get back.

(RECESS FROM 10:06 A.M. TO 10:35 A.M.)

THE BAILIFF: All rise.

(OPEN COURT, JURY NOT PRESENT, DEFENDANT PRESENT)

THE COURT: Thank you. Please be seated.

Mr. Laine, you had something you wanted to say before I left -- where's Bryan?

(MR. LAINE ENTERS COURTROOM)

THE BAILIFF: There he is.

THE COURT: Let the record reflect the jury is not present, the defendant is, with his attorney.

You had something you wanted to say before I took a break, Mr. Laine?

MR. LAINE: Yes, sir, Your Honor. I was going to ask -- I know that the State has a chance to rebuttal, so I don't know if it's premature or not -- an election. If the Court will allow me, I just spoke to -- we were going to put on one witness. We may rest. If we rest, I was going to ask the State to make an election for the jury charge and also ask for an instructed verdict. So, that's where I'm at right now.

THE COURT: I think it's premature at this point.

MR. LAINE: Okay.

THE COURT: So --

MR. LAINE: Can I have just a moment, Your Honor, because we may rest?

THE COURT: You can have like 10 seconds. I'm almost 5 minutes past what time I told them to be back.

MR. LAINE: Then I would like to go ahead and make the Motion for Instructed Verdict right now, if the State has rested.

THE COURT: Go ahead. You can do it from your table. That's fine.

MR. LAINE: Your Honor, now comes

Carl Bellotti. We move for an instructed verdict in that the State has not proven each and every element of the offense beyond a reasonable doubt. Basically, the State indicted Mr. Bellotti with driving -- (Reading): Unlawfully operating a motor vehicle in a public place while the defendant was intoxicated.

The State has not proven beyond a reasonable doubt, nor do they supply any probable cause for the arrest of Mr. Bellotti. It was not proven that Mr. Bellotti was, per se, intoxicated -- that being with a Breathalyzer or some type of blood analysis. It was also not proven that Mr. Bellotti was given any field sobriety tests. In that particular matter, he was not even challenged as his -- to field sobriety tests. We heard the officer state that they assumed that he was intoxicated. They gave him nothing that would even relate to a field sobriety test.

Also, second, that the combination of substances has not been proven. No blood was taken; no alcohol test was given. And because no sobriety test was given, the only evidence that they've offered to this Court amounts to reasonable suspicion. Nothing amounts to probable cause, and certainly no evidence amounts to beyond a reasonable doubt.

So, therefore, we would ask the

Court, based on that, to grant an instructed verdict.

THE COURT: Okay. It's denied.

Tony, we are ready.

(JURY ENTERS COURTROOM)

THE COURT: Let the record reflect all members of the jury are present. The defendant is present, along with his attorney.

Mr. Laine, you may proceed.

MR. LAINE: Your Honor, at this time the Defense would rest.

THE COURT: Okay. Ladies and gentlemen, the Defense has rested. What I'm going to do, at this point I've got to prepare a charge. I will read that charge to you. That will be the document that you take back there that contains all of the law that's necessary to enable you to reach a verdict.

What I'll do is this: We are going to try -- and I hate to keep you waiting around, but we are going to try 20 minutes. We will try to start back at 11:00. I think that we can reasonably do that. As soon as we come back, I'll read the charge. I'm going to give the attorneys 10 minutes a side to argue the case to you. At that point, I'm going to turn you loose to the jury room; and you can begin your deliberations. If you will give us -- now it

Court, based on that, to grant an instructed verdict.

THE COURT: Okay. It's denied.

Tony, we are ready.

(JURY ENTERS COURTROOM)

THE COURT: Let the record reflect all members of the jury are present. The defendant is present, along with his attorney.

Mr. Laine, you may proceed.

MR. LAINE: Your Honor, at this time the Defense would rest.

THE COURT: Okay. Ladies and gentlemen, the Defense has rested. What I'm going to do, at this point I've got to prepare a charge. I will read that charge to you. That will be the document that you take back there that contains all of the law that's necessary to enable you to reach a verdict.

What I'll do is this: We are going to try -- and I hate to keep you waiting around, but we are going to try 20 minutes. We will try to start back at 11:00. I think that we can reasonably do that. As soon as we come back, I'll read the charge. I'm going to give the attorneys 10 minutes a side to argue the case to you. At that point, I'm going to turn you loose to the jury room; and you can begin your deliberations. If you will give us -- now it

will be right at 21 minutes. Meet back out front at 11:00 o'clock, and we will try to have everything ready to argue to you at that time; okay?

Remember the instructions I gave you. Don't start deliberating now. Wait until everything's done. And we will get you back in here at 11:00. You are free to go.

(JURY EXITS COURTROOM)

THE COURT: Let the record reflect the jury is not present.

And I want to make sure that we get it on the record that -- Mr. Bellotti, you understand you had a right to testify; and you gave up that right to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Laine explained all that to you?

THE DEFENDANT: Yes, sir.

THE COURT: And do you have any questions of me about the right that you gave up?

THE DEFENDANT: No, sir.

THE COURT: Okay. I need -- do you have your proposed charge?

MR. LAINE: Your Honor, I looked at one -- an old one that the State had; and I'm in agreement

with it.

THE COURT: Okay. Do you have a proposed charge?

MR. LAINE: No, I don't have a proposed charge.

THE COURT: Okay. You understand that the Discovery Order says that you're to have that -- provide it to me?

MR. LAINE: No, sir.

THE COURT: Well, that's what the order says.

MR. LAINE: Okay. I am in agreement with theirs, Your Honor.

THE COURT: Okay. But that -- I didn't ask you if you was in agreement. I --

MR. LAINE: Well, you have --

THE COURT: -- asked you -- and you're talking while I am talking; okay? My question is: Did you do what the Discovery Order requires?

MR. LAINE: Not at this time. I have been in the process of doing --

THE COURT: Well, this is the time. So, are you -- anticipate having that to me in the next 10 minutes?

MR. LAINE: Yes, sir.

THE COURT: You do?

MR. LAINE: Yes, sir.

THE COURT: Okay. As soon as you can, get that to me.

MR. LAINE: Okay.

THE BAILIFF: All rise.

(RECESS FROM 10:42 A.M. TO 11:07 A.M.)

(OPEN COURT, JURY NOT PRESENT, DEFENDANT PRESENT)

THE COURT: Let the record reflect the jury's not present. The defendant is present, along with his attorney.

I have tendered a copy of the charge to both State and Defense counsel. The first page is the "Introduction" page, second page is "Definitions," third page is "Driving While Intoxicated," fourth page, "Prior Conviction," the next page is "Felony Offense," the next one is the "Intoxication" definition, "Public Place" definition, "Unlawfully" definition, "Vehicle" definition, "Defendant's Failure to Testify," the charge, three pages of "General Instructions," a "not guilty" verdict form and a "guilty" verdict form.

Is there any objections to the charge by the Defense?

MR. LAINE: Your Honor, the only objection that we would have would be that in the "Intoxication"

definition -- we would ask that the State make an election at this time whether they would want to use "mental or physical faculties," and whether they were going to use "by the induction of alcohol or drugs." Basically, we ask the election not be made. We don't feel that there was any --

THE COURT: Any other objections to the charge?

MR. LAINE: No, sir, Your Honor.

THE COURT: Okay. That's overruled.

Mr. Thomas, does the State have any objections to the charge?

MR. THOMAS: No, sir, Your Honor.

THE COURT: I will give y'all 10 minutes to argue. I will hold you 100 percent to those times. Please don't make me cut either one of you off. I will give you a 2-minute warning. I will give you a 1-minute warning; but after that minute expires, I'm going to ask you to stop.

We are ready. I'm sorry.

(JURY ENTERS COURTROOM)

THE COURT: Let the record reflect all members of the jury are present. The defendant is present, along with his attorney.

Ladies and gentlemen, at this time

I'm going to read to you this charge; and as I go through this, remember, you're going to take this entire document back with you. The attorneys will have 10 minutes to argue their case to you. I will cut them off at 10 minutes. I'm going to give them a 2-minute warning, a 1-minute warning; and the reason it is that way is because the arguments are not evidence. You've heard all the evidence, but they will have an opportunity to argue that. But, again, you'll take this back with you. At that particular point in time, you'll select a foreperson; and then you will begin your deliberations.

**READING OF THE COURT'S CHARGE**

THE COURT: (Reading): Members of the jury, Introduction: The defendant stands charged with the offense of felony driving while intoxicated, alleged to have been committed in Jefferson County, Texas, on or about the 21st day of September of 2008, and that the defendant was convicted of the offense of driving while intoxicated on two previous cases, in Cause No. 132178 on January 5th, 1989, and in Cause No. 138038 on January 5th, 1989, in Jefferson County, Texas, and those convictions became final prior to the offense for which the defendant stands charged. To these jurisdictional elements, the defendant has agreed

that these convictions were final and true. The defendant has entered a plea of not guilty to the indictment.

Our law requires that I submit the following charge to you in this case. This charge contains all of the law necessary to enable you to reach a verdict. If any evidence was presented to raise an issue, the law on that issue must be provided.

Definitions: So that you can better understand some of the words and terms used in the charge, the law provides the following definitions.

Driving While Intoxicated: A person commits an offense if the person is intoxicated while driving or operating a motor vehicle in a public place. The offense is a felony if the person has been convicted twice before for this same offense.

Prior Conviction - DWI: Evidence has been admitted in this case concerning the defendant's having been at least two times previously convicted of being intoxicated while driving or operating a motor vehicle in a public place. If he was, you are instructed that such evidence cannot be considered by you as in any manner proving or tending to prove that the defendant was intoxicated while driving or operating a motor vehicle in a public place on or about

September 21st, 2008.

Felony Offense: Our law further provides that a person commits a felony offense if he commits the crime of driving while intoxicated at a time when he had been previously convicted of two offenses of driving while intoxicated. The defendant has stipulated and agreed that he has been previously convicted of driving while intoxicated on two separate occasions previous to the offense for which he stands charged.

Intoxication: Intoxication means that the defendant does not have the normal use of his mental or physical faculties by reason of the voluntary introduction of alcohol or drugs into his body.

Public Place: Public place means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, in the common areas of schools, hospitals, apartment houses, office building, transport facilities and shops.

Unlawfully: Unlawfully means criminal or tortuous or both and includes what would be criminal or tortuous but for a -- but for a defense not amounting to justification or privilege.

Vehicle: Vehicle includes any device

in, on, or by which a person or property is or may be propelled, moved or drawn in the course of commerce or transportation except such devices as classified as habitations.

Defendant's Failure to Testify: Our law provides that a defendant may testify in his own behalf if he elects to do so. This is a right given to a defendant; and in the event he elects not to testify, that fact cannot be taken as circumstances against him. In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purposes whatsoever.

Charge: If you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, that on or about the 21st day of September of 2008, and anterior to the presentment of this indictment, in the County of Jefferson and State of Texas, that the defendant Carl Matthew Bellotti, III, did then and there unlawfully operate a motor vehicle in a public place while the defendant was intoxicated, and you further find that, as agreed, the defendant was previously convicted of two prior driving while intoxicated offenses and those convictions became

final prior to this alleged offense, then you shall find the defendant guilty of felony driving while intoxicated, as alleged in the indictment. Unless you so find, or if you have a reasonable doubt thereof, you shall find the defendant not guilty.

General Instructions: You have a right to consider all the facts that are shown by the evidence and to draw natural and reasonable inferences from such facts. You alone have the authority and duty to determine what the facts are in this case. In evaluating the evidence, you must totally disregard what you believe is my opinion about any factual matter.

All persons are presumed to be innocent, and no person may be convicted for an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined or indicted for, or otherwise charged with the offense, gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial

consideration of the evidence in the case.

The prosecution has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt; and if it fails to do so, you must acquit the defendant. It is not required that the prosecution prove guilt beyond all possible doubt. It is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt.

You cannot question the bailiff concerning the testimony or the law, nor should you discuss the case in his presence. If a question about the law develops during your deliberations, it must be reduced to writing, signed by your foreperson and given to the bailiff. The question will then be answered by the Court as soon as possible to the extent allowed by law.

Questions and comments of the attorneys do not constitute testimony and must not be considered as evidence. You must also disregard any statement of the attorneys that is inconsistent with the law contained in this charge.

Any physical exhibits admitted into evidence will be furnished to you by the bailiff upon your request. You must not consider facts that have

not been introduced into evidence or legal principles not contained in this charge. It is improper for any juror to discuss or consider anything which they know or have learned outside the testimony presented to you and the law contained in this charge. If a juror should discover that they have any outside information, they must not mention this information to any other juror, nor consider it themselves in arriving at a verdict.

You are the exclusive judges of the facts proven, the believability of the witnesses and the weight to be given to their testimony. However, you must be bound by and strictly follow the law contained in this charge. Your failure to follow the law could result in a mistrial being declared, and your deliberate violation of this charge could subject you to being held in contempt of court.

After the attorneys present their arguments to you, you will retire, select a foreperson and consider your verdict. The arguments are not evidence, and you should give the arguments only the consideration you feel they deserve during your evaluation of the evidence. It is the duty of your foreperson to make certain that your deliberations are conducted in accordance with this charge. When you

have reached a unanimous decision, your foreperson should sign the appropriate verdict attached to the charge. In returning your verdict, it is your responsibility to see that justice is done in this case.

That's signed by me.

Verdict Form No. 1: We, the jury, find the defendant not guilty.

Verdict Form No. 2: We, the jury, find the defendant guilty of the offense of felony driving while intoxicated, as alleged in the indictment.

The State has the right to open and close the arguments.

MR. THOMAS: Your Honor, the State would waive its opening but reserve its right to close.

THE COURT: Mr. Laine, you'll have 10 minutes. I'll give you a 2-minute warning and a 1-minute warning.

**CLOSING ARGUMENTS BY THE DEFENSE**

MR. LAINE: Thank you. Your Honor.

Okay. From the defense standpoint, I hope you see the inconsistencies. The State's going to come up and say it's short and sweet, and there -- there you go. What's the problem here? Basically

there's a lot of problems. There's a lot of problems with proof. There's a lot of problems with what the people said happened at the time but then come and testify here today about things they never wrote in their statements, never said in their statements that Mr. Bellotti, would be reasonable to assume, never did. So, the fact of the matter is, I hope you can see those consistencies that differentiate what those people -- the officers were saying now versus what they wrote in their statements when this occurred. And when this occurred, what evidence do we have?

Well, we have no field sobriety test because the officer, in his statement, just didn't give one. We also have the fact that there is no videos, but we heard the other young officer say, what, every car in the whole Groves Police Department doesn't have a video, where they're all -- they're all being worked on; and that's why we don't have one.

Then we go to the actual evidence of intoxication other than a field sobriety test. The State's going to come and say, Well, we couldn't do a field sobriety test because of all these -- he was so drunk he couldn't stand, had to drag him out -- drag him to the Groves Police Department where he fell asleep and everything else. However, when you ask the

individuals -- they asked the officers and you -- asked the young lady, Did you write this in your statement? Is this what you said happened at the time this occurred? None of that happened. None of -- they wrote none of that in their statements. They said none of that; but, yet, they come today and testify to that.

And I just submit to you that that certainly doesn't rise to the level of beyond a reasonable doubt. Then we have no video. We have two officers with no video. Then, of course, we have no Breathalyzer. And the reason for that is, is because the officer says that it's the hurricane -- because of the hurricane, I can't give -- get a video because the only place I can do a video is down at the Sheriff's Department -- down at the jail -- the Jefferson County Jail. The only reason -- the only way I could do a breath test was down at that jail.

Well, I will submit to you, ladies and gentlemen, that you give that the weight that you feel it deserves. Not being able to do a video at the Groves Police Department, you give that the weight on the realistic end of that -- or over here at this downtown jail, once he was transported to the downtown jail -- which if everybody was over here, which included nurses and everything at Jefferson County was

over here -- the defense would submit certainly that could happen or certainly a breath analysis could happen and take it.

Then, of course, the officer is saying -- again, he didn't write in his statement -- that Mr. Bellotti was asleep or felt like he was asleep when he got there. But he didn't have a blood test because he refused. Again, the testimony that we have, we have no corroborating evidence, which is fair to assume is in most every DWI case. And we have no breath test. We have no video. We have some statements from -- from individuals that when they were on the stand contradicted what they said now versus what they wrote in their statements then.

So, we have a young man after the storm, gets in a wreck, taken to the Groves Police Department, and then taken to GEO. And I would submit, ladies and gentlemen, that it was for convenience. No ambulance was ever called. Was that not protocol? If you have a wreck and a guy seems disoriented, you just automatically just assume, We're going to take their testimony that he's drunk and that you are going to send him on down to the jail?

I will submit to you, yes, most of us -- I don't know if you did. I stayed during Ike. I

didn't stay during Rita. But certainly after those, there's of lot of poleax on law enforcement. Without doing anything further, then -- then from the defense standpoint -- you just take the guy on to jail. And in order to take the guy on to jail, you have to go ahead and create facts that you want to present to a jury for reasons to take him to the jail. But we heard the facts -- or we heard what happened there versus what happened in the seat today.

So, ladies and gentlemen, I -- I guess you would ask yourself, Is this the type of evidence that I would want to be found guilty on? Is this the type of evidence that raises to beyond a reasonable doubt? Is the inconsistencies and the lack of what the individual said at the time of the incident versus what they're saying here today, does that raise to the level of beyond a reasonable doubt? And I will say I hope it doesn't. We are asking you today, ladies and gentlemen, to find Mr. Bellotti not guilty. The facts that were from the stand, from the defense standpoint, doesn't prove that. And if I said it in voir dire, I'll say it again -- maybe I didn't -- sometimes -- the State of Texas -- we are all the State of Texas. We never win or lose in cases like this. We always win when justice is done. And I appreciate your

time and consideration in this case. I look forward to your verdict. Thank you.

THE COURT: Mr. Thomas, you will have 10 minutes.

## CLOSING ARGUMENTS BY THE STATE

MR. THOMAS: Thank, you Your Honor.

I guess the officers are just liars. I guess that's the defense -- Sergeant White and Deputy Phillips are just liars. They didn't have enough to do in the days after Hurricane Ike, they had to make up -- make up a charge against Mr. Bellotti. That's what they want you to believe apparently.

Use your common sense, folks. Do you really think that's the case? Do you really think they had nothing else to do other than to make up a story to look for something to do in the days after Ike? Use your common sense.

In our lives we have a pretty good idea when someone's intoxicated when we are around them, when they're not their normal selves. You and I do, and we are not even police officers. We can recognize when someone's been drinking, had no business driving. But that's certainly what Deputy Phillips and Sergeant White observed that day out of that man (pointing). They smelled alcohol, words weren't

even making sense.

Where are you?

Port Neches.

Try Groves. Can't understand anything else he's been saying. He can't even get away from the side of his truck because he can't stand up. I was going to try to do some field sobriety tests, try to take him over to some level ground. He couldn't even stand up. He was trying to make a decision, Do I want to do some field sobriety tests and him fall down in the middle of the street and get hurt; or is it better to stay beside his truck safely? If we did the field sobriety test and he falls down and hurts himself, we'd be in this courtroom griping about how they didn't take good care of him, letting him get hurt. That would be their fault and the police officer's fault, too, I guess.

Deputy Phillips comes up. He smelled alcohol. I had to help him to the car. I had to put my arm on his back and help the man walk, then I had to pick his feet up, put them inside the car for him, get his feet back out the car. What's an intoxicated person want to do? They're happy, they love you, everything's great; and the next minute they want to fight you. That's just what Sergeant White observed.

He got to the point where he was going the other way and was fixing to become combative. I just put him in cuffs before it got out of control.

He gets back to the jail -- excuse me -- the Groves Police Department; and he's asleep on the bench -- more evidence that he is intoxicated, had no business being behind the wheel of that truck. In the days after Ike, as you-all know, everything is torn up around here. Groves Police Department was torn up. The jail that has the videos for DWI's and Breathalyzer, it's closed. They had to get out of there for the storm. What do we do with this guy? We have Carl Bellotti here intoxicated. Where are we supposed to take him? Apparently the downtown jail's now open. That's not -- we don't normally take people there; but that's the only place we've got. That's where they had to take him.

So they didn't have an opportunity to videotape him or give him a Breathalyzer. They were trying to make do under bad conditions, as if they didn't have enough to do already in the time after Ike. As if it wasn't busy enough for our first responders after Ike, they had to stop and take care of him (pointing).

If you think the police officers are

liars, like they want you to believe, how about this: How about the lady standing out in the front yard of her mother's home? When you get the first clue that this guy's intoxicated and shouldn't have been operating a motor vehicle is when he wrecks in her front yard. How about that for the first sign that guy doesn't have any business driving? And like it comes to a big surprise to us all after we've all been through all these hurricanes, that there's work crews, there's tree trimmers and everybody else on the road working on the days after a storm. Well, it caught him by surprise. I guess when you're in the condition he is, you look up and you -- uh-oh, crash.

I guess we should be fortunate that that ditch was there, because Aleisa and her two grandchildren in the front yard -- had that ditch not been there -- we'd be here on something even more worse than driving while intoxicated.

Sergeant White said, I suspected drugs, all the signs of an intoxicated person sadly behind the wheel of a vehicle. But then there's one last piece of the puzzle that we need to talk about. Sergeant White said the hospitals were open. The hospital's open. Carl Bellotti, can I have a specimen of blood? Let's not worry about an Intoxilyzer

machine, whatever that might do. How about a specimen of blood, take it to a hospital. They don't work for the police. They don't work for you and me. They are going to do scientific testing on your blood to tell 12 jurors just what your blood contains. Carl, can I have a sample of that blood so we can tell those 12 jurors just what your blood contained?

I am not giving you a sample of my blood.

Why?

WAS HURT NOT THINKING STRAIGHT

Because he doesn't want you to know just what all he had in his system. That was his opportunity to prove to you that he had not been drinking, had not been using drugs, that he had been fine behind the wheel of a vehicle. And what he did say? I don't want the 12 of you to have it. It was that same attitude that was telling Mrs. Aleisa Sanders, Don't call the police. Don't call the police -- here they are -- because he knows he's caught.

Use your common sense. That man on September 21st, 2008 -- as if we didn't have enough trouble in our county -- is driving around our county intoxicated, endangering the lives of workmen, Aleisa and her grandchildren, and whoever else was driving

around that day. All signs point to one thing, that man (pointing) was intoxicated behind the wheel of that truck. The 12 of you need to hold him responsible and find him guilty.

THE COURT: Okay. Ladies and gentlemen, if you will please go with the bailiff and begin your deliberations.

THE BAILIFF: Ladies and gentlemen, if you were taking notes, would you please put your notes here on the bar.

(JURY EXITS COURTROOM FOR DELIBERATIONS)

THE COURT: We will be in recess until they get a verdict.

THE BAILIFF: All rise.

(RECESS FROM 11:34 A.M. TO 6:30 P.M.)

**IN CHAMBERS HEARING**

THE COURT: Okay. We have a question that came out -- Question No. 2 that will be made part of the record -- and the Court will send back the response that is attached to Question No. 2. And Mr. Laine had an objection to that.

MR. LAINE: Well, Your Honor, I agree with basically the response, except I would like an admission or something to be included with that. I guess within the response, second paragraph -- one,

two, three, four, five, six, seven -- eighth line down, we would -- the eighth line starts with "have disagreed." I would like it to say "comma during direct or cross-examination comma," then to read on from there. So, I guess it would read this way -- the whole sentence, "unless the jury had disagreed upon some part of the testimony, under the law you are not entitled to have any of the testimony reread; but if you have disagreed upon any point or points in the testimony, you will so state to the Court in writing and point out in writing the point or points upon which you have disagreed" -- I put "during direct or cross-examination comma" -- "then the Court will have the court reporter read back to you only the testimony on the point or points in dispute and no other."

THE COURT: And the Court's response is that I don't even know if they have a disagreement at all as to what the testimony is, and I will send this in and see where we go from there.

So, your request is denied; and I will send this in to them.

REPORTER'S CERTIFICATE

THE STATE OF TEXAS)
COUNTY OF JEFFERSON)

I, Summer Tanner, Official Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ _666.00_ and was paid by _Don Moye_.

WITNESS MY OFFICIAL HAND this is the _11th_ day of _December_, 2009.

_Summer Tanner_

Summer Tanner, RPR
Texas CSR #8208
Expiration Date: 12/31/10
Official Court Reporter
Jefferson County, Texas

THE STATE OF TEXAS §    IN THE DISTRICT COURT OF

§

VS. § JEFFERSON COUNTY, TEXAS

§

CARL MATTHEW BELLOTTI, III § [252ND JUDICIAL DISTRICT]

# REPORTER'S RECORD
## Volume 3 of 4

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GUILT / INNOCENCE
(HUNG JURY)
October 13th, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 1 1 2015

Abel Acosta, Clerk

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

THE STATE OF TEXAS              §       IN THE DISTRICT COURT OF

                                §

VS.                             §       JEFFERSON COUNTY, TEXAS

                                §

CARL MATTHEW BELLOTTI, III      §       [252ND JUDICIAL DISTRICT]


# REPORTER'S RECORD
## Volume 3 of 4

****************************

GUILT / INNOCENCE
(HUNG JURY)
October 13th, 2009

****************************

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

REPORTER'S RECORD

VOLUME 3 OF 4

TRIAL COURT CAUSE NO. 09-07283

THE STATE OF TEXAS     *    IN THE 252ND DISTRICT

                            *

VS.                      *    COURT OF

                            *

CARL MATTHEW BELLOTTI,    *

III, A/K/A CARL MATHEW    *

BELLOTTI, III, A/K/A      *

CARL MATHEW BELLOTTI,     *

A/K/A CARL MATTHEW       *

BELOTTI, III, A/K/A       *

CARL MATHEW BELOTTI, III   *    JEFFERSON COUNTY, TEXAS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

GUILT/INNOCENCE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 14TH day of OCTOBER, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Layne Walker, Judge Presiding, held in Beaumont, Jefferson County, Texas:

Proceedings reported by Machine Shorthand.



APPEARANCES

FOR THE STATE:

Mr. Perry Thomas
SBOT NO. 19849120
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701

Mr. Pat Knauth
SBOT NO. 11585500
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701

FOR THE DEFENDANT:

Mr. Bryan Laine
SBOT NO. 24011488
Attorney at Law
1045 Redwood
Kountze, Texas 77625

SUMMER TANNER, CSR, RPR
252nd District Court

VOLUME 3

GUILT/INNOCENCE

|  | PAGE |
|---|---|
| Case Called | 5 |
| Jury Question | 5 |
| Defendant's Motion for Mistrial | 6 |
| Court Grants Motion for Mistrial | 7 |
| Foreman Announces Jury Deadlocked | 8 |
| Jury Dismissed | 9 |
| Reporter's Certificate | 10 |

VOLUME 4

EXHIBITS

JURY'S EXHIBITS

NO.           DESCRIPTION

1             Jury Question No. 1

2             Jury Question No. 2

3             Jury Question No. 3

4             Jury Question No. 4

5             Jury Question No. 5

(OPEN COURT, JURY NOT PRESENT, DEFENDANT NOT PRESENT)

THE COURT: I just got a deal from the jury. I want the record to reflect that the jury began deliberating yesterday at 15 minutes until 12:00. Yesterday was October the 13th, 2009. They went to the jury room at 15 minutes until 12:00 and deliberated until -- somebody correct me if I'm wrong -- 2:05, took a break from 2:05 for lunch, returned at 3:00 o'clock, deliberated without a break until 6:30 --

MR. THOMAS: Yes, sir.

THE COURT: -- yesterday afternoon. I ordered that they return at 8:00 o'clock this morning. They actually went into the jury room at what time?

THE BAILIFF: 8:09.

THE COURT: 8:09. And have been deliberating since 8:09. It is now 10:12. The jury has just sent out a note.

It says (Reading): Judge, we are split. No one will change their position and haven't since the beginning. We see no additional evidence ideas to change current position. Please advise. We understand what we were asked to do based on the charge but see no way to a resolution.

And I think I have read that correct. Y'all take a look (tendering). What do y'all want to

do -- and I want to let the record reflect Mr. Laine is present and Mr. Thomas is present while we are having this discussion.

MR. LAINE: Your Honor, just from the defense standpoint, we've -- I have read a proposed Allen Charge or Dynamite Charge from the Court. I believe since -- based on two notes previous yesterday that we -- that they could not make a decision. I think the 6:30 note basically said the same thing, our decision's been the same --

THE COURT: I agree.

MR. LAINE: -- since the start, that the Court was -- it -- under its authority, we would ask for a mistrial at this time.

THE COURT: Mr. Thomas, do you have any objection?

MR. THOMAS: Your Honor, I will agree with whatever Mr. Laine wants to do at this point in time.

THE COURT: I want the record to be clear, I have tried a lot of cases; and most of the time it's -- there's a little bit of confusion in light -- this jury has been dead set, in my opinion, since the very first question that they are deadlocked; and they just never have used the magical terms. But I don't think there's any question in my mind that they are

deadlocked, and continued deliberation would be futile. And, therefore, I'm going to grant Mr. Laine's Motion for Mistrial. We will reset this matter for -- I will take a look at it, see when we can get y'all back down here and get the case tried.

MR. LAINE: Yes, sir.

THE COURT: Let's do this. If I can, let's get Bellotti -- Mr. Bellotti, let's get him in here and then I will get them in here and I will cut them loose. While y'all do that, I'm going to do this plea real quick.

(PAUSE IN PROCEEDINGS)

(OPEN COURT, JURY NOT PRESENT, DEFENDANT PRESENT)

THE COURT: Okay. I am ready for the jury.

MR. THOMAS: Judge, I think we both would like for you to inquire with the foreman first.

THE COURT: That they are hopelessly deadlocked?

MR. THOMAS: Yes, sir.

THE COURT: Okay.

(JURY ENTERS COURTROOM)

THE COURT: Let the record reflect all members of the jury are present. The defendant is present, along with his attorney. A note was sent out

saying that the jury was not able to reach a verdict.

Mr. Hopson, I'm going to ask you, sir: Are you satisfied that the jury is hopelessly deadlocked in this matter?

THE FOREPERSON: Yes, sir.

THE COURT: No chance of reaching resolution in this case?

THE FOREPERSON: No, sir.

THE COURT: Okay. The request has been made by Mr. Laine for a mistrial without objection. I'm going to grant this Motion for Mistrial.

At this time, your job here is done. If you don't mind, give us the badges back. Next week we will go through the process, again. We will select another jury and try the case, and we will continue to do so until there's resolution. You are released from your instructions. If you want to talk to anybody, feel free to do so. If you need a work excuse signed, go straight across the hall to Ms. Ramos' office; and she will get that taken care of for you. You are free to go. If somebody wants to hang around and talk to an attorney, if y'all will, just wait outside and tell Wayne or Tony who it is you want to speak with, and they will be happy to speak with you. Y'all are free to go.



(JURY DISMISSED)

# REPORTER'S CERTIFICATE

THE STATE OF TEXAS)
COUNTY OF JEFFERSON)

I, Summer Tanner, Official Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ _441.00_ and was paid by _Don Moye_.

WITNESS MY OFFICIAL HAND this is the ___11th___ day of __December__, 2009.

_____
Summer Tanner, RPR
Texas CSR #8208
Expiration Date: 12/31/10
Official Court Reporter
Jefferson County, Texas
Beaumont, Texas 77701

SUMMER TANNER, CSR, RPR
252nd District Court

THE STATE OF TEXAS      §      IN THE DISTRICT COURT OF

§

VS.      §      JEFFERSON COUNTY, TEXAS

§

§

CARL MATTHEW BELLOTTI, III      §      [252ND JUDICIAL DISTRICT]

# REPORTER'S RECORD
## Volume 1 of 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GUILT / INNOCENCE

&

PUNISHMENT

&

PLEA OF GUILTY AND SENTENCING
October 18th, 2011

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 11 2015

Abel Acosta, Clerk

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

THE STATE OF TEXAS                §        IN THE DISTRICT COURT OF
                                  §
VS.                               §        JEFFERSON COUNTY, TEXAS
                                  §
CARL MATTHEW BELLOTTI, III        §        [252ND JUDICIAL DISTRICT]


# REPORTER'S RECORD
## Volume 1 of 1

************************************
### GUILT / INNOCENCE
### &
### PUNISHMENT
### &
### PLEA OF GUILTY AND SENTENCING
### October 18th, 2011
************************************

Philip W. "Phil" Moore, Amicus Curiae
15623 Fagerquist Road
Del Valle, Texas 78617-5800
Phone: (512) 667-1508
e-mail: pwm11.07@gmail.com

**SUMMER TANNER, CSR, RPR**
**252ND DISTRICT COURT**
**(409) 835-8637**

TO:  Mr. Carl Bellotti, Jr.
     2122 Merriman Street
     Port Neches, Texas 77651

FROM:  Summer Tanner
       Official Court Reporter
       252nd District Court
       1001 Pearl
       Beaumont, Texas 77701

RE:  Cause No. 09-07283
     The State of Texas vs. Carl Matthew Bellotti, III

REPORTER'S RECORD:  Vol. 1
BILLED - 11/21/2013
*******************************************************
Original and 1 Copy

Vol. 1 - Guilt/Innocence, Punishment and
         Plea of Guilty
   145 pages @ $5.50 pp..........................$797.50

Binding.........................................$15.00


**TOTAL.........................................$812.50**

REPORTER'S RECORD

VOLUME 1 OF 1

TRIAL COURT CAUSE NO. 09-07283

THE STATE OF TEXAS         \*    IN THE 252ND DISTRICT
                                \*
                                \*
VS.                             \*    COURT OF
                                \*
                                \*
CARL MATTHEW BELLOTTI,       \*
III, A/K/A CARL MATHEW      \*
BELLOTTI, III, A/K/A         \*
CARL MATHEW BELLOTTI,        \*
A/K/A CARL MATTHEW          \*
BELOTTI, III, A/K/A          \*
CARL MATHEW BELOTTI, III    \*    JEFFERSON COUNTY, TEXAS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
GUILT/INNOCENCE
&
PUNISHMENT
&
PLEA OF GUILTY AND SENTENCING
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 18TH day of OCTOBER, 2011, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Layne Walker, Judge Presiding, held in Beaumont, Jefferson County, Texas:

Proceedings reported by Machine Shorthand.

COPY

A P P E A R A N C E S

FOR THE STATE:

Mr. Perry Thomas
SBOT NO. 19849120
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701

Mr. Pat Knauth
SBOT NO. 11585500
Assistant District Attorney
1001 Pearl, 3rd Floor
Beaumont, Texas 77701

FOR THE DEFENDANT:

Mr. Norman Desmarais
SBOT NO. 00795925
Attorney at Law
1233 Nederland Avenue
Nederland, Texas 77627
(409) 729-2777

## VOLUME 1

### GUILT/INNOCENCE & PUNISHMENT

### PLEA OF GUILTY AND SENTENCING

|                                              | PAGE |
|----------------------------------------------|------|
| Stipulations                                 | 5    |
| Jury Sworn                                    | 7    |
| State Reads Indictment                        | 8    |
| Defendant Pleads Not Guilty                   | 8    |
| State Testimony Begins                        | 9    |

| STATE'S WITNESSES | DIRECT | CROSS |
|-------------------|--------|-------|
| Aelisa Sanders    | 9      | 17    |
| Kevin White       | 36     | 48    |

|                                              | PAGE |
|----------------------------------------------|------|
| State Rests                                   | 91   |
| Defendant Admonished                          | 91   |
| Motion for Instructed Verdict by Defense      | 92   |
| Court Denies Motion                           | 93   |
| Defense Rests                                 | 94   |
| Jury Instructions                             | 97   |
| Defendant's Closing Statements                | 104  |
| State's Closing Statements                    | 111  |
| Jury Deliberations                            | 116  |
| Jury's Verdict                                | 118  |
| Defendant Rejects Plea Offer                  | 120  |
| Defendant Pleas Not True to Enhancements      | 122  |
| State's Testimony Begins                      | 123  |

|                        | PAGE |
| ---------------------- | ---- |

| STATE'S WITNESSES | DIRECT | CROSS |
| ----------------- | ------ | ----- |
| James Carl Rose | 123 | 132 |

| | PAGE |
| --- | --- |
| State Rests | 135 |
| Defense Rests | 135 |
| Defendant Pleads Guilty | 138 |
| Defendant Pleads True to Enhancements | 139 |
| Defendant Sentenced | 141 |
| Jury Dismissed | 144 |
| Reporter's Certificate | 145 |

EXHIBITS

STATE'S EXHIBITS

| NO. | DESCRIPTION | TENDERED | ADMITTED | VOL. |
| --- | ---------- | -------- | -------- | ---- |
| 1 | Stipulation | 75 | 76 | 1 |
| 3-7 | Judgment & Sent. | 131 | 131 | 1 |
| 8-10 | Pen Packets | 126 | 127 | 1 |
| 1 | Plea Papers | 138 | 138 | 1 |

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

THE BAILIFF: All rise. 252nd District Court is now in session. The Honorable Layne Walker presiding.

THE COURT: Thank y'all. Please be seated. Is everybody ready?

MR. THOMAS: Ready. I just had one question, Judge: How y'all want to handle the reading of the indictment? You have to read the two that he's pled true to? Do you want to read the first part about intoxication first and then enter a plea and then the two enhancement paragraphs and he can plea to that two separate times?

THE COURT: Yes, sir. Is he going to plea true? Is there a stipulation?

MR. DESMARAIS: We've already stipulated before, Your Honor.

THE COURT: That's what I want to make sure of.

MR. THOMAS: I think I need to read it for the --

THE COURT: I understand. I guess the question is what if he stands up and says they are not true?

MR. THOMAS: Then we would go forward with

the two priors.

THE COURT: Okay.

MR. DESMARAIS: We stipulated. I don't know why you have to read them. They are not going to make a decision on them. There's no jury decision, so there's no reason to let them know we stipulated to the two priors.

MR. KNAUTH: I'd be concerned about the jury instructions.

THE COURT: I think he's right about that.

MR. THOMAS: Last time in the charge you had instructed the jury that he'd pled true to two priors.

THE COURT: Right.

MR. THOMAS: Is that -- you can do that again.

THE COURT: I -- yeah, I think you have to.

MR. THOMAS: Right, to get the -- that's -- essentially just read this first paragraph?

THE COURT: I'd just read the first paragraph. And let the record reflect that the defendant has stipulated to the jurisdictional enhancements and agrees that he was convicted of those offenses. Is that the case, Mr. Desmarais?

MR. DESMARAIS: I think that's the way we have to do it. If the Court decides to read the two enhancements, he'll plea true to them.

THE COURT: We will go on the first paragraph.

MR. THOMAS: Yes, sir.

THE COURT: We're ready.

(JURY ENTERS COURTROOM)

THE COURT: Good morning to you.

THE JURY: (Response)

THE COURT: Let the record reflect all members of the jury are present. The defendant is present, along with his attorney. At this time, would you each raise your right hand for me please.

(JURY SWORN)

THE COURT: Jury's sworn. Is the State ready to proceed?

MR. THOMAS: We are, Your Honor.

THE COURT: Defense ready to proceed?

MR. DESMARAIS: Defense is ready. Hold on just so I can switch the seat.

THE COURT: You got it. Mr. Thomas, you can read the indictment.

Would the defendant stand for the reading of the indictment?

THE DEFENDANT: (Standing)

MR. THOMAS: (Reading): In the name and by the authority of the State of Texas, the Grand Jurors for the County of Jefferson, State aforesaid, duly organized as such at the July Term, A.D., 2009, in the Criminal District Court of Jefferson County, in said County and State, upon oath in said Court, present that Carl Matthew Bellotti, III a/k/a Carl Mathew Bellotti, III a/k/a Carl Mathew Bellotti a/k/a Carl Matthew Belotti, III a/k/a Carl Mathew Belotti, III, hereafter styled the defendant, on or about the 21st day of September, 2008, and anterior to the presentment of this indictment, in the County of Jefferson, State of Texas, did then and there operate a motor vehicle in a public place while the defendant was intoxicated, against the peace and dignity of the State. It's signed by the foreperson of Grand Jury.

THE COURT: Mr. Bellotti, to the indictment, do you enter into a plea of not guilty or guilty?

THE DEFENDANT: Not guilty.

THE COURT: Okay. You may be seated. Does the State desire to make an opening statement?

MR. THOMAS: No, sir.

THE COURT: Okay. Call your first

witness.

MR. THOMAS: We would call Aelisa Sanders.

THE COURT: Aelisa Sanders.

(WITNESS ENTERS COURTROOM)

MR. THOMAS: I'm tendering a copy of her statement to Counsel.

(WITNESS ENTERS COURTROOM)

THE COURT: Good morning. Will you raise your right hand for me, please.

(WITNESS SWORN)

THE COURT: Come on up and have a seat, please. Watch your step.

You may proceed.

MR. THOMAS: Thank you, Your Honor.

AELISA SANDERS,

having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THOMAS:

Q. Mrs. Sanders, would you state your full name for the ladies and gentlemen of the jury?

A. Aelisa F., as in Fay, Sanders.

Q. And, Mrs. Sanders, do you work for a living?

A. No, I do not.

Q. Okay. And where do you live?

A. I live in north Vidor --

Q. Okay.

A. -- Texas.

Q. Do you have some relatives or did you have relatives that had a home here in Jefferson County, Texas?

A. Yes.

Q. Who was that?

A. My mother.

Q. And where was that located at?

A. In Groves.

Q. Okay.

A. On 32nd.

Q. Back on September 21st, 2008, were you at your mother's home that day?

A. Yes.

Q. What time of day were you at your mother's home?

A. I was there all day --

Q. Okay.

A. -- until --

Q. Why were you over there at your mother's house?

A. We were cleaning up after a storm for her.

Q. I think -- was that after Hurricane Ike, one of the hurricanes?

A. Yes. Yes. The house was okay. Yard was horrible.

Q. Okay. And, so, sometime after this storm, you're cleaning up your mother's yard; is that correct?

A. Correct.

Q. And your mother's home is located in Groves?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes. I'm sorry. "Yes."

Q. That's all right. Now, as you're working in your mother's yard, did something unusual happen?

A. Yes, it did.

Q. And about what time of the day was that?

A. Ugh, 5:00, 5:30, somewhere around there.

Q. Was it still daylight?

A. Yes.

Q. Well, what happened that was unusual?

A. Well, um, screeching of tires, you know, and look up and see a -- a small truck go off the road and go into the ditch -- nosedive in the ditch.

Q. Okay. Was that in front of your mother's house?

A. Yes.

Q. Kinda in her yard?

A. If it would have gone to the left, it would

have been her yard, yes.

Q. Okay.

A. But it -- uh-huh.

Q. You were out there in the yard working when this occurred; right?

A. Correct.

Q. And what first got your attention, the screeching of the tires?

A. The noise, uh-huh. Yes, sir.

Q. And you see the truck go into the ditch?

A. Yes. As I was turning, it was in the process of -- in the ditch, yes.

Q. Okay. After that truck went into the ditch, what did you do?

A. I hollered for my husband to come around the house so that he could take charge of my two grandchildren I had with me in the front yard.

Q. Okay. And what did you do after that?

A. I ran across the street to see if the person needed assistance of any kind.

Q. Was the person still behind the wheel of the car when you got there?

A. Yes.

Q. And what were they doing?

A. Ugh, staring.

Q. What do you mean? Describe for us what you mean by "staring."

A. Um, was not frantic, just a -- what I would describe as, maybe, hesitating to see what happened. Just sitting.

Q. Okay. Did he just sit there or did he eventually get out or what happened?

A. I knocked on the window. Eventually rolled it down, asked if they were hurt, if they needed any kind of assistance. And first thing that was said was just, Don't call the police. Don't call the police.

But something was not right.

Q. What was not right?

A. With the way the person was acting, I didn't know if maybe the way the truck went in if they hit their head or what. Ugh, real slurred speech, not really knowing exactly where they were or what had happened. Yeah, eventually did get out of the truck.

Q. Okay. So, how many people were in the truck?

A. One.

Q. And was it male, female?

A. Male.

Q. The person that got out of the truck, do you see him in the courtroom today?

A. Yes, sir.

Q. Point to him and describe what he's wearing for us, please.

A. (Pointing) He's right to my right. He's got a blue tie and I guess that's a green khaki-colored suit and a white shirt.

MR. THOMAS: I'd ask the record reflect she's identified the defendant.

THE COURT: The record will so indicate.

Q. (BY MR. THOMAS): So, when he rolled the window down, the first thing he said was, Don't call the police?

A. Yeah. It was kind of in the process of me asking, Are you okay, did you hit your head -- it's just common questions, I guess, you would ask.

And it -- he kept shaking his head and wouldn't really look at me but, Don't call the police. Don't call the police. Because I was asking if he was hurt.

Q. And you said he eventually -- then he got out of the truck?

A. Uh-huh.

Q. What happened when he got out of the truck?

A. Staggery, just kept saying, What happened. I need to get my truck out. What happened? Didn't really make any sense.

And I just continued to ask if he was okay, if he needed any -- you know, an ambulance. It registered, but it didn't. It was just kinda like I wasn't there. Stumbling, leaned -- propped against the truck. He couldn't hold himself up very well. He stumbled if he tried to walk.

Q. Okay. Did you see any evidence that he'd been hurt --

A. No.

Q. -- like a knot on the head?

A. No, I did not.

Q. Blood --

A. No.

Q. -- scratches, anything like that?

A. No.

Q. Did you come to any conclusions about the man's condition?

A. Yes.

Q. What did you conclude?

A. In my mind, I thought he was drunk.

Q. Okay.

A. I would say sloppy drunk.

Q. Okay. He was not able to hold himself up?

A. No. He never fell to the ground.

Q. Okay.

A. But very stumbly, holding on and grasping for things, and then he just leaned against his truck.

Q. Did -- did you -- did you or your husband or someone call the police?

A. Yeah. I did.

Q. And the police eventually came to where you were at?

A. Yes.

Q. I guess when the police got there they took charge of the situation?

A. Correct. Uh-huh.

Q. Did you have any more conversations with the man after he got out? You noticed he was trying to support himself on the truck. Did you have any more conversations with him before the police got there?

A. Basically occasionally, Are you okay? Where are you going?

He said he was going home. He said, Right down the road.

I said, Where do you live.

Something to the effect of Port Neches. And I knew we weren't in Port Neches.

Q. Okay.

A. Said he'd just got off of work. He said he worked on a -- offshore, and just something like that,

nothing -- but he did try to flag down cars.

Q.   That's what I was just fixing to ask you.

A.   Uh-huh.

Q.   Tell me about that.

A.   Well, he'd stumbled out, and I'd tell him, Come back over here, you know, come back over here. Don't get in the road.

Trying to get somebody to pull him out.

Q.   Okay.

A.   A couple cars did stop --

Q.   Okay.

A.   -- but nobody -- he just kept saying, I need to get my truck out.  I need to get my truck out.

Q.   No one -- no one pulled him out?

A.   Oh, no.  No.

Q.   And did the police department then eventually come to your scene?

A.   Right.

Q.   To that location?

A.   Uh-huh.

MR. THOMAS:  I pass the witness, Your Honor.

THE COURT:  Mr. Desmarais?

CROSS-EXAMINATION

BY MR. DESMARAIS:

Q.   Good morning, Mrs. Sanders.

A.   Good morning.

Q.   Your mother's house was across the street from him?

A.   Correct.

Q.   Okay.  So, there was an intersection, and he was in -- when you say ditch, you're talking about a drainage culvert -- culvert?

A.   It was a ditch.

Q.   Grass-filled?

A.   No.  It was kinda steep.  It wasn't one of these great big ditches because the streets are very narrow, but it was -- my mother's house -- and here is -- can I do my hands?

Q.   Sure.

A.   32nd runs this way (indicating).  There's a side street right here (indicating).

Q.   And that's --

A.   And my mother's house is here (indicating). There's not a side street where my mother's house is. The side street actually goes into her driveway.  It's a crossover.

Q.   Okay.  And he was taking a right turn onto the side street?

A.   I don't think he was turning.

Q.   Was he traveling on 35 -- 32nd Street?

A.   Right.

Q.   Okay.   And then when he went off the thing that he went off -- the ditch off the intersection, Kleespies Street?

A.   Yes.   That's right here (indicating) on this corner.   But it wasn't like he was making a turn.   He went straight into the ditch -- hit the stop sign and he nosed into --

Q.   When you say "straight into the ditch," did he cross over the ditch -- how wide is the ditch?

A.   I don't know.   Normal ditch.   I don't -- I don't know what -- two feet, three feet?   I don't know.

Q.   So, you had your back to him.   Your mother's yard, how far offset is her house from there?

A.   It's not far.   The road is an older town road. It's enough for two cars to pass.   The ditches are not wide, and it's just right there.

Q.   Okay.   But it is across the street --

A.   Correct.

Q.   -- parallel to 32nd?

A.   Uh-huh.

Q.   Did you make a statement to the police?

A.   Yes.

Q.   Okay.   Do you remember when you made that

statement?

A. Uh-huh. Yes, sir.

Q. And that was on the 25th of December -- September?

A. I believe it was the 21st.

Q. Did you ever sign a statement?

A. Yes.

Q. Okay. And you signed that on the 25th of September?

A. 21st, I believe.

MR. DESMARAIS: May I approach the witness?

THE COURT: Yes, sir.

Q. (BY MR. DESMARAIS): Let me show you this document.

A. I could be wrong.

Q. If you want to read it just to refresh your memory.

A. Oh, okay. 25th. Okay. That's what it says at the top. Oh, it happened on the 21st.

Q. So, on the 25th, you went down to the police station to give another statement?

A. I don't remember. I don't think I went to the police station.

Q. Did they come to your place --

A.   I talked to the police officer that day.

Q.   When they -- let me see if I can make this clear.   When did you sign the statement -- you signed it on the 25th.   Where did you sign it?

A.   I made the statement to the officer there after the accident.

Q.   Okay.

A.   And I signed what he had.   When I made my statement, I signed it.

Q.   So, there's another statement out there, a handwritten statement?

A.   It was on the form that they gave me.

MR. DESMARAIS:   Your Honor, I'd like the prosecution to provide that handwritten statement or the form statement.

MR. THOMAS:   (Tendering)

Q.   (BY MR. DESMARAIS):   Do you remember signing the typewritten statement?

A.   If my signature's on there, I signed it.

Q.   Okay.   The question is do you remember doing it?

A.   I don't -- yes.   I know I signed my statements.

Q.   Right now we have two statements.

A.   Okay.

Q. A handwritten one and a typed one.

A. Are they the same?

Q. Do you remember signing --

A. Yes.

Q. -- both of them?

A. Yes, I do.

Q. Okay.

A. I remember signing, yes.

Q. One was given on the 21st at 5:22.

A. Okay.

Q. One was given on the 25th. We don't know what time. Do you agree so far?

A. If it's there, it was, yes.

Q. Okay. Now, in the statement you gave to the police officer, you -- he asked you questions; you answered them?

A. No. He asked what happened --

Q. Okay. And then --

A. -- and I told him.

Q. -- told him what happened?

A. Correct.

Q. And then he wrote it all down on this thing, and then he asked you to sign it; correct?

A. No. I believe I wrote it.

Q. This is your handwriting?

A. Right.

MR. DESMARAIS: May I approach again, Your Honor?

THE COURT: Yes, sir.

A. Let me see.

Q. (BY MR. DESMARAIS): (Tendering)

A. This has been awhile back. A lot has happened since then.

No. I stated that. I did not write that. That's not my handwriting.

Q. So, the policeman wrote this, showed it to you, probably, and said, Is this what happened, and you said, Yes, and signed it; correct?

A. Yes. I told him -- he didn't write what he wanted. I told him what happened.

Q. Okay. That's fair.

And then at some point he went down and he provided you with a typewritten statement, had you review it and asked you to sign it on the 25th?

A. Again, I don't remember. It's been awhile. A lot has happened since then, but if it's typed and my signature is on it, I signed it. No one came to my house.

Q. Okay. When you approached the car, was the car running?

A. I don't remember.

Q. You said the window was up?

A. Correct.

Q. Was it a hot day that day?

A. I don't remember.

Q. Okay. When he opened up the window, could you feel the air-condition?

A. I don't remember that. I was more concerned that he was hurt.

Q. Did you help him out of the car?

A. No, I did not.

Q. At any time did you touch him?

A. No, I did not.

Q. Did you make the police -- the call to the Groves Police before you crossed the street or after you had gotten to his car?

A. Let me think. The best I can remember, I believe I asked if he was okay and then called.

Q. Say again.

A. I believe to the best of my memory I went directly and asked if he was okay --

Q. Okay.

A. -- and called at that time.

Q. At the time you're asking him if he was okay?

A. Well, I stepped off.

Q. And your husband stayed at --

A. He was in the yard.

Q. -- your mother's house?

A. Uh-huh.

Q. He never approached the car?

A. No.

Q. Did he make any statements on the scene?

A. My husband?

Q. Yes.

A. No.

Q. Did the police officer ever approach him to ask him what he saw?

A. No.

Q. Was he in the front yard or was he around the back?

A. He was around the back.

Q. Okay. Was your mother there?

A. No.

Q. Anybody else approach?

A. Sorry?

Q. Any other neighbors --

A. No.

Q. -- there? Was there any work crews on that street that day?

A. Yes, sir.

Q.   Where was the work crew?

A.   Um, not far in front of -- or past the street that he went in the ditch.

Q.   When you say -- he was heading east or west?

A.   I -- I don't know my directions very well.

Q.   Okay.  I have --

A.   He was heading towards the main street.  I don't know what street it even is.  Not toward the highway, heading the other way.

Q.   Well, let's make it simple.  You're in front of your mother's house?

A.   Correct.

Q.   The street is catty-corner or directly across from your mother's?

A.   Directly across from her driveway.

Q.   All right.  And he's pointing to the left side or to the right side?

A.   I'm my mother's house.  He's coming this way (indicating).

Q.   So, he's going from your right to left?

A.   Yes.

Q.   Okay.  Where were -- where were the workmen?

A.   My left.

Q.   To your left.  How far down the road?

A.   If he had not hit the ditch, a couple seconds

later he would have hit the workmen; they were that close.

Q. They were a hundred feet down?

A. They were close. I don't know how many feet, but -- ugh, two car lengths, maybe.

Q. They were down two car lengths?

A. Maybe.

Q. Did they have any cones down?

A. Yes.

Q. And the cones, that's where you're saying they were down two car lengths? The cones start at two car lengths down?

A. No. The actual work vehicle -- I don't know what they were doing, but it was some type of maybe electrical truck that they use with the lift. It was there. They are doing some type of work.

Q. Okay.

A. And the cones were off the back, toward where he hit the ditch, so they weren't far. The -- from the corner to the back of the work truck, maybe, was two car lengths.

Q. So, 28 feet, 30 feet?

A. I don't know. I don't know.

Q. Were they off the road or on the road?

A. The workmen?

Q. (Nodding head up and down)

A. On the road. They had to be --

Q. I mean, was the truck parked on the road, or was it parked off in the grass?

A. No.

Q. Off the road. So, it was right in the middle of the road closing down the lane?

A. It was in the lane, yes. You could still pass in the other lane.

Q. And you say he stopped several cars. How many cars did he try to attempt to stop?

A. Two that I remember.

Q. And were they going towards the trucks or away from the truck?

A. Toward.

Q. Toward. And just --

A. Like where he came from.

Q. So, he just tried to wave them down and say give me a hand?

A. He was stumbling in the road and hollering, Stop, stop. I need my truck out.

But it wasn't -- it was slurry, and he was not...

Q. Now, in this first statement you made, you never mentioned the fact -- you never said that he was

slurring his words or he was stumbling around or he tried to stop any traffic; is that correct?

A. I don't know. It's there in front of you. I don't know.

MR. DESMARAIS: May I approach, again, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. DESMARAIS): If you'll just read that, review it (tendering).

A. That's basically at the time hurried and nervous and whatever was going on. That's what --

Q. Okay. About him being blank-faced and not paying attention to you when you first went to the thing, that's not in this first statement either, is it?

A. No.

Q. Now, in your second statement, made four days later, you say he stumbled around and tried and attempted to stop cars?

A. That's true.

Q. Okay. Stumbled around through traffic. There were two cars that passed him?

A. No, sir. Two cars that turned down the little side street that he was able to stop.

Q. So, he did stop cars?

A.   They slow-rolled.   They didn't want to stop. A man was just about to fall into their car and hollering, "stop," so, they stopped.

Q.   So, he was never on 32?   He was --

A.   No.

Q.   -- on the side street?

A.   No.   Because I kinda stood and said, Don't get on this road.

But he was trying -- because he wanted to stop a car.   He kept saying, Don't call the police.

And I said, The police are on their way. The ambulance is on the way.

Q.   The ambulance is on its way.   Did you call an ambulance?

A.   I just called 911 and they said, Is the person hurt.   Well, I didn't know.

Q.   Right.

A.   That's a normal response, usually an ambulance --

Q.   And that's what you told whoever took the 911 call?

A.   Yeah.   I couldn't say if he was hurt.

Q.   Did they say they would send an ambulance?

A.   They said help's on the way.

Q.   After you made this call, how long was it that

you -- that the first policeman arrived?

A. Oh, not very long. Ugh, I don't know. Five, ten minutes at the longest. I don't really remember, but it was not very long.

Q. Okay. Did any other vehicles arrive on the scene?

A. A police car and a police SUV of some type. They weren't both patrol cars, but they were both police vehicles.

Q. So, two different policemen?

A. Uh-huh, yes.

Q. Did they arrive at the same time or did they --

A. Directly after each other.

Q. Did the wrecker arrive at the same time?

A. The who?

Q. The wrecker, the tow truck?

A. I -- I don't remember if they drove up at the same time. I don't know.

Q. Did you see any skid marks?

A. At the time, no. I was concerned with the person.

Q. Okay. I understand.

How damaged was the front of the truck?

A. I didn't go around to see.

Q.   So, you didn't see that?

A.   Stop sign was down.

Q.   When you say "down," was it just laying right down in front or was it pulling away or --

A.   It wasn't pulled out of the ground, but it was (indicating) --

Q.   Flat on the ground or --

A.   Not all the way down.  It was angled --

Q.   Angled.

A.   -- close to the ground.  It was angled close to the ground.

Q.   Now, you testified that he -- you smelt alcohol?

A.   That I smelled alcohol?

Q.   (Nodding head up and down)

A.   When did I testify to that?

Q.   He asked you if -- you said that they would -- he had -- you smelt alcohol on him?

A.   I didn't say I smelt alcohol.  I said --

Q.   Did you smell --

A.   -- I --

Q.   Did you smell alcohol?

A.   No, I did not.  I didn't get that close.

Q.   Okay.  So, when you were up at the window and he was right in front of you, you smelt no alcohol?

A.    I -- I don't get that close to a person.  I don't know.

Q.    Understandable.

So, my question is you at no time smelt any alcohol?

A.    I did not, no.

Q.    Did you see the size of his eyes?

A.    The size of his eyes?

Q.    Yes.  I mean, you said you thought he was intoxicated?

A.    Yes.

Q.    Okay.  You smelt no alcohol on him?

A.    Correct.

Q.    So, did you think he was on drugs?

A.    First thing that came to my mind is he looks like he's drunk -- sloppy drunk.

Q.    That's the first thing that came to your mind?

A.    After he said he was okay.

Q.    Okay.

A.    Of course, you always wonder if they hit their head, whatever.

Q.    Correct.

Did you see any evidence of him having drugs in his system or being drugged?

A.    I -- I couldn't say that.

Q. So, you would have no experience seeing people that are under the influence of any type of drugs?

A. Medication. I don't -- I don't know what you're asking.

Q. He looked like he had been under medication?

A. He looked drunk to me.

Q. Okay. When you say "drunk," you smelt no alcohol?

A. Correct.

Q. Okay. Did he look like he could have had an injury?

A. No, not to me. I --

Q. Wasn't that your first reaction, you didn't know whether he had hit his head or had an injury?

A. I asked him if he hit his head. He said no.

Q. Okay.

A. I saw no evidence that he -- I can't be 100 percent sure of any of it because I had no testing equipment. I hadn't -- I'm not a doctor. I don't know.

MR. DESMARAIS: Pass the witness.

THE COURT: Mr. Thomas?

MR. THOMAS: I have no further questions of this witness, Your Honor.

THE COURT: Ma'am, you can step down.

THE WITNESS:  May I say one thing?

MR. DESMARAIS:  Objection, Your Honor.

THE COURT:  Can she step down?

MR. THOMAS:  Yes, sir.

THE COURT:  Is she free to go?

MR. THOMAS:  She is.  May she be excused?

THE COURT:  Yes, sir.  Any objection to that, Mr. Desmarais?

MR. DESMARAIS:  (Pause)

THE COURT:  Wayne, have them stay out in the hall.

MR. DESMARAIS:  At this time, I don't believe I'm going to call her back.  I may want to call her back.

THE COURT:  Is she not free to go?

MR. DESMARAIS:  Not excused, Your Honor, at this time.

THE COURT:  Okay.  Just have her wait out in the hall.  Who's your next witness, please?

MR. THOMAS:  Kevin White, Your Honor.

THE COURT:  Who?

MR. THOMAS:  Kevin White.

THE BAILIFF:  Your Honor, may I approach?

THE COURT:  Yes, sir.

(WITNESS ENTERS COURTROOM)

MR. DESMARAIS: May I approach, Your Honor? May I approach?

THE COURT: Yes, sir.

MR. DESMARAIS: May I approach?

THE COURT: Yes, sir.

(AT THE BENCH, ON THE RECORD)

MR. DESMARAIS: Why was Mr. Bellotti --

THE COURT: We'll deal with that later.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: Raise your right hand, please.

(WITNESS SWORN)

THE COURT: Thank you, sir. Please have a seat.

MR. THOMAS: Your Honor, I'm tendering a copy of his report to Counsel (tendering).

THE COURT: Okay. The record will so reflect. You may proceed.

MR. THOMAS: Thank you, Your Honor.

KEVIN RUSSELL WHITE,

having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THOMAS:

Q. Would you state your name for the ladies and gentlemen of the jury?

A. Yes. Kevin Russell White.

Q. And what did you used to do for a living?

A. I was a Groves Police Sergeant. I retired in December of '09.

Q. How long were you with Groves Police Department?

A. I initially hired with Groves in November of 2003 --

Q. And prior to that?

A. -- six, seven years. Before that, I was Beaumont Police Department for several years. I worked up in the Dallas area for several years. I was a Houston police officer. Altogether about 23, 24 years in law enforcement.

Q. Then after you retired in 2009, you did an overseas adventure. What did you do?

A. I was a -- working for the US Army as a counterinsurgency investigator.

Q. Okay. And you're home now?

A. Yes.

Q. Okay. Back on September 21st, 2008, you were still working for the Groves Police Department at that time; is that correct?

A. That's correct.

Q. And on September 21st, 2008, what were the circumstances in Southeast Texas during that time?

A.    Well, we were dealing with the aftermath of Hurricane Ike.

Q.    Okay.  And on that day in particular, was that the day that the evacuation order had been lifted?

A.    Yeah.  I believe it was effective at midnight.  If I remember right, it was Sunday.

Q.    Okay.

A.    So, people were starting to flow back in.

Q.    Okay.  On September 21st, 2008, did you get a call in reference to a truck driving into a ditch?

A.    Yes, I did.

Q.    And where was that -- supposedly take place at?

A.    The 5200 block of 32nd Street in the city of Groves, Jefferson County, Texas.

Q.    And when you got that call, what did you do?

A.    I responded.  I think I left from the station.

Q.    Did you go straight to that location?

A.    Yes, I did.

Q.    When you got to that location, what did you see?

A.    I -- as I pulled up, there was a maroon-colored Ford Ranger pickup truck that'd driven off into a ditch traveling westbound on 32nd Street.  So, it was in the ditch on the north side of the

street. And then there was a gentleman standing outside the truck.

Q. Okay. The person that was standing outside the truck, do you see him in the courtroom today?

A. Yes, I do.

Q. Point to him and describe what he's wearing.

A. (Pointing) Gentleman seated here in the brownish-colored jacket -- suit coat.

MR. THOMAS: I'd ask the record reflect he's identified the defendant.

THE COURT: The record will so indicate.

Q. (BY MR. THOMAS): Do you remember about where he was standing when you got there when you first saw him?

A. I want to say it was on the driver's side probably towards the rear of the pickup truck.

Q. What did you do when you got there?

A. I pulled up behind, turned on my emergency lights, stepped out and approached him.

Q. When you approached him, what took place?

A. I asked him if he was the driver of the truck in the ditch, and I asked him what happened.

Q. Did he -- did he say he was the driver?

A. No.

Q. Did he say anything?

A.    No.    Just asked him general questions.    About the only reply I got out of him was he thought he was in Port Neches.

Q.    When, in fact, he's in Groves?

A.    Correct.

Q.    So, you're asking him a series of questions, and he's really not answering any of them?

A.    That's correct.

Q.    What did you notice about his condition?

A.    I noticed he was having a lot of problems with his balance, and I detected a very strong odor of alcohol about his person.

Q.    He'd been drinking?

A.    Yes, in my opinion.

Q.    You've made DWI arrests, ran into some people that are intoxicated before?

A.    Several.

Q.    You know what to -- you know what an intoxicated person looks like; right?

A.    Yes.

Q.    Was this individual -- he's intoxicated on that day?

A.    Yes.

Q.    You smelled an odor of alcohol about his person; is that correct?

A.   That's correct.

Q.   What else did you notice about his condition?

A.   Speech was very garbled, very hard to understand when he did talk, just wasn't making sense. He wasn't coherent. Again, he was having a lot of problems with his balance. I actually -- truck was off in a ditch. It's got a shoulder. The road wasn't necessarily real level there, so I had asked him to step out into the level portion of the road with the intention of doing some field sobriety tests; but as I walked him in that direction, I had to actually hold onto his arm because I felt like he was about to fall down.

Q.   Did you do some field sobriety tests with him?

A.   No, I did not.

Q.   Why not?

A.   Because I just felt like in my opinion the level of intoxication was obvious, and I just thought that these tests -- he was going to fall down, and it would have probably resulted in more injury to him and just general difficulties. So, I just made a determination that I already had enough evidence that he was under the influence of alcohol, and I placed him under arrest.

Q.   During this time you're having to support him

physically?

A.   Correct.

MR. DESMARAIS:  Sorry, Your Honor.  I didn't hear that.  Can he repeat that question?

Q.   (BY MR. THOMAS)  I said you had to support him physically.  And you answered yes?

A.   Yes.

Q.   You put him in your patrol car, or did you do something else with him?

A.   No.  Actually, he went in another officer -- Deputy Phillips arrived on the scene, and I put him in Deputy Phillips's vehicle.

Q.   I got you.

Describe for me the scene, the -- kinda the street where the truck is wrecked.  Describe for us, if you would, what that looked like.

A.   Okay.  It was late afternoon.  32nd Street's a two -- very narrow two-lane paved street coming off Twin City Highway in the vicinity of the H-E-B grocery store.  There was a work crew.  I believe it was a power line crew that was out there removing storm debris.  They had a flagman up, they had trucks and cones out.  They had yellow amber lights flashing on the trucks.  They pretty much had the entire westbound lane going towards 32nd Street blocked.  And he had

gone off in the ditch, as I recollect, probably less than 50 yards away from the -- from the last truck in the line.

Q. Did it appear he was traveling toward those work trucks when he went into the ditch?

A. Yes, because the vehicle was -- clearly had been traveling westbound, dropped off in the ditch still facing the westbound direction. And it's a very deep ditch. When the vehicle went off, it was basically -- it was at a good angle.

Q. But there was still room for a person to pass around the side of those work crews; is that correct?

A. Yeah. That's why the flagman was out there. He was directing people around going into the incoming lane.

Q. I guess the first concern I have is, is what's the possibility this individual was maybe just hurt in the wreck? Did you see any evidence that he was injured in any way in the wreck?

A. I didn't observe any physical injuries on him, and it didn't seem that the -- there was any real damage to the truck that would suggest the impact with the ditch was that great.

Q. Sometimes you see on the windshield -- when a person goes forward, they'll hit their head on the

windshield.  Any evidence on the steering wheel --

A.    There was no evidence like that.

Q.    Sometimes, you know, maybe you can tell a person banged their head on the steering wheel.  Did you see anything like that?

A.    I observed no physical injuries at all.  He was just staggering and basically incoherent.

Q.    This street that he was driving on, is that a public place?

A.    Yes, it is.

Q.    Public highway?

A.    It's a public highway.

Q.    And that truck's a motor vehicle; correct?

A.    Correct.

Q.    And this took place here in Jefferson County, Texas; is that correct?

A.    That's correct.

Q.    During your investigation, did you learn this individual's name to be Carl Matthew Bellotti?

A.    Yes, I did.

Q.    You said Deputy Phillips transported him.  Where did he transport him to?

A.    Took him back to the Groves Police Station.

Q.    Now, is that routine with an intoxicated person?

A.   It's 50/50.  A lot of times we'll bring them back to our station and do paperwork and then we take them up to the County Jail to do the rest of processing there.  In this particular case, because of the hurricane, the County Jail on Highway 69 was not available.  It had been damaged in the hurricane.  Everybody was coming to downtown Beaumont to the old jail.  So, the entire process with prisoners had to be revamped.  We -- we basically were doing all the paperwork in Groves and then just transporting them with the paperwork, because they really had no place at the jail up here for us to sit down and do our paperwork.

Q.   Normally with an intoxicated person, a person arrested for driving while intoxicated, would be to proceed -- to take them to the Mid-County jail to videotape them in the jail --

A.   Yes.

Q.   -- offer a Breathalyzer test, things like that?

A.   Yes.  But the main County Jail on Highway 69 is equipped with what they call DWI rooms, and they're equipped with the video cameras, they're marked out to do the field sobriety tests, and it's just where we go to do our standardized processing.  Also, we usually

have somebody there to operate the Intoxilyzer machine, a trained deputy.

Q. None of that's available that day?

A. None of it was available.

Q. So, you -- you were not able to offer him a breath test; is that correct?

A. That's correct.

Q. Did you offer him an opportunity for any other sort of testing?

A. Yes, I did.

Q. What did you offer him?

A. The only other option is blood test.

Q. When you asked him to provide a sample of his blood, what did he tell you?

A. "No."

Q. If he would have wanted to have given a blood test, what would you have done to have obtained a sample of blood?

A. Would have taken him -- I believe Renaissance Hospital had reopened by then, so I would have taken him over to the emergency room at Renaissance Hospital, and a certified lab tech would have drawn his blood for us.

Q. But he didn't want that to happen?

A. That's correct.

Q.   Did you ask him that before or after he was transported to the Groves police station?

A.   After I got back.  Deputy Phillips transported.  I stayed on scene for about 20, 30 minutes waiting on a wrecker.  I went back to the station and started my paperwork, and that was part of the paperwork.

Q.   When you first got back -- or first got to the Groves station, was Carl Bellotti already at the station when you got there?

A.   Yes.  He was seated in -- it doubles as a patrol room, and it's also our area where we bring prisoners.  It has a bench there that's set up to put the prisoners on.  So, he was seated on the bench when I walked in.

Q.   And when you walked in, he's seated on the bench, what was he doing?

A.   Sleeping.

Q.   When you get back to the Groves station, could you still smell the odor of alcohol about his person?

A.   Yes.  It was strong.

Q.   While there, while processing your paperwork, that's when you do the procedure where you ask him if he wanted to provide a sample of blood?

A.   Yes.

Q. There's no -- there's no DWI room at the Groves police station?

A. That's correct.

Q. Am I -- I get the feeling after this hurricane, law enforcement, other first responders are kinda working on the fly what to do -- do in certain situations; is that correct?

A. Yeah. We all sustained damage. We had damage at City Hall and at the police department. We were running on a generator. We had water in the building. Everything was disorganized.

Q. Because of that, you were not able to take and do a video of Mr. Bellotti that day?

A. That's correct.

Q. Officer White, in your opinion, on September 21st, 2008, was Carl Bellotti intoxicated?

A. Yes.

Q. Did he have any business operating a motor vehicle?

A. No.

MR. THOMAS: I pass the witness, Your Honor.

THE COURT: Mr. Desmarais?

CROSS-EXAMINATION

BY MR. DESMARAIS:

Q. Good morning, sir.

A. Good morning.

Q. Were you at the station at that time when the call came in?

A. I was either at the station or en route to the station from my home. We have take-home vehicles. Like, normally we come on shift about -- my shift would normally start at six o'clock at night; but because I'm a supervisor, I go in a little early. So, it's not uncommon if a call is dropping at that time of day and I'm available, or a night shift officer is available, we would take the call so that the day shift officers don't have to handle it.

Q. So, that day you were just beginning your shift?

A. That's correct.

Q. And you got a call -- 911 called or you -- or dispatch called you and said --

A. Well, it came generally through the police dispatch. I don't know if it was a 911 call or not.

Q. Okay. All you have on one call is hit record; correct?

A. Correct.

Q. Okay. Was the 911 recording equipment working?

A. To the best of my knowledge, but that's at the police dispatch in Nederland that we -- we share a police dispatch center here; Nederland, Port Neches and Groves.

Q. Okay. So, there -- there's possibly a tape of that 911 call?

A. It's possible.

Q. Did Nederland Police Department have power by that time?

A. They either run on City power or they were off of generators just like us. I honestly don't remember. Power was coming on throughout the county, but...

Q. When you say you were on a generator, what size generator? Is this one of these commercial generators?

A. It's a large commercial generator that they had installed at City Hall. It runs all of City Hall. But when we're on it, we have to conserve power. We can't have everything running. We can't have computers up and running and so forth.

Q. Well, this was on a Sunday. So, other than the police department, was any part of City Hall open?

A. Yes.

Q. They were doing business --

A. There were people there, because, again, we

were in emergency operations, so the entire city staff was working 24 hours.

Q.   Okay.   And this was, you say, the day that they lifted the evacuation?

A.   Yeah.   I -- again, if I remember right, the evacuation was either lifted midnight or maybe that morning at 6:00 in the morning.   I -- it was the first day that people were coming back into the area.

Q.   And the hurricane had happened a week before?

A.   Approximately a week.   I forget the exact day.

Q.   So, the hurricane had happened like Friday -- the Friday night -- week ago Friday?

A.   That sounds right, yeah.

Q.   And people had been coming back into Groves all week long?

A.   Not officially -- well, I mean, some people were authorized to come in because we have -- at that time, they had the -- I forget what we were calling it, but some people were authorized.   They set up a system where people had -- their driver's licenses were stamped, and they were -- for example, at one of the plants, if they were considered key personnel, they were allowed back in.   But the general public wasn't allowed back in.   Now, you know as well as I do that we don't necessarily enforce hurricane evacuations in

Texas.

Q. Right.

A. So, I'd say 25 -- 20 to 25 percent of the population was back in Groves.

Q. In fact, probably that many never even left or evacuated?

A. Yeah. That was a problem during Hurricane Ike.

Q. A lot of people that never evacuated. Traffic was pretty normal?

A. Exactly.

Q. And when was power restored in Groves?

A. I honestly can't remember. I mean, I live in Groves. I want to say it came on probably within ten days or so of landfall.

Q. Because I lived in Port Neches, and my power came on that Friday --

A. Yeah.

Q. -- Saturday morning.

A. And, again, it was staggered. It was coming on -- I remember complaining because two streets down from me they had power for two days before I had power.

Q. But how about the police station?

A. We probably came on relatively early because it's normal to try to get the power up at the City Hall

and whatnot. I remember we were still on a generator that day. Maybe the power had came on that night or following day.

Q. Do you have security cameras in the police station?

A. The one in the patrol room is -- it's installed there, but it hasn't worked -- well, I haven't been in there since 2009, but it hadn't been working for about a year.

Q. Do you have security cameras outside the police station?

A. No, not in Groves.

Q. So, the only security camera you had was in the patrol room --

A. They have --

Q. -- and it wasn't working?

A. It's not a security camera. It was installed there for interviews and whatnot, but it hasn't worked in --

Q. It didn't work?

A. No. It hasn't worked in probably --

Q. Did you have --

A. -- two or three years. They were talking about getting a new system when I left there.

Q. Did you have any handheld video cameras as

part of your equipment?

A. No.

Q. Did you have any cameras -- regular, digital cameras?

A. Yeah, we had cameras.

Q. Okay. Did you have a flat enough floor and space to perform your roadside tests?

A. At the station?

Q. Yes.

A. The floor is flat enough, but it's a small room. It's got the patrol desk there with the computers. It's just not for somebody -- if I feel like they're going to fall down, I'm not going to do it in there because we've had -- we've had people fall in that room and suffer injuries.

Q. And you couldn't do it out in the hallway?

A. No, not safely. Not at that time, because we had stuff stacked up in the hallway, and, like I said, we had water in the building. We still had -- there were still parts of the building --

Q. So, there's no place in this whole building where you're saying the whole staff of City Hall and the police were coming in, that was long enough to do a ten-pace walking?

A. Oh, I'm sure there was. Again, though, it's

just like what I said at the scene that his condition was such that I just felt like if I asked him to do his field sobrieties he was going to fall down and injure himself.

Q. So, you never asked him to do field sobriety?

A. No.

Q. Did you call out an ambulance on the scene?

A. No, I did not.

Q. Now, one of the field sobriety tests was the HGN test?

A. Correct.

Q. You're familiar with that?

A. Yes, I am.

Q. And he was standing there?

A. Yes.

Q. And you could have done that test, couldn't you have?

A. Again, he was staggering all over the place. I don't think -- I don't think he would have done it. I don't think I could have gotten the instructions across to him. It was the circumstances I was dealing with. He just was not coherent.

Q. At no point did he stand still, are you telling me?

A. He was moving around, and he was staggering

about. At one point, he almost fell in the ditch. In fact, when I went to handcuff him, we both almost went into the ditch.

Q. Okay. We'll get to that in a minute.

So, you're telling me he's staggering all around you, and you were trying to talk to him?

A. Yes. The whole time --

Q. And he didn't do anything?

A. The whole time I'm trying to talk to him, he's just moving about.

Q. And you're following him around?

A. Well, it wasn't like we were covering several yards, but we were basically doing a circle.

Q. And at no point did you say, okay -- when you first came in, you said he was standing up against the truck.

A. Right.

Q. Okay. So, he was stationary?

A. He was leaning against his truck.

Q. Okay. He was stationary?

A. Right.

Q. And at that point you couldn't go up, say, Get stationary again, and let me give you the HGN test?

A. Well, we were -- when we are talking to him and interviewing him, we ask him to step away. We

don't let them lean against their truck. The moment I had him step away from his truck, he was staggering and nearly falling down. I was literally reaching and holding him by the arm the whole time I was talking to him.

Q. The whole time?

A. Yes.

Q. Now, at some point, did you ask for his license?

A. I don't know if I specifically asked him for it or if I just found it on him when I -- when I searched him.

Q. So, you did a pat down on him?

A. I searched him after his arrest.

Q. How about his insurance card?

A. It would have been in the truck in the glove box.

Q. In fact, you asked him to get his insurance and his license, and he got into the truck and got his insurance card for you; correct?

A. Not that I recall. In fact, I -- I don't recall that I would have -- that I did ask that, but I'd be very surprised if I did because the way the truck was sitting on the side of the road. He was --

Q. You didn't ask him to provide a license, so

you didn't ask him to provide any insurance?

A. I don't recall asking him for his insurance card. I may have asked him for his driver's license.

Q. Did he provide it to you?

A. I honestly don't remember if he provided it or if I found it on my own.

Q. Did you handcuff him or did Officer Phillips handcuff him?

A. As I recollect, I placed the handcuffs on him just about the time Officer Phillips was pulling up, and then I searched him, handed him off to Officer Phillips.

Q. Did you call Officer Phillips to the scene?

A. I think he was dispatched once he checked into -- checked into service.

Q. Okay. Did you call them back to ask him to do it?

A. To do what? I'm sorry.

Q. To send somebody else out?

A. I may have directed dispatch to send another officer because, again, I'm the supervisor, so I'm not supposed to necessarily be getting tied up on stuff. So, I honestly don't recall if I told dispatch to send him or they just sent him.

Q. Now, he arrived at about the same time you did

or how much longer after you were there?

A. No. He was several minutes, probably at least five, maybe as much as ten minutes later. I was dispatched --

Q. He came in, and what were you doing at the time when he arrived?

A. As I recall, I was in the process of placing him under arrest, putting handcuffs on him when Officer Phillips pulled up.

Q. Okay. Did you at any point sit him down in your car?

A. In my vehicle?

Q. Yes.

A. I don't believe so. I'm -- best that I remember is we walked him straight -- I remember telling Phillips, Let's put him in your car, take him back to P.D.

Q. So, for ten minutes, he's stagging, falling around -- according to you -- you're chasing him around, asking him questions. Then Detective Phillips comes up and you say, Here, take him and put him in the car?

A. Right.

Q. At what point did you ask Mrs. Sanders for a statement?

A. That was after -- after Deputy Phillips got there and left the scene.

Q. Okay. And at no time did you say that he -- you asked him for his card or his license?

A. I don't remember asking him. Again, I may have. I don't remember. I know I got his driver's license off him because I remember running a check on his driver's license.

Q. After you put the cuffs on him, did you lean him over and pat him down?

A. I'm sure I did.

Q. Did you find any drugs on him?

A. No.

Q. Okay. Any prescription drugs on him?

A. I don't remember if I did or not.

Q. Did you write it down in your report -- or would you have written it down in your report?

A. If I found drugs on him?

Q. (Nodding head up and down)

A. Yeah, it would have been indicated in my report.

Q. So, if it's not included in your report, then you didn't?

A. I would say no, I didn't find them, because I'm sure I would have -- even if they were

prescriptions prescribed to him, I'm sure I would have noted them in my report.

Q.   Did you do a search of the vehicle?

A.   Yes.

Q.   Did you find any evidence of any drugs in there?

A.   No, I did not.

Q.   Did you find any evidence of alcohol?

A.   No, I did not.

Q.   Now, you went off and -- why didn't you transport him down to the police station?

A.   Because I knew I was going to be on the scene for several more minutes waiting on a wrecker.  I knew that I had to take a statement from Mrs. Sanders.

Q.   When did the wrecker arrive?

A.   Probably within 15 to 20 minutes.

Q.   When you got there or when?

A.   From when I called for it.  So, at one point, I called for it.  They have 20 minutes to respond.

Q.   So, you're saying they got there 20 minutes after you called for them?

A.   Could have been a little sooner, but probably no later than 20 minutes.

Q.   When did you call for it?

A.   Probably within about 15 minutes of being on

scene. So, probably around 5:40, 5:45.

Q. Now, you say you asked him regular questions. So, as you approached him, you don't remember whether you asked him for his insurance and license. Did you ask him where he was coming from?

A. Yes.

Q. Did he know the answer?

A. No.

Q. He didn't know where he was coming from?

A. The only answer he -- only answer that he supplied to me was that he was on his way back to Port Neches.

Q. Did he know his name? Did you ask him his name?

A. Whether I asked him or not, I don't honestly remember. At some point, I got his driver's license with his name on it.

Q. And then you said -- did you ask him where he was going?

A. Yes.

Q. And he couldn't answer that, you said?

A. No. He said he was going to Port Neches. He said he was in Port Neches. He was going to his home in Port Neches.

Q. But he didn't answer you where he was coming

63

from?

A. No, he did not.

Q. Did he tell you why he was there, where he was heading, and you --

A. No.

Q. Did he tell you where he lived?

A. I don't think he gave me a specific address. I remember he just said he lived in Port Neches.

Q. So, you asked him that question, also?

A. I either asked it or he volunteered it.

Q. Did you ask him what happened?

A. Yes. That was one of the first things I asked when I walked up: Are you the driver and what happened.

Q. And he knew that he was the driver?

A. No. Didn't give me a response to either question.

Q. You testified that he said that he had been the driver.

A. Huh?

Q. You testified --

A. No. No, I didn't. I didn't.

Q. So, he didn't answer you. He didn't know that he was the driver of the vehicle?

A. No.

Q.   According to you.

So, he knew where he was going, but he didn't know where he was coming from or he didn't answer you?

A.   Again, the only answer that he provided was, I'm in Port Neches, and I'm on my way back home to Port Neches.

Q.   But you asked him where he's --

A.   I asked, Do you know where you're at.

Port Neches.

Q.   Now, in the ten minutes, how did you secure him?

A.   Handcuffs behind his back.

Q.   Well, you said that you were handcuffing him when Officer Phillips came.  Officer Phillips arrived ten minutes after you did on the scene.  For that ten-minute period -- according to you, he's stumbling around, falling around, he's a danger -- how did you secure him for that ten minutes?

A.   Again, I was talking to him and holding him by one arm.  At some point, I finally decided I'm just placing you under arrest for drunk driving --

Q.   And what point --

A.   -- and that's when I handcuffed him.  I say ten minutes.  It may have been five minutes.  It's hard

to -- you're out there dealing with it, time goes by fast or slow. It was no more -- or no less than five, no more than ten minutes after I was on scene.

Q. As part of your paperwork, when you got back -- withdraw that question.

When you said, You're under arrest, at that point did you Mirandize him?

A. At that point, no.

Q. Okay. At what point did you Mirandize him?

A. At the station.

Q. So, did Officer Phillips Mirandize him?

A. You'd have to ask Officer Phillips, but I don't believe he would have.

Q. Okay. So, he's in the cuffs. You put him in the car, and you said, You're under arrest. You haven't Mirandized him yet. How long between the time that he left the scene and you got back to the police station?

A. No more than 30 minutes.

Q. So, 30 minutes? Less than 30 minutes?

A. I would say that I was -- again, 30 minutes -- 25, 30 minutes at the most.

Q. Then you go in, you wake him up?

A. (Nodding head up and down)

Q. Was he lying down on the bench flat on the

bench?

A.    No.    He was sitting slumped over on the bench.

Q.    When you say "slumped over," leaning forward?

A.    No.    Leaning against the wall.    The bench is seated -- the bench is up against the back wall.    It sits in a corner so that you can move to one side of the bench and you can --

Q.    So, he wasn't slumped.    He was leaning back?

A.    Leaning back or leaning to the side, as I remember him.

Q.    Well, which one was he?

A.    Probably both.    I remember he was sitting in the very corner of the bench.    And, again, the corner of the bench is in the corner of the walls where two walls come together so you can lean with your head against the wall.

Q.    Okay.    Do you have an interview table in that room?    Do you have a table in that room?

A.    No, not for interviews.

Q.    Do you have a table in the room?

A.    Yeah.    There's a large table with computers on it the officers sit at to do their work.

Q.    Okay.    And you have chairs around that?

A.    Office chairs.

Q.    You already had another person in custody in

the police station at that time, didn't ya?

A.    I didn't.  Maybe another officer did.

Q.    Was there another person in custody at that time?

A.    I think that -- I can't remember if it was day shift had somebody in there or one of my officers maybe made an arrest during the same time frame.  I remember two prisoners were in there because two prisoners went to jail that night.

Q.    And is it possible that when you came in that Mr. Bellotti was sitting on a chair at the table and the other person was on the bench?

A.    No.

Q.    Was the other person sleeping on the bench?

A.    No.

Q.    What was the other person doing on the bench?

A.    I honestly don't remember.  My focus was on Mr. Bellotti.  He was my prisoner.

Q.    So, you woke him up?

A.    Yes.

Q.    Then you Mirandized him?

A.    Yes, part of standard DWI process.

Q.    At this time were the cuffs in front of him or behind him still?

A.    I honestly don't remember.  It's possible that

we would have moved the cuffs up front. Some officers will do that once we get to the station.

Q. Now, you made a -- you write up reports; correct?

A. Correct.

Q. With all your experience, these reports are supposed to be accurate?

A. Uh-huh.

Q. And complete?

A. Uh-huh. Yes.

Q. And you've made a hundred DWI arrests in your career --

A. Yeah, at least.

Q. -- a hundred or so?

A. Between DWI's, public intoxication and other alcohol-related arrests, well over a hundred.

Q. So, writing reports and making them complete and accurate and everything else is standard operating procedure?

A. Yes.

Q. Now, in your report you didn't write down anyplace that you had to hold him up, did you?

A. I'd have to look at my report.

MR. DESMARAIS: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. DESMARAIS): (Tendering) If you will review this. You can read it.

A. No, I did not specifically say I had to hold him up in the report.

Q. In fact, in your report you said he wasn't able to perform any of the tests; is that correct?

A. That's correct.

Q. Nowhere did you say you didn't give it to him because you were afraid he was going to injure himself?

A. That's the wording. I mean, maybe I could have worded it better, but that's what I intended was he was just physically unable to perform any test.

Q. He never performed any test. You never asked him to perform any test; is that correct?

A. That's correct.

Q. So, you didn't know whether he was able to or not?

A. The man couldn't stand up on his own. These tests require you to stand still and not fall down. He was falling down without even doing the test. I wasn't going to subject him to the test or subject myself to the test --

Q. You didn't --

A. -- to have --

Q.   -- write that in your report --

A.   No, I did not.

Q.   Okay -- that he was falling down?

A.   I indicated in the report that he was staggering about.

Q.   At what point did you Mirandize him -- I want to get back to that -- when you told him that he had the right to remain silent, the right to have an attorney?

A.   It's part of the DWI paperwork.  It's all part of the process in there.  When you read them the Mirandize, then you read them -- there's a series of questions on the paperwork that follow.

Q.   And do you have that paper that --

A.   I'm sure it's part of the --

Q.   -- you gave him Mirandizing --

A.   I don't have it.  It should be in the paperwork, the case --

Q.   Are you talking about the statutory warning?

A.   Statutory --

Q.   Statutory Warning?

A.   The DIC-23's, -24, and the statutory warning's all --

Q.   Yes.  I'm talking about the Miranda rights. Did you read them to him --

A.    Yes.

Q.    -- off the card?

A.    Yes.

Q.    You didn't have him sign it? They don't sign them?

A.    No.    There's nowhere on that form that they sign it.

Q.    Do you think he understood all his rights?

A.    I wouldn't be able to answer that.    I -- again, the man was incoherent.    So, chances are, he didn't, but...

Q.    So, at this time, he's still incoherent?

A.    He was highly intoxicated is the answer --

Q.    I didn't ask that, sir.

A.    Okay.

Q.    At this time, you're saying he was still incoherent?

A.    Right.

Q.    He didn't understand his Miranda rights, you're saying, in your opinion?

A.    Whether he understood them or not, I can't say for sure.

Q.    Did you ask, "Do you understand these rights"?

A.    Yes, I did.

Q.    Did he answer you?

72

A. I don't remember his specific response. I'm certain it wasn't a no, but just because somebody nods their head "yes" or says "yes" when they're in that state of intoxication doesn't necessarily mean that they're understanding them.

Q. He indicated that he understood his rights; correct?

A. He probably did. I don't know. It's in my report --

Q. You're the arresting officer. Are the Miranda rights rather important to get?

A. Yes.

Q. Okay. Now you're saying the statutory warnings. Did you read this document to him, or did you have him read it?

A. I read it. I read it to him.

Q. And you filled it all out complete?

A. Complete.

Q. And there are some things which you don't fill out because?

A. Some things aren't always applicable.

Q. Physical description, if he was licensed?

A. Correct.

Q. Because you had gotten his license at this time?

A. Right.

Q. So, did you give his license back to him?

A. No.

Q. So, you read him all the statutory warnings?

A. That's correct.

Q. In your opinion, did he understand them?

A. He acknowledged them. Whether he actually understood them or not, again, I can't say.

Q. So, these, he acknowledged (indicating)?

A. Yes.

Q. In the statutory warnings, he does not have a right to have an attorney before he signs this; is that correct?

A. That's correct.

Q. So, you just tell the man he has a right to an attorney, he has the right to remain silent, and then you read him a document that says, well, you don't have a right to an attorney, and you don't have to remain silent as far as the test goes, but -- and you think he understood that? He acknowledged that he understood the difference?

A. He signed the paperwork acknowledging that he understood that statutory warning.

Q. Actually, he didn't sign the paperwork.

A. Okay. I would have to look at the form. Did

he refuse to sign it?  It is possible.  It's been since 2008.

Q.    Is this the copy (tendering)?

A.    Okay.  I'm mistaken.  He did.  The subject refused to allow the taking and further refused to sign below by the requesting officer.

Q.    So, he refused to sign?

A.    Correct.

Q.    It's not mandatory to sign this; correct?

A.    That's correct.

Q.    You explained to him what -- why he's signing it; correct?

A.    Correct.

Q.    You think he understood it?

A.    I am not in his head.  I don't know if he's understanding it or not.

Q.    I'm asking your impression, sir.  In your opinion --

A.    Did he --

Q.    -- did you feel comfortable, after everything you just read to him, that he understood?

A.    I think he understood what he was under arrest for.  I think he understood what I was asking him to do, which was to give a sample of his blood.

Q.    So, he did have some understanding?

A.    To that point, yes.

Q.    Okay.  Now, it's one -- part of your arrest, when you brought him down to GEO --

THE COURT:  Let me interrupt you.  We're going to take our morning break.  We'll start back at 15 minutes until 11:00; that's 10:45.  Remember the instructions I gave you yesterday, and I'll see you back here at 10:45.  You're free to go.  Everybody else remain seated.

(JURY EXITS COURTROOM)

THE COURT:  See y'all at 10:45.

THE BAILIFF:  All rise.

(RECESS FROM 10:26 A.M. TO 10:51 A.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

THE BAILIFF:  All rise.

THE COURT:  Thank y'all.  Please be seated.

MR. THOMAS:  Before we bring the jury in, I want to tender for the record that stipulation that's in the Court's file.  Stipulation's in the record.  I think we did it yesterday, but I want to make sure.

THE COURT:  Hand me that file.

MR. DESMARAIS:  I have no objections to him making sure of something we did yesterday.

THE COURT:  Are you offering it as State's

1?

MR. THOMAS: Yes, sir.

THE COURT: Is there any objection?

MR. DESMARAIS: No objection.

MR. KNAUTH: And it's --

MR. THOMAS: Is it admitted?

THE COURT: Let's take a look at it and just make sure. Mr. Desmarais, do you want to come up here and take a look at this? This is the agreement that stipulates the two prior DWI convictions, and I'm going to remove the Order. There's no reason for an Order, and I think that will be a comment by me on the weight of the evidence. So, if y'all don't have any objection, I'll remove that.

MR. THOMAS: That's fine.

THE COURT: I'll hand that to you. You mark it.

MR. THOMAS: Yes, sir.

THE COURT: Did you want this in?

MR. DESMARAIS: No, sir.

THE COURT: I don't know why he had that Order with that, but I'm going to take it out.

Okay. Mr. Desmarais, State's tender No. 1. Any objection to State's 1?

MR. DESMARAIS: No objections, Your Honor.

THE COURT: Okay. State's 1 will be admitted.

(STATE'S EXHIBIT NO. 1 ADMITTED)

THE COURT: And that's the agreement that stipulates to the two prior convictions. Okay. Are we ready to go now?

MR. THOMAS: Yes, sir.

THE COURT: All right. We're ready.

MR. DESMARAIS: Could I --

THE COURT: Sir? Hang on. Hang on.

MR. DESMARAIS: Could I get a glass of water before we start?

THE COURT: Why certainly. You can have whatever you want, Mr. Desmarais. Ready. Norm, how much longer do you need him?

MR. DESMARAIS: Maybe half an hour, could be shorter.

THE COURT: Whatever. Just a guesstimate.

(JURY ENTERS COURTROOM)

THE COURT: Let the record reflect all members of the jury are present. The defendant is present, along with his attorney. Mr. Desmarais, the witness is yours.

MR. DESMARAIS: Thank you, Your Honor.

Q. (BY MR. DESMARAIS): I may repeat myself just

to review a couple of -- where I was last time.

Now, the police -- the Jefferson County Jail facility, they were manned. They just didn't have any prisoners; correct?

A. You're talking about the facility on 69 right now?

Q. Yes, sir.

A. I honestly don't know. I just know it was closed down during the hurricane.

Q. When -- yes, but this was a week after the hurricane. Like you said, all law enforcement and all county, government, everybody -- everybody was working 24/7 trying to recover and everything else; correct?

A. Yeah.

Q. So, they had personnel at the police station, but they had moved the prisoners for security reasons. Is that a correct statement?

A. It's possible. I don't know.

Q. Did you check to see if that was the case?

A. Well, I checked to see if the jail was open, again. I was told no, we were still bringing them here to Beaumont.

Q. Who did you check with?

A. Through dispatch. So, dispatch would have called either here to the jail on 69 or --

Q. So, you specifically asked dispatch to see if the jail's open?

A. Yes.

Q. If anybody's down there?

A. Yes, sir.

Q. You were driving an SUV?

A. Yes.

Q. Did you have camera equipment installed?

A. No.

Q. You had no equipment installed, not that it wasn't working? You had --

A. Oh, I'm sorry. It was installed, but it hasn't worked.

Q. So, it wasn't working?

A. No, not in that vehicle.

Q. Okay. Officer Phillips, did he have camera equipment installed?

A. I honestly don't know because I don't remember which vehicle he was driving. It's possible. You'd have to ask him.

Q. Okay. Let me ask a question: How many vehicles did the Grove Police Department have at the time?

A. 12 vehicles -- off the top of my head, eight, nine, maybe ten; but at any given time, we have new

vehicles coming in that haven't had the equipment installed yet. And at that timeframe, we just had equipment that had broken down. We hadn't replaced it with new stuff.

Q. All right. On the 21st of September, 2008 --

A. Right.

Q. -- how many vehicles did the Groves Police Department have?

A. Again, off the top of my head I'd have to say in patrol we probably had ten assigned to patrol, I believe.

Q. All right. I'll go with that.

A. Yeah.

Q. Of those ten, how many had video equipment installed?

A. I -- I don't know. I wasn't in charge of vehicles, so I really never kept track. I mean, I'm wanting to say that we actually had put a couple of vehicles back into use for the hurricane that we had pulled off the line and then we put them back in use to use during the hurricane. So, I know for a fact those didn't even have radios in them. We had a couple of new vehicles that had come in from the -- from the dealership that were in the process of having all the equipment installed, and I think we put those on the

line to use during the hurricane, again, without the radios and the, necessarily, VCR equipment. So, what Phillips was driving that night, I don't remember.

Q. How long was your video equipment out?

A. Oh, it'd been out for as long as I'd been driving that vehicle.

Q. How long is that?

A. Probably at that time -- let's see. It was a Ford Expedition. I'd probably been driving it at least six months, maybe -- maybe six to eight months. It was just a matter they weren't going to repair it because they were going to replace it.

Q. Okay. So, the video equipment, did you -- was this the type of equipment that you could either take video or you could also just have sound without the video?

A. No. Ours, if you're recording, it was going to record video even if you're recording the sound.

Q. Okay. Was your video part out or was your sound out or was the whole thing out?

A. As I recall, the whole system didn't work. It powered up, but it did not record. It hadn't worked correctly the whole time I drove that vehicle.

Q. So, when you were making stops or you were doing anything, normally people have --

A. Right.

Q. -- the little radio, and that also works the recording equipment; correct?

A. Correct.

Q. And you went around for six months, you're saying, without any protection with the recording equipment?

A. Correct. Small department, limited funds.

Q. Did the County Jail down here in the GEO, did they have electricity back yet?

A. Yeah.

Q. Okay. Did they have a room where they could perform tests?

A. No.

Q. They had no area where they could perform tests?

A. No.

Q. Did they have any security cameras?

A. I'm sure they had cameras.

Q. Were they working?

A. I wouldn't know. I mean, I -- you'd have to ask the jail staff at the time.

Q. Okay. So, there was no way you could take a video down here?

A. There was no way to come here to take a video

intended for -- for that kind of processing. If you're talking about interviewing and doing DWI processing, that wasn't available.

Q. Well, did you ever check to see if they had any videos of Mr. Bellotti when he was down here?

A. Did I ever check? No.

Q. So, they could have had a video with him when he checked in; right?

A. They could have.

Q. But you didn't check him in. You didn't bring him down here?

A. I did not bring him down here.

Q. You arrested him, but you didn't bring him down here?

A. That's correct.

Q. There's a reason for that?

A. I assigned one of the officers -- I don't remember which one. But, again, I'm -- you've already asked me, and I think that I do remember there was another prisoner that was brought down. So, two prisoners came down at once in one vehicle.

Q. Do you remember who brought them down?

A. Maybe Phillips. If not, then probably one of the other officers working, maybe Guerrero, or Georgie would have been on my team at the time. But I -- I'm

almost wanting to say it was Guerrero, because I think the other prisoner was Guerrero's case.

Q. Was Officer Phillips the same guy that transported them to the Groves Police Station?

A. Philips brought him to the police station in Groves, but I think I had Officer Guerrero transport him to the jail, along with the other prisoner.

Q. Now, DIC-25 is you're basically explaining to him again because he refused to take a blood test, you said, and his license gets suspended; correct?

A. Correct.

Q. And you read that whole document to him?

A. The DIC-25?

Q. (Nodding head up and down)

A. No.

Q. You didn't read it to him?

A. I read the portion where it's warning him that it could be -- I'd have to look at the form, sir. I don't -- I can't ever remember which one's the 23 or 24 or 25 without looking at the form. There's one form that we just hand it to them. It's the copy that goes to the State, and they get a copy. We don't generate --

Q. (Tendering) Review that.

A. Okay. No. My answer's no, I do not -- I did

not specifically read this form to him. That's the form that he gets a copy of.

Q. Okay. So, you just -- you allow him to read it before you fill it out, or do you just give it to him after?

A. My general -- I usually hand it to them at the jail to put in their pocket or put it in their jail pocket, wherever I fill the form out.

Q. So, you handed it to him and he put it in his pocket and went on the way?

A. Yeah.

Q. And he knew what it was and everything else?

A. I presume he did.

Q. Just to review: At this time, when you're giving him all these things and reading them, his cuffs -- they switched over his cuffs in front of him; correct?

A. Sir, I honestly don't remember. It's possible they were. I can't -- it's been three years. At some point, I would say they were switched in front of him because at some point I would have been trying to get him to sign paperwork.

Q. Did you switch it over, or, once again, did Officer Phillips switch it?

A. I believe Officer Phillips. But, again, there

would have been a transfer of handcuffs -- he probably was in two or three different sets of handcuffs. He went from my handcuffs to -- I'm speculating -- when Guerrero, or whoever transported him, would probably switched cuffs out at that point. In other words, Officer Guerrero would have put his handcuffs on him so that I had my handcuffs on me if I needed them for some other reason. And that's just standard.

Q. Just to straighten out something: I believe in your statement you directed Detective -- Detective Phillips to bring him down to the Beaumont thing?

A. I'd have to look. Again, I don't remember if Phillips brought him or one of the other officers. All I remember is Phillips brought him from the scene to the Groves police station.

Q. Well, let me ask you a question: Do you remember when you got your handcuffs back?

A. Specifically?

Q. Yeah.

A. No. Again, I --

Q. Did you go back out on patrol that night?

A. Yes.

Q. Okay. You would have had your handcuffs when you went back out on patrol; right?

A. That's what I'm saying. We normally would

switch them out before somebody takes -- when we switch out -- we don't -- we wouldn't necessarily do it on the scene but at the station where things are a little bit more controlled; and, generally, the people that are handcuffed are usually calmed down by then. If they've been giving us any problems -- it's all about officer safety. If somebody's going to tussle with us, we don't take the handcuffs off.

Q. Let me ask you a question -- the reason I keep harping on this is are you sure at the scene that Officer Phillips was not the one that handcuffed him and then transported him down to the jail?

A. At the scene, I'm pretty sure I'm the one that handcuffed him. Now, did Officer Phillips transport him to Beaumont jail? It's possible. You'd have to ask him.

Q. And then it would have been his handcuffs?

A. I'm saying that would have been the standard practice, yes, to switch out handcuffs.

Q. As part of the paperwork, do you also fill out a probable cause affidavit to get an arrest warrant?

A. Yes.

Q. And you filled one out that night?

A. Yes.

Q. Okay. And where do you bring that probable

cause affidavit to get the arrest warrant?

A.    When somebody's in custody, it goes with them to the jail and then -- the copies go to the jail and other copies go with the paperwork to the D.A.'s Office.

Q.    And then they look at it, and they send it to a Magistrate, Justice of the Peace?

A.    Well, when someone's in jail, some Magistrate at the jail, whoever's doing the arraignments.

Q.    Would be -- a Magistrate is any judge, Justice of the Peace?

A.    Right.

Q.    Was the Justice of the Peace that had handled Groves in town that night?

A.    I wouldn't know.  We wouldn't take them before the Justice of the Peace that night.

Q.    So, you don't know if there was a Justice of the Peace around?

A.    Right.

Q.    Did you know if any of the judges were around?

A.    No, I don't.

Q.    Because you could have gotten a search warrant to have him take a blood test; correct?

A.    We could have, but it --

Q.    All it takes is a probable cause affidavit and

a judge's signature and you could have gotten your blood test; correct?

A. Yes, sir. It's just -- it's not standard practice to do that. You've got to go find a judge and there's a time delay involved and it's just -- again, we were operating during hurricane operations. It just wasn't being done like that. It was basically --

Q. My question is: Could you have done that?

A. I could have done it.

Q. Yes.

Did you even think about doing that?

A. No.

Q. If you had done that, you would have had blood test results and evidence to present; right?

A. Presumably, yes.

Q. That was your decision not to go get a search warrant, though?

A. That's correct.

Q. It was your decision not to give any roadside tests?

A. That's correct.

Q. For various reasons, it was your decision not to give any roadside tests back at the station?

A. That's correct.

Q. How far did you say the workmen was down from

the --

A.    From where the vehicle ended up in the ditch?

Q.    (Nodding head up and down)

A.    I'd say between 25 and 50 yards, maybe even closer.

Q.    Okay.  If you said in your report 200 feet, that's within the ballpark?

A.    If that's what's in my report, that's probably accurate because that would have been when my memory was fresh.

Q.    Okay.  So, all these reports -- what's in these reports are at the time you remember everything fresh?

A.    Well, yeah, because I'm writing it that night. Yeah.

Q.    And witness statements, any statements they made, that's what happened; that's the freshest recollection?

A.    That's why you try and take statements immediately, yes.

Q.    So, that's why it's important to have complete statements with all your impressions on it?

A.    Correct.

Q.    Would you think it's fair to say that if there's any difference to what you're testifying to

that's not included in the statement that there's a reason for that?

A. It's possible that I'm not remembering everything from three years ago, but that's...

Q. It's more likely that whatever's in that statement is closer to really what happened then. Would you say that's a fair statement?

A. The report is accurate, yes.

MR. DESMARAIS: Pass the witness.

THE COURT: Mr. Thomas?

MR. THOMAS: I have no further questions, Judge.

THE COURT: Sir, you may step down. Call your next witness.

MR. THOMAS: Your Honor, at this time, the State of Texas would rest.

THE COURT: Okay. Mr. Desmarais?

MR. DESMARAIS: May I talk to him?

THE COURT: Yeah. Tony, take the jury in the jury room real quick.

MR. DESMARAIS: Before I rest, I have one.

THE COURT: I'LL get y'all right back out.

(JURY EXITS COURTROOM)

THE COURT: Okay. Let the record reflect the jury is not present. I wanted to put on the record

I just saw you visit with Mr. Bellotti about his right to testify, and I saw him indicate that he did not wish to testify. I just simply make to sure you know, Mr. Bellotti, you have a right to testify. Once you get on the stand, naturally the State can ask you a lot of questions. It may hurt your case. It may help your case. I don't know. Bottom line to it is, you understand what your legal right is to testify?

THE DEFENDANT: Yes, sir.

THE COURT: And do you wish to testify or not testify?

THE DEFENDANT: Not testify.

THE COURT: Not testify. I find that he's made that decision intelligently and knowingly. Mr. Desmarais, you had something else you wanted to bring up?

MR. DESMARAIS: At this time, I would like to make a motion for a directed verdict of not guilty and judgement of acquittal.

THE COURT: Okay. On what --

MR. DESMARAIS: The State has failed to prove beyond a reasonable doubt or to present enough evidence beyond a reasonable doubt that -- that he was intoxicated at the time. There's been no evidence of what -- whether he lost his normal physical things.

There's only been opinion. There's been no hard evidence or circumstantial evidence. There's been opinion evidence, that's it, as far as that goes. And as far as the first witness, she said, I can't tell. I don't know. I can't tell whether he was intoxicated or not.

This officer said only in his opinion. He smelt the alcohol, but alcohol is not probable cause for a DWI arrest because it is legal to drink and have alcohol on your breath and drive. The issue is intoxication, not whether he was drinking. Therefore, there's no evidence whatsoever that he was intoxicated, so we are asking for an instructed verdict at this time.

THE COURT: That's denied. Let's do this: Let's run back in the back. I'm going to -- let's cut the jury loose. I'm going to give y'all both 15 minutes to argue. I think we've got the charge ready. Do you honestly think you'll take 15 minutes?

MR. THOMAS: No.

MR. DESMARAIS: Yes.

THE COURT: We'll have it to the jury --

MR. DESMARAIS: Yes, I will take -- give me 16, I will take 16.

THE COURT: I know. Let's do this: Let's

let the jury out. We're going to start back at 11:30, and tell them we're going to get the jury charge ready. And let's get them on through here, and then we'll take our break and get the charge done.

(JURY ENTERS COURTROOM)

THE COURT: Y'all can go with Tony. We will get you back in at 11:30, and we will argue the case.

(JURY EXITS COURTROOM)

THE COURT: Let the record reflect the jury is not present. Just to make sure, you say that you have rested on the record?

MR. DESMARAIS: Yes, I've rested.

THE COURT: Okay. Has the State rested?

MR. THOMAS: Yes, sir.

THE COURT: Both sides have rested. Let's go back, let's work on this charge.

THE BAILIFF: All rise.

(RECESS FROM 11:15 A.M. TO 11:33 A.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

THE BAILIFF: All rise.

THE COURT: Thank y'all. Please be seated.

MR. KNAUTH: Judge, Norm, is it okay if we release Kevin White, the Groves Marshall, the police

officer? Yes?

MR. DESMARAIS: Yeah, I guess. You can release Mrs. Sanders, too. I don't think we're going to need either one of them back.

THE COURT: Let the record reflect the jury's not present. The defendant is present, along with his attorney. The State has made a motion to abandon the word "unlawfully" in the indictment. I'm going to scratch that out. Mr. Desmarais, I'm going to put an "AB" by that. So, that will be abandoned. I have tendered a copy of the proposed charge to both State and Defense counsel. And, Mr. Desmarais, do you have any objections to the Court's charge?

MR. DESMARAIS: On Page 3, "Driving While intoxicated," Your Honor, the last sentence, "The offense is a felony if the person has been convicted twice before for the same offense," is not part of the definition of driving while intoxicated; and if nothing else, I also think it's redundant because on Page --

THE COURT: 5.

MR. DESMARAIS: -- 5 or 6, you include a definition of what a felony offense was. But that line, "The offense is a felony" is not part of the definition of driving while intoxicated. So, it's also redundant because you do make a definition later in the

charge. It will cause -- it hops on the point a little bit too much and, I believe, leads the jury -- possibly lead the jury down the wrong -- incorrect path.

THE COURT: Okay. Your request -- objection is overruled. Any objections by the State?

MR. THOMAS: Before I comment, Judge, I informed the Court earlier that I wanted to abandon a word "unlawfully" --

THE COURT: We did that in your absence. And Mr. Knauth --

MR. THOMAS: Did he handle it okay?

THE COURT: -- handled that. He did you proud.

MR. KNAUTH: I didn't say a word.

THE COURT: That's why he did such a good job. The word "unlawfully" has been deleted. There was no objection to that. And I scratched it out, and I put an "AB" for abandoned.

MR. THOMAS: Thank you, sir.

THE COURT: All right.

MR. THOMAS: And I have no objection to the charge.

THE COURT: Okay. 15 minutes a side. I will hold both sides very, very, very, very -- one more time -- very strictly to this. So, whenever I -- I'm

going to give you a two-minute warning, I'm going to give you a one-minute warning, and whenever I say "ten seconds," you get the hook after that; okay?

We're ready.

(JURY ENTERS COURTROOM)

THE COURT: Let the jury -- record reflect the jury is present. The defendant is present, along with his attorney. I'm going to read to you the Court's charge. This is a document we just got prepared. This charge will contain all of the law necessary to enable you to reach a verdict. You can take this charge back there with you. I'm going to give each attorney 15 minutes to argue their side. The arguments are not evidence. You've heard all the evidence. These arguments are just their opinion. You can take it or leave it, whatever you want to do with that. But since it is not evidence, I will hold each side strictly to the 15-minute time limit. And these lawyers are professional, and they'll abide by that. But, again, as I go through this, remember you're going to take this document back there with you. At that time, you'll select a foreperson, and then you will begin your deliberations.

JURY INSTRUCTIONS

THE COURT: (Reading): Members of the

jury, Instructions: The defendant stands charged with the offense of felony driving while intoxicated, alleged to have been committed in Jefferson County, Texas, on or about the 21st day of September, 2008, and that the defendant was convicted of the offense of driving while intoxicated on two previous occasions in Cause No. 132178 on January 5th, 1989, and in Cause No. 138038 on January 5th, 1989, in Jefferson County, Texas, and these convictions became final prior to the offense for which the defendant stands charged. These jurisdictional elements the defendant has stipulated that these convictions were final and true. The defendant has entered a plea of not guilty to this indictment. Our law requires that I submit the following charge to you in this case. This charge contains all of the law necessary to enable you to reach a verdict. If any evidence was presented to raise an issue, the law on that issue must be provided.

Definitions: So that you can better understand some of the words used in the charge, the law provides the following definition.

Driving while intoxicated: A person commits an offense if the person is intoxicated while driving or operating a motor vehicle in a public place. The offense is a felony if the person has been

convicted twice before of the same offense.

Prior conviction, DWI: Evidence has been admitted in this case concerning the defendant's having been at least two times previously convicted of being intoxicated while driving or operating a motor vehicle in a public place. If he was, you are instructed that such evidence cannot be considered by you as any manner of proving or tending to prove that the defendant was intoxicated while driving or operating a vehicle in a public place on or about September 21st, 2008.

Felony offense: Our law further provides that a person commits a felony offense if he commits the crime of driving while intoxicated at a time when he had been previously convicted of two offenses of driving while intoxicated. The defendant has stipulated and agreed that he has been previously convicted of driving while intoxicated on two separate occasions previous to the offense for which he -- for which the defendant stands charged.

Intoxication: Intoxication -- or intoxicated means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug or a combination of two or more of those

substances or any other substances into the body.

Public place: Public place means any place to which the public or substantial group of the public has access and includes, but is not limited to, streets, highways, and common areas of schools, hospitals, apartment houses, office buildings, transport facilities and shops.

Vehicle: Vehicle includes any device in, on or by which a party or property is or may be propelled, moved or drawn in the course of commerce or transportation, except such devices as are classified as "habitation."

Defendant's failure to testify: Our law provides that a defendant may testify in his own behalf if he elects to do so. This is a right given to a defendant, and in the event he elects not to testify, that fact cannot be taken as circumstances against him. In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purposes whatsoever.

Charge: Now, if you believe beyond a reasonable doubt that in Jefferson County, Texas, that on or about the 21st day of September, 2008, and

anterior to the presentment of this indictment, in the County of Jefferson, State of Texas, the defendant, Carl Matthew Bellotti, III, did then and there unlawfully operate a motor vehicle in a public place while the defendant was intoxicated, and you further find that as agreed, the defendant was previously convicted of two prior driving while intoxicated offenses and those convictions became final prior to the alleged offense, then you shall find the defendant guilty of felony driving while intoxicated, as alleged in the indictment. Unless you so find, or if you have a reasonable doubt thereof, you shall find the defendant not guilty.

General instructions: You have a right to consider all the facts that are shown by the evidence and to draw natural and reasonable inferences from such facts. You alone have the authority and duty to determine what the facts are in the case. In evaluating the evidence, you must totally disregard what you believe is my opinion about any factual matter. All persons are presumed to be innocent, and no person may be convicted of an offense unless each person -- or unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined or indicted for, or

otherwise charged with the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt, after a careful and impartial consideration of all the evidence in the case. The prosecution has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant. It is not required that the prosecution prove guilt beyond all possible doubt. It is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt. You cannot question the bailiff concerning the law or the testimony. If a question about the law develops during your deliberations, it must be reduced to writing, signed by your foreperson and given to the bailiff. The question will then be answered by the Court to the extent allowed by law. Questions and comments of the attorneys do not constitute testimony and must not be considered as evidence. You must also disregard any statement of the attorneys that is inconsistent with

the law contained in this charge. Any physical exhibits admitted into evidence will be furnished to you upon your request by the bailiff. You must not consider facts that have not been introduced into evidence or legal principles not contained in this charge. It is improper for any juror to discuss or consider anything which they may know or have learned outside the testimony presented to you and the law contained in this charge. If a juror should discover that they have any outside information, they must not mention this information to any other juror, nor consider it themselves in arriving at a verdict. You are the exclusive judges of the facts proven, the believability of the witnesses and the weight to be given to their testimony. However, you must be bound by and strictly follow the law contained in the charge. Your failure to follow the law could result in a mistrial being declared, and your deliberate violation of the charge could subject you to being held in contempt of court. After the attorneys present their arguments to you, you will retire, select a foreperson, and then consider your verdict. The arguments are not evidence, and you should give the arguments only the consideration you feel they deserve during your evaluation of the evidence. It is the duty of your

foreperson to make certain that the deliberations are conducted in accordance with this charge. When you have reached a unanimous decision, your foreperson should sign the appropriate verdict attached to the charge. In returning your verdict, it is your responsibility to make sure that justice is done in this case. That's signed by me.

Verdict Form No. 1: We, the jury, find the defendant not guilty.

Verdict Form No. 2: We, the jury, find the defendant guilty of the offense of felony driving while intoxicated, as alleged in the indictment.

The State has the right to open and close the arguments.

MR. THOMAS: The State would waive its opening but reserve its right to close.

THE COURT: Okay. Mr. Desmarais, you'll have 15 minutes. I'll give you a two-minute and a one-minute.

MR. DESMARAIS: Thank you, Your Honor.

DEFENDANT'S CLOSING STATEMENT

MR. DESMARAIS: This is what it all comes down to. This is where you do your job. You'll go back soon into a room, elect a foreman, and you'll make

decision. You'll look at all the evidence and make a decision. It was a short trial, but it's an important trial. Mr. Bellotti's freedom is on the line. The State has the burden, and they must present enough evidence to have you find him guilty beyond a reasonable doubt. Let's look at the evidence. The evidence has -- Mrs. Sanders came in. She made two statements which I think is important in her testimony. One was that she smelt no alcohol; and, two, her last statement was, I can't be sure of anything. Other than that, it was her opinion and her observations. Her observations changed from her statement she made when her memory was fresh to four days later when she made another statement to today, three years later, when she testifies. The problem with three years after an incident happens, yes, memory has slipped. You start to think something, and it becomes what it is. That's why you make statements and write documents on the first day or soon afterwards. That's when your memory is fresh, and it won't be cluttered by what you think happened. Beyond a reasonable doubt's a level -- it's not, gee, yeah, I think that's possible. Opinion, theories, hyperbole; those things are not evidence. What we have is we have Mr. Bellotti driving his truck into a culvert; call it a ditch. And the police

officer referred to it as a deep ditch. Like I said, hyperbole. But he also made the statement there was no damage. The car wasn't really damaged up in the front. And the post wasn't knocked out of the ground. The stop sign on those little metal things wasn't knocked out of the ground. You didn't hear anything about speeding or start thinking about speed; that kinda negates the fact there's no damage on the front end if it was driven into a deep ditch and knocked over a stop sign, and he didn't even take it out of the ground.

They brought up the workers 200 feet down the road. You may hear something how they were in danger because he was speeding down the road. You had people across the street, not even on the same side, at the front of their house. Yes, there was young kids. That's not evidence of intoxication. What evidence do you have of intoxication? What did the State bring you? They brought you Sergeant White -- or ex-Sergeant White, whose testimony differed substantially from his statements. Several times he said, Well, no, I didn't write that down, or I don't remember; I don't remember; I don't actually recall; I don't actually recall.

He recalls some things. As far as testifying to different than what's in your statement -- they could have reviewed his statements

before they get on the stand and testify the same way. I'm not doing -- I don't attribute any deviousness to the prosecution or to the police officer or definitely not Mrs. Sanders. That happens. You make things worse as time goes along, especially when you get in here and you say, wait a minute. What evidence do I have? Oh, I didn't give him any roadside tests. Oh, well, excuse for that, I don't write it down. The excuse is for that, Oh, he was falling down. He was a danger to himself. He was standing there leaning up against the truck. I don't know whether he's supposed to stand there in attention, but he was upright. He was walking around. It was their choice not to give him any roadside tests. They couldn't give him a HGN test, which is that eye test. While he was leaning up against the car, all he has to do is just lean upright. Oh, no, I didn't -- decided not to do that.

Granted, it was a week after the hurricane. No, we can't get him a Breathalyzer test. No, we can't do a video. No, none of the vehicles we had had any working videos. No, the camera that we had at the Groves Police Department, that wasn't working. It hadn't been working for years. Oh, the video -- possible videos down here at GEO to show the condition, Oh, no, we don't have any of that. No, we don't even

have any cameras, which are all probably bona fide reasons. None of this equipment worked in any of the vehicles. It's still the State's burden to bring in the evidence. They have to bring in the evidence. If there's cameras that don't work in the car, get them fixed. If you have a security camera that doesn't work in the police department, get it fixed. Bring in the evidence. The only evidence you have is Officer White now standing here saying, yes, and not that he was intoxicated. You haven't heard that evidence at all. He was highly intoxicated in my opinion. His opinion is not evidence. Just like what I'm saying when I'm talking to you right now is not evidence. As far as a blood test -- Breathalyzer test, they had no Breathalyzer test. You hear the words "drug use." There was absolutely no evidence of any drug use, so nobody even should say that he was intoxicated because of drug use. There was no evidence of bottles. I find it funny that the police officer said -- Officer White said that there was a strong odor. That's just the way it is. There's no such thing as an odor of alcohol, even though it's an odorless liquid. There is no odor of alcohol. It's one word, strong. Mrs. Sanders -- and she was up at the window talking to him -- I didn't smell any alcohol. Officer White, when he was down at

109

the police station, he implied, at least for Groves, the government was all there, it was Sunday afternoon, and we were working 24/7. Some of you may have been around. He could have gone to any judge -- locate any judge, got a search warrant and gotten a blood test that he needed to present to you for evidence. We don't do that. That's not our policy. Well, once again, that's not a reason. But because you have decided to take the easy way out and the quick way out, don't come in and say, oh, no, we don't have any evidence. He refused any evidence. That was an interesting thing, also, which -- he was given the Miranda rights. One of the things -- one of the final questions you ask, "Do you understand this." He acknowledged those. Then he's read this long document, the DIC-24, about you don't have a right to an attorney and all that. You understand this?

Yes.

Do you want to sign it?

No.

Oh, he understood all that. Yeah, we gave him a copy of the suspension of license. He understood all that. I asked him questions. I don't think he knew where he was. And he wasn't clear. He doesn't remember getting his license. He doesn't

remember getting his insurance card. In the charge, it says reasonable inferences -- or you can make reasonable inferences. That's the way -- you got to be careful with that that you don't add two and two and come up with five. Any time an officer is stopped -- or somebody is stopped on a traffic violation, you ask for their license and for their insurance. Did the police officer get it? Did he get it? That's the first thing. Oh, I don't remember asking him for his insurance card. I don't know that I ever saw his insurance card.

Why?

Oh, he was falling down.

Well, you just testified and you said in your statement he was leaning up against his truck standing there. The other witnesses say he was walking around trying to wave down cars. You have to be careful. They have to bring you the evidence; that's the thing. And he did testify that, In my opinion, he was intoxicated, and fortunately -- or unfortunately, depending on which side of the stand you're on. As the judge told you, our opinions as an attorney is not evidence. His opinion you can only use -- you can base your judgment on what his opinion's worth. You decide what his opinion's worth. This is too serious; that's

why the burden's so high, by a reasonable doubt, especially in a case like this. Another citizen's -- fellow citizen's liberty is on the line. The government's trying to put -- take his liberty away, so we put the burden on them and say, Okay, get 12 people in here and bring in all the evidence you can have, convince them beyond a reasonable doubt, don't give them theories or hyperboles and confusion, and say, Oh, well, folks, use your common sense; and just, wink, wink, we all know what's going on.

THE COURT: Two minutes.

MR. DESMARAIS: They need to bring in evidence. They did not meet their burden, I suffice. What we're requesting is go back, consider everything you've heard this morning and send Mr. Bellotti home this afternoon. I thank you for your patience and time listening. Thank you.

THE COURT: Thank you, sir. Mr. Thomas, you'll have 15 minutes.

MR. THOMAS: Thank you, Your Honor.

STATE'S CLOSING STATEMENT

MR. THOMAS: Housekeeping matter or two before I start: The only issue is was Mr. Bellotti intoxicated September the 21st, 2008. It's already agreed -- he's agreed twice before he 'd been convicted

of driving while intoxicated, so that's not an issue for you. Your only issue is was he intoxicated September 21st, 2008. I'm going to disagree with Mr. Desmarais. Opinion is evidence. That's how you base your decision is on the opinions and observations, the training and experience that -- that people that we hire that work for you and me, we base our decisions in this courtroom on their opinions and their observations and the things that they saw, heard and smelled on September 21st, 2008.

So, what evidence do we have of Carl Bellotti being intoxicated on that day? Well, it begins by Mr. Bellotti driving off into a ditch for no apparent reason other than he's intoxicated. He's driving down a straight road. Now, you and I normally make it down the road okay. Even if there's an electrical worker's truck in the road, we all have driven around those during hurricanes or after hurricanes before. That's just life. Everyone else that was driving that road made it around just fine but not Mr. Bellotti. That's how all this begins; for no apparent reason, he just drives off into a ditch. And there's Mrs. Sanders working in her mother's front yard. She goes up to him, and what's he say? Don't call the police. Don't call the police. He gets out,

he's staggering around out of the car, and what's he try to do? Please, somebody stop and pull me out of this ditch so I can get outta here. Why? Mr. Bellotti knows he's messed up drunk. Please pull me out. Please pull me out. He's staggering around. Police are called. Much to Mr. Bellotti's chagrin, they come. And Officer White, who's had a lot of experience dealing with intoxicated people, says this guy's leaned up against the car, and he's a mess. I have to take him by the arm to help him out to the street, and he's in such bad shape I had to hold onto him the whole time. It's not an opportunity for me to let go and let him do tests. If I let go, he's going to fall down and hurt himself. That's how out of shape he's in. You want him to do field sobriety test, and, what, fall down and then sue us all? No. Officer White did the correct thing in holding onto him and not letting him -- not letting him fall down.

Now, remember the standard for intoxication is a person has lost normal use of their mental or physical faculties. They've lost what is normal. So, as we talk about this, let's consider Mr. Bellotti's behavior. Is it normal just to drive off into a ditch? Okay. Let's say it was. Let's say it was just an accident. Is it normal for Mr. Bellotti

to not be able to stand up on his own and have to lean up on his truck? Is it normal to stagger around in the street? Is it normal that an officer has to hold him by the arm to keep him from falling down? That's not his normal behavior, and we know why. Why did Officer White tell you why he believes he was intoxicated? I could smell alcohol. I could smell it on him. Yeah, it was a strong odor of alcohol. Look at his statement. I bet it was a strong odor of alcohol. The odor of alcohol. He can't stand up on his own.

Please don't call the police. Please someone call and drag me out of this ditch so I can get outta here before the police get here. Why? Because he knows he's intoxicated. He knows he's about to be in some trouble. So, he's arrested and taken to the Groves police station where he has a nice nap sitting on the bench; there's another sign of Mr. Bellotti's condition. He just falls asleep. Most of us, if we'd been arrested and taken to jail, we'd be scared to death. What have I done? What's going to happen to me? Not him. Right at home. He just went to sleep. And then Mr. Bellotti is offered the opportunity to prove to the 12 of you something. He had the opportunity that day to prove to you that he was not intoxicated.

MR. DESMARAIS: Objection, Your Honor.

MR. THOMAS: Officer White --

MR. DESMARAIS: He's trying to shift the burden of proof to Mr. Bellotti.

THE COURT: Overruled.

MR. THOMAS: Officer White looked through those statutory forms and asked him the big question: Would you like to provide a sample of your blood for testing. A sample of that blood could be shown to the 12 of you. We've all had blood work done. Scientifically reliable things to have our blood tested. Would you like to have an opportunity -- would you like to give a sample of your blood so these 12 jurors would know just what's in your blood?

No, sir. I'm not going to do that. Why? Because he knows what that blood sample's going to show. Drives into a ditch. Don't call the police. He staggers about in the street trying to get away. The odor of alcohol about his person. I'm in Port Neches headed to my house in Port Neches.

Try again, Mr. Bellotti. We're in Groves. Mr. Bellotti, would you like to provide a scientific sample for the jury to see?

No, sir. If that alone's not enough, based on the training and experience of a police

officer telling you that Mr. Bellotti's intoxicated and has no business being behind the wheel of a car, then let's just -- let's talk about an unbiased opinion. How about Mrs. Sanders, who's in her mother's front yard cleaning up after the storm with two grandchildren out there with her. What did she say about Mr. Bellotti? What was her description? I decided he was sloppy drunk. Sloppy drunk. No training needed for that. No years as a police officer needed for that. That was just one of your fellow citizens using her common sense coming to an easy and obvious conclusion that that man (pointing) was intoxicated September 21st, 2008. That was not a man that had the normal use of his mental or physical faculties because, ladies and gentlemen, he was sloppy drunk. Say by your verdict he's guilty, and hold him accountable and responsible for his actions that day.

THE COURT: Okay. Ladies and gentlemen, if you will go with the bailiff and begin your deliberations.

(JURY DELIBERATIONS)

(RECESS FROM 12:08 A.M. TO 2:12 P.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

THE BAILIFF: All rise.

THE COURT: Thank you. Y'all please be

seated.   Did you get lunch?

THE DEFENDANT:   Yes, sir.

THE COURT:   Was it good?

THE DEFENDANT:   Yes, sir.

THE COURT:   We're ready.

(JURY ENTERS COURTROOM)

THE COURT:   I just saw somebody say it's cold in here.

THE JURY:   No.   It's fine, Judge.

THE COURT:   Thank you, Lord.   Most the time I sit in here, it's just so -- it's burning up hot.   So, it actually feels pretty good.   Let the record reflect all members of the jury are present. The defendant is present, along with his attorney.   Has the jury reached its verdict?

THE FOREPERSON:   Yes, sir, we have.

THE COURT:   Would you hand that form to the Bailiff, please?

THE FOREPERSON:   (Tendering)

THE BAILIFF:   (Tendering)

THE COURT:   Okay.   Would you please stand and read your verdict?

Would the defendant stand for the reading of the verdict?

THE DEFENDANT:   (Standing)

THE FOREPERSON: (Reading) We, the jury, find the defendant guilty of the offense of felony driving while intoxicated, as indicated in the -- as alleged in the indictment.

THE COURT: Thank you. You may be seated. You may be seated.

Is the State ready to proceed with the punishment phase?

MR. THOMAS: Can we have maybe five minutes to get organized?

THE COURT: Sure.

MR. THOMAS: Is that okay?

THE COURT: Let's make it a seven-minute break. We will start back -- I'll give you time to stretch your legs. We'll start back at 2:20. What we'll do, we'll go through the punishment phase. Mr. Thomas will have an opportunity to present evidence, if any, to you. Mr. Desmarais will have that same opportunity, if any. Once both sides have rested, I'll prepare another charge, and then it will be your duty to determine the appropriate punishment. So, take a six-and-a-half-minute break. Remember the instructions; don't talk about the case anymore amongst yourselves until we get the next charge to you. I'll see you back here at 2:20. You're free to go.

(JURY EXITS COURTROOM)

THE COURT: Okay. Let the record reflect the jury is not present. What -- is this --

MR. THOMAS: It's habitual.

THE COURT: That's what I'm wondering. Do you want an opportunity talk to see if y'all can't get this resolved? I mean, I'm not going to get in your business, but I just want to -- if y'all want that opportunity -- what is it, minimum 25?

MR. THOMAS: Yes, sir.

THE COURT: Carl, do whatever you want to do. Norm, I trust you. But if y'all want to have --

MR. DESMARAIS: I'll talk with him, Judge.

THE COURT: -- a small opportunity to try to get it resolved, that's great. If not, we'll start back. How long do you need or --

MR. THOMAS: All I have is Mr. Rose.

THE COURT: I guess my question is: Are y'all going to plea true to the enhancements?

MR. DESMARAIS: I believe we are going to plea -- make them prove it up just for the record, Your Honor.

THE COURT: Okay. And are you ready to do that?

MR. THOMAS: Yes, sir.

THE COURT: Okay.

(RECESS FROM 2:17 P.M. TO 2:30 P.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

THE BAILIFF: All rise.

THE COURT: Thank you. Please be seated. All right. Any movement? Are y'all going to get it resolved or -- what was the offer?

MR. THOMAS: 30.

THE COURT: 30 years?

MR. THOMAS: Yes, sir.

THE COURT: 30 months? 12.44?

MR. THOMAS: 30 years.

THE COURT: All right. The offer was 30 years. And reject?

MR. DESMARAIS: Yes, sir, we reject the offer.

THE COURT: Okay. Good deal. All right. We're ready.

(JURY ENTERS COURTROOM)

THE COURT: Let the record reflect all members of the jury are present. The defendant is present, along with his attorney. Is the State ready to proceed with the punishment phase?

MR. THOMAS: We are, Your Honor.

THE COURT: Would the defendant stand for

the reading of the enhancements, please?

THE DEFENDANT: (Standing)

MR. THOMAS: (Reading): And the Grand Jurors, upon their oaths aforesaid, do further present in and to said Court at said term, and before the commission of the primary offense, the defendant was finally convicted of the felony of attempted theft, a third-degree felony, on or about January 19th, 1999, in Cause No. 48779, in the Criminal District Court of Jefferson County, Texas; and the Grand Jurors aforesaid, upon their oaths aforesaid, do further present in and to said Court at said term that before the commission of the primary offense the defendant was finally convicted of the felony of driving while intoxicated, a third-degree felony, on February 10th, 1999, in Cause No. 97-0605-CR in the 25th Judicial District Court of Guadalupe County, Texas; and the Grand Jurors aforesaid, upon their oaths aforesaid, do further present in and to said Court at said term, that before the commission of the primary offense, and after the conviction in Cause No. 48779 became final, and after the conviction in Cause No. 97-0605-CR became final, the defendant committed the felony of driving while intoxicated, third-degree felony, and was finally convicted of such felony on March 12th, 2002, in Cause

No. 83727 in the Criminal District Court of Jefferson County, Texas. Against the peace and dignity of the State, signed by the foreperson of the Grand Jury.

THE COURT: Okay. Mr. Bellotti, to these enhancements, do you enter into a plea of true or not true?

THE DEFENDANT: Not true.

THE COURT: Okay. You may be seated. Mr. Thomas, call your first witness.

MR. THOMAS: Call Carl Rose, Your Honor.

THE COURT: Okay. Will raise your right hand for me.

(WITNESS SWORN)

THE COURT: Could y'all approach the bench real quick, please, Mr. Desmarais?

(AT THE BENCH, ON THE RECORD)

THE COURT: Is that --

MR. THOMAS: I'm not going to read that because that was used to enhance it to just a felony.

THE COURT: I just wanted to make sure.

MR. THOMAS: But I am going to prove those up, too.

THE COURT: That's what I wanted to make sure.

MR. THOMAS: Yes, sir.

THE COURT: Good deal.

(OPEN COURT, DEFENDANT AND JURY PRESENT)

THE COURT: You may proceed.

MR. THOMAS: Thank you, sir.

JAMES CARL ROSE,

having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THOMAS:

Q. Mr. Rose, would you state your full name for the ladies and gentlemen of the jury.

A. James Carl Rose.

Q. And what do you do for a living, sir?

A. I work for the Jefferson County Criminal District Attorney's Office as an investigator.

Q. What are the duties of an investigator with the Criminal District Attorney's Office?

A. We assist in the prosecution of criminal cases in Jefferson County to assist the prosecutors in any form and fashion which they need to make their cases better. We also investigate criminal cases that are proposed to us by the District Attorney's Office.

Q. How long have you been employed in this capacity?

A. I've worked for the D.A.'s Office 19 years.

Q. Prior to that, where were you employed?

A. I worked for Groves Police Department 18 years.

Q. Do you have any training in fingerprints?

A. Yes, sir, I do.

Q. What type training and experience do you have with fingerprints?

A. I attended the Texas Department of Public Safety basic ID officer's course in 1975. I've also attended the DPS intermediate and advanced latent fingerprint course. In addition to the Texas Department of Public Safety, I also attended the FBI basic, intermediate and advanced latent fingerprint course, as well.

Q. So, about 35 years or so you've been doing fingerprints?

A. I've been looking at a lot of ridges for 35 years, yes, sir.

Q. And sometimes you're called upon to testify in court about the results of a fingerprint analysis you've done; is that correct?

A. That's correct.

Q. Let me show you what I've marked as State's Exhibit No. 2. Do you recognize what State's 2 is (tendering)?

A. Yes, sir. It's a set of inked fingerprints I

took from the defendant.

Q. When you say "the defendant," who are you talking about?

A. Mr. Bellotti in the blue tie and kinda khaki jacket.

MR. THOMAS: I ask the record reflect he's identified the defendant.

THE COURT: The record will so indicate.

Q. (BY MR. THOMAS): So, you took fingerprints from Mr. Bellotti, and that's what's contained in No. 2; is that correct?

A. Yes, sir.

Q. And at my request, did you take a series of documents and look to compare to see -- first of all, see if there's any fingerprints in these documents and compare the fingerprints in 2 with these documents?

A. That's correct.

Q. Let me show you what I've marked as State's 8, 9 and 10 first. Have you seen 8, 9 and 10 before (tendering)?

A. Yes, sir, I have.

Q. And what are those documents?

A. These are what we refer to as pen packets.

Q. What's a pen packet?

A. It's a certified document from the Texas

Department of Criminal Justice Institutional Division. It normally includes a photograph, a set of fingerprints and a judgment and sentence, which indicates why the subject was in prison.

Q. Okay. A judgment and a sentence, those are the documents that are use by the court to, I guess, put on paper why they're being sent to prison?

A. That's correct.

Q. Did you -- in those, 8, 9 and 10, you said you found fingerprints?

A. Yes, sir.

Q. Did you compare the fingerprints in that 8, 9 and 10 with the fingerprints you found on State's Exhibit No. 2?

A. Yes, sir, I did.

Q. The fingerprints found in 8, 9 and 10, did they match the fingerprints of Carl Bellotti?

A. Yes, sir, they did.

Q. Is it your testimony those fingerp- -- those documents -- the fingerprints in those documents, 8, 9 and 10, belong to this defendant (pointing)?

A. Yes, sir.

MR. THOMAS: Your Honor, at this time, I would tender State's 8, 9 and 10.

MR. DESMARAIS: No objections at this

time.

THE COURT: State's 8, 9 and 10 will be admitted.

(STATE'S EXHIBITS NO. 8, 9 AND 10 ADMITTED)

Q. (BY MR. THOMAS): Mr. Rose, have you ever heard of two people having the same set of fingerprints?

A. No, sir.

Q. Let's -- walk me through some of these documents, if you will. We're going to start with No. 8, Exhibit No. 8. Inside of that, flip through to the first set of judgment and sentences. State's No. 8, if I understand correct, has a number of judgments and sentences for various offenses; is that correct?

A. That's correct.

Q. Okay. The first one you come to in State's No. 8, what's the cause number in that?

A. 48779.

Q. Okay. And for "Carl Mathew Bellotti"?

A. That's correct.

Q. Take a look and compare that with State's Exhibit No. 9. What does No. 9 say in that?

A. It's also a judgment and sentence of Cause No. 48779 of "Carl Mathew Bellotti."

Q. And State's No. 9, though, is a judgment

adjudication -- adjudicating guilt, and what else is contained in that right underneath that writing?

A. First Amended Nunc Pro Tunc.

Q. Okay. And that State's No. 9, the nunc pro tunc judgment and sentence, what's the offense he was convicted of?

A. In No. 9, it was attempted theft.

Q. So, this No. 9 apparently corrects some paperwork errors in State's No. 8; is that correct?

A. That's my understanding. Yes, sir.

Q. Okay. Go to the next one, please, sir.

A. Cause No. 65217.

Q. And what is that -- who's the person, the subject of that?

A. "Carl Matthew Belotti, III."

Q. And what offense was he convicted of in that?

A. Felony driving while intoxicated.

Q. Okay. And the offense -- or the judgment date of that judgment and sentence?

A. January 19th, 1999.

Q. Okay. If you'll go forward to the next one, please, sir. What is that one?

A. Cause No. 69062.

Q. Okay. Out of -- Carl Matthew Belotti, again?

A. Yes, sir.

Q.    Was that out of the Criminal District Court of Jefferson County, Texas?

A.    That's correct.

Q.    What was the offense that he was convicted of in that judgment and sentence?

A.    Felony driving while intoxicated.

Q.    Was, again, the judgment date of January 19th, 1999?

A.    Yes, sir.

Q.    Okay.  Move on forward.  What is that one for?

A.    That is Cause No. 97-0605-CR.

Q.    Okay.

A.    It's in District Court of Guadalupe County, 25th Judicial District.

Q.    And is that Carl Matthew Bellotti, also?

A.    That's correct, sir.

Q.    What was Mr. Bellotti convicted of in Guadalupe County?

A.    All these are different, so just hang with me. Driving while intoxicated, felony.

Q.    All right, sir.  Any more judgments and sentences in that particular --

A.    No, sir.

Q.    Okay.  This is now State's No. 10.  Look through that pen packet, if you would, please.  What

was the cause number for that?

A. Cause No. 83727.

Q. Okay. Out of the Criminal District Court of Jefferson County, Texas?

A. Yes, sir.

Q. And what was the conviction?

A. Driving while intoxicated, second.

Q. Okay. And then, again, Carl Matthew Bellotti; is that correct?

A. That's correct.

Q. Okay. So, if we use that one, and then there's apparently three DWI -- felony DWI convictions in this pen packet, so there's four -- there's paperwork for four different prior felony DWI convictions; is that correct?

A. That's correct.

Q. And in addition to that, the felony of attempted theft; is that correct?

A. That's correct.

Q. Now, let me show you -- this is State's Exhibit 3, 4, 5, 6, and 7 --

THE COURT: Did you say "2"?

MR. THOMAS: No, sir.

THE COURT: What did you say?

MR. THOMAS: I said 3 through 7.

THE COURT: Thank you.

MR. THOMAS: Yes, sir.

Q. (BY MR. THOMAS): Have you seen 3 through 7?

A. Yes, sir.

Q. And what are those?

A. These are judgments and sentences out of County Court at Law.

Q. Okay. For misdemeanor convictions; is that correct?

A. That's correct.

Q. Did you compare the fingerprints you took off your fingerprint card, State's No. 2, with the fingerprints found in those exhibits?

A. Yes, sir, I did.

Q. And the fingerprints in those exhibits, they belong to Carl Bellotti?

A. That's correct.

MR. THOMAS: Your Honor, at this time, I would tender State's 3 through 7, Your Honor.

THE COURT: Okay.

MR. DESMARAIS: No objections, Your Honor.

THE COURT: 3, 4, 5, 6 and 7 will be admitted.

(STATE'S EXHIBITS NO. 3-7 ADMITTED)

Q. (BY MR. THOMAS): State's No. 3, sir, what was

the conviction of for -- misdemeanor conviction in that case (tendering)?

A. Controlled substance possession.

Q. And then State's No. 4, what was the misdemeanor conviction in that case?

A. Controlled substance possession.

Q. No. 5, what was the misdemeanor conviction in that case?

A. Possession of marijuana.

Q. State's No. 6, what was the conviction in that one?

A. Possession of dangerous drugs.

Q. And No. 7, what's the misdemeanor conviction in that one?

A. Possession of dangerous drugs.

MR. THOMAS: Your Honor, I pass the witness at this time.

THE COURT: Mr. Desmarais?

CROSS-EXAMINATION

BY MR. DESMARAIS:

Q. Are all these -- those cases are based upon the amount of money involved; correct?

A. Sorry?

Q. Theft cases are based on the money involved?

A. That's correct.

Q.    Attempted theft takes the least -- one of the -- a reduction of one grade --

A.    Yes, sir.

Q.    -- felony?

Now, this case he was found guilty of, attempted theft --

A.    Okay.

Q.    -- is that correct?

A.    I'll have to look at it, sir.  I believe that's correct.

Q.    Theft is a third degree?

A.    It all depends on what the value of the property was.

Q.    Do you know what the value of the property was of this or what the indictment was that they said this was?

A.    Sir, I don't know anything about the case itself.  I don't have any knowledge of it at all.

Q.    You read the indictment on this case; correct?

A.    I would have to look at it, sir.

Q.    (Tendering)

A.    Yes, sir, I did.

Q.    Misdemeanors are qualified here as C, B and A?

A.    I'm sorry.  I couldn't hear you.

Q.    Misdemeanors are qualified as C, B, and A?

A.    That's correct.

Q.    C's are the ones that they handle in municipal courts and justice of the peace court?

A.    Yes, sir.    They're kinda like a traffic ticket.

Q.    And then B's would be the lowest level that's handled by the county courts?

A.    That's correct.

Q.    And what are usually dangerous drugs?

A.    They're drugs that don't qualify for the -- well, controlled -- it's not a controlled substance. It's one grade less than controlled substance.    It comes in as a dangerous drug.

Q.    A lot of prescription medicine?

A.    Mostly, yes, sir.

Q.    Mostly prescription medication.

So, possessing something like that, you don't have a proper prescription or something like that?

A.    That could be it, yes, sir.

Q.    Now, on these identify -- where you identified the fingerprints, how many prints did you identify?

A.    On each one of the county court cases, I stopped at 10.    On the pen packets, I went all the way up to 15.

Q.    10 and 15?

A.    Yes, sir.

MR. DESMARAIS:    Pass the witness.    Thank you.

THE COURT:    Mr. Thomas?

MR. THOMAS:    I have nothing further, Your Honor.

THE COURT:    Sir, you may step down.

MR. THOMAS:    State of Texas rests -- well, I would ask the Court to admit any evidence in the guilt/innocence phase of the trial here in the punishment phase.

THE COURT:    Okay.    It will be.

MR. THOMAS:    With that, the State of Texas would rest.

THE COURT:    Mr. Desmarais?

MR. DESMARAIS:    Defense rests, Your Honor.

THE COURT:    Okay.    Ladies and gentlemen, I'm going to prepare the second charge.    Give us -- give me until 10 minutes after three o'clock.    We'll try to have it done.    I may not be that quick, so bear with me.    Let's check back at 10 minutes after 3:00. If we're ready, I'm going to give the attorneys ten minutes a side to argue, then you'll have the case. But ten minutes until 3:00.    If we need a few more

minutes, I'll tell Wayne and Tony, and we'll get you back as soon as I'm ready. You're free to go. Everybody else remain seated.

(JURY EXITS COURTROOM)

THE COURT: Let the record reflect the jury's not present. Mr. Bellotti is, along with his attorney. Mr. Bellotti, I want to make sure you understand you have the same right to testify in the punishment phase, and I know Mr. Desmarais has covered that with you. Do you want to waive your right to testify, or do you wish to testify?

THE DEFENDANT: I will waive my right.

THE COURT: Okay. So, you do not want to testify?

THE DEFENDANT: No, sir.

THE COURT: Okay. I find that you intelligently and knowingly made that decision. I need to see y'all in the back.

MR. THOMAS: Can I make one request on the record?

THE COURT: Sure.

MR. THOMAS: The last paragraph of the indictment, it says the defendant committed the felony of driving while intoxicated, dash, third-degree felony, I just want to drop that language "third-degree

felony" in there. I think there's a misspelling of the word "felony." I'll just drop that phrase, leave it as "committed the felony of driving while intoxicated," and then it goes on from there.

THE COURT: Got you. Any objection to that, Mr. Desmarais?

MR. DESMARAIS: No.

THE COURT: Okay. It's done. Y'all come on back.

(RECESS FROM 2:52 P.M. TO 3:13 P.M.)

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

THE BAILIFF: All rise.

THE COURT: Thank you. Please be seated. Have you sent that?

MR. THOMAS: Yes, sir. Cause No. 7283 on Carl Matthew Bellotti. If y'all don't mind, come on up, please. I need the indictment.

Okay. Are you Carl Matthew Bellotti? Are you Mr. Bellotti?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Desmarais, will he waive the formal reading of the indictment?

MR. DESMARAIS: We'll waive the formal reading.

THE COURT: The indictment in this case

alleges that on or about the 21st day of September, 2008, that you committed the offense of felony driving while intoxicated. To the indictment, do you enter into a plea of guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Have you pled guilty freely and voluntarily?

THE DEFENDANT: Yes.

THE COURT: And is that -- is this your signature on State's Exhibit No. 1?

THE DEFENDANT: Yes, sir.

THE COURT: Prior to signing that document, did you read it and/or did Mr. Desmarais explain it to you to your full and complete satisfaction?

THE DEFENDANT: Yes, sir, he did.

THE COURT: Do you have any questions about it?

THE DEFENDANT: No, sir.

THE COURT: State's tender No. 1.

MR. DESMARAIS: No objection.

THE COURT: State's No. 1 is admitted.

(STATE'S EXHIBIT NO. 1 ADMITTED)

THE COURT: Any evidence that he is incompetent?

MR. DESMARAIS: No evidence, Your Honor.

THE COURT: The third paragraph states that before the commission of the primary offense that you were finally convicted of the felony of attempted theft, a third-degree felony, on January 19th, 1999, in Cause No. 48779, in the Criminal District Court of Jefferson County, Texas. Is that provision true or not true?

THE DEFENDANT: That's true.

THE COURT: The next paragraph says that before the commission of the primary offense that you were finally convicted of the felony of driving while intoxicated, a third-degree felony, on February 10th, 1999, in Cause No. 97-0605-CR, in the 25th Judicial District Court of Guadalupe County. Is that true or not true?

THE DEFENDANT: That's true.

THE COURT: That's all we need, isn't it?

MR. THOMAS: I think we need that last one, Judge.

THE COURT: Sorry. And the last paragraph says that before the commission of the primary offense, and after the conviction in Cause No. 48779 became final, and after the conviction in Cause No. 97-0605-CR became final, you committed the felony of driving while

intoxicated, and that you were finally convicted of that felony on March 12th, 2002, in Cause No. 83727, in the Criminal District Court of Jefferson County. Is that provision true or not true?

THE DEFENDANT: True.

THE COURT: Have you pled true to all enhancement paragraphs freely and voluntarily?

THE DEFENDANT: Yes, sir, I have.

THE COURT: Okay. You've entered into a proposed plea bargain agreement with the State. The recommendation is that I find you guilty -- and a jury's already found you guilty -- assess your punishment at 30 years' confinement in the Institutional Division and you're waiving all rights to appeal and you'll have no right of appeal. Is that your understanding of the agreement, Carl?

THE DEFENDANT: Yes, sir.

THE COURT: Is that what you want me to do?

THE DEFENDANT: Yes, sir.

THE COURT: Now, you know we just -- the jury's out in the hallway. We went through punishment and went through the guilt/innocence phase. They found you guilty beyond a reasonable doubt of the offense of felony driving while intoxicated.

THE DEFENDANT: (Nodding head up and down)

THE COURT: We were preparing the Court's charge to get the jury back in here to make the determination as to what would be the appropriate punishment, and while they're out, that's when you-all worked out this agreement, and you're asking me to approve a 30-year deal before that jury comes back in?

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: If I do this, the jury doesn't have any say. I will cut them lose, send them home, and your day in court is done.

THE DEFENDANT: That's it.

THE COURT: Understanding all that, do you want me to accept this agreement?

THE DEFENDANT: Yes, I do.

THE COURT: Okay. Mr. Desmarais, is there any reason not to do it today?

MR. DESMARAIS: No, sir.

THE COURT: I, and the jury, find the evidence to be sufficient the find you guilty of the offense of felony driving while intoxicated. I find the enhancement provisions to be true. You are guilty. I assess your punishment, pursuant to your agreement, at 30 years' confinement in the Institutional Division. You will receive credit for any time that you're

entitled to by law. If you have any other case out there, this will run concurrently with those cases. You have waived all rights to an appeal. You have no right of appeal. Let me ask you this: Are you a hundred percent satisfied with Mr. Desmarais?

THE DEFENDANT: Yes, I was.

THE COURT: Do you halfway like me now?

THE DEFENDANT: Never have disliked you.

THE COURT: All right. I just want to make sure. I'm going to get you a copy of the certification. I truly do wish you the best.

THE DEFENDANT: Wish you the best, too, Your Honor.

THE COURT: I will give you and your mother -- I didn't know about that. Sorry to hear about that.

THE DEFENDANT: Thank you.

THE COURT: I will give you and your dad a few minutes back in the back. Do this, Tony: Put him up for just a second. Let me dismiss the jury so they can get their stuff out of the jury room. Then we will put y'all in there together; okay? Good luck to you, man. See you later.

Norm, we should have that printed up right about now.

Carl, good luck man. See you later.

(JURY ENTERS COURTROOM)

THE COURT: All righty. I guess y'all are wondering why in the world we're so late, and the reason we are, while you were on a break, the parties were available to reach an agreement. Mr. Bellotti just pled guilty, in conformity with your verdict, and agreed to a 30-year sentence in the Institutional Division. Now, understand this: By finding him guilty, if you believed that two of those prior felonies were true, which I'll tell you there's no evidence otherwise -- there it is -- and if you follow the law and you follow the evidence, you go, yeah, he was convicted of those other felonies, the minimum punishment for him would have been 25 years' confinement in the Institutional Division. So, Mr. Desmarais has been doing this a long time. Mr. Thomas has been doing this a long time. And justice prevailed, but it took getting y'all down here and going through this process. And just so you'll know, we tried this case a year ago? Two years ago -- and the jury had -- it was a hung jury. So, it's just been -- we have been trying to get it back up. It's hard to try something twice. Without y'all coming down here giving up your time, we wouldn't have a

disposition of the case. But Mr. Bellotti will be going to the Institutional Division for 30 years. And with that, you are now released from the instructions I gave you. If you want to talk to me, you are more than welcome. If you want to talk to the attorneys, you're more than welcome to. If you don't want to talk to anybody and you want to get outta here and need a work excuse signed, Wayne or Tony is going to show you where Ms. Ramos's office is. We are going to get all of y'all's stuff out of the jury room. You run in there, grab your stuff. You get 40 bucks for every day you've been here. Don't spend it all in one place. I'll say this much to you: Any time 12 people can come together and make a decision, justice always prevails. Y'all did a great job. Thank you so much. See you next jury service. Go get your stuff and get outta here.

(JURY DISMISSED)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS)
COUNTY OF JEFFERSON)

I, Summer Tanner, Official Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 812.50 and was paid by Mr. Carl Bellotti.

WITNESS MY OFFICIAL HAND this is the 19th day of November, 2013.

_____
Summer Tanner, RPR
Texas CSR #8208
Expiration Date: 12/31/14
Official Court Reporter
Jefferson County, Texas
Beaumont, Texas 77701